# EXHIBIT

# B

2015 WL 6455145
Only the Westlaw citation is currently available.
For Online Publication
United States District Court,
E.D. New York.

1077 MADISON STREET LLC, Plaintiff,

v.

Donovan MARCH, et al., Defendants.

No. 14–CV–4253 (JG)(VVP).
|
Signed Oct. 26, 2015.

**Attorneys and Law Firms**

Craig Stuart Lanza, Brooklyn, NY, for Plaintiff.

Craig K. Tyson, New York, NY, for Defendant March.

*MEMORANDUM AND ORDER*

JOHN GLEESON, District Judge.

 **\*1** On July 10, 2014, plaintiff 1077 Madison Street, LLC ("Madison Street") filed this foreclosure action alleging that defendant Donovan March defaulted on a mortgage taken out with Flushing Savings Bank ("FSB") for a property located at 99–05 194th Street, Hollis, New York 11423 (the "Property"). Madison Street filed this summary judgment motion on July 1, 2015, and I heard oral argument on August 21, 2015. For the reasons below, the motion for summary judgment is granted.

BACKGROUND

Unless otherwise noted, the facts set forth here are either undisputed, or, if disputed, are viewed in the light most favorable to March, the nonmoving party. *See Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002).

On August 30, 2007, March took out a mortgage from FSB in the principal amount of $211,000 for the financing of the Property. Pl. Rule 56.1 Stmt. ¶ 1; Spitz Aff. ¶ 3, Ex. 1 (the "Mortgage"). The Mortgage was filed with the Queens County Clerk on September 11, 2007. Pl. Rule 56.1 Stmt. ¶ 2; Spitz Aff. ¶ 4, Ex. 1. FSB assigned the Mortgage to Hayden

Asset IX, LLC ("Hayden") by executing an Assignment of Mortgage dated April 19, 2013, which was filed with the Queens County Clerk on June 24, 2013. Pl. Rule 56.1 Stmt. ¶ 3; Spitz Aff. ¶ 6, Ex. 2 ("Assignment 1"). Hayden assigned the Mortgage to 99–05 194th Street, LLC on February 20, 2014. Pl. Rule 56.1 Stmt. ¶ 4; Spitz Aff. ¶ 7, Ex. 3 ("Assignment 2"). On June 20, 2014, 99–05 194th Street, LLC assigned the Mortgage to Madison Street. Pl. Rule 56.1 Stmt. ¶ 5; Spitz Aff. ¶ 8, Ex. 4 ("Assignment 3"). March defaulted on the Mortgage on February 1, 2008. Spitz Aff. ¶ 16. The Mortgage was accelerated on May 5, 2014 when a Notice of Default was served on March at 2811 Bonds Lake Road, Conyers, Georgia 30207. Pl. Rule 56.1 Stmt. ¶ 8; Lanza Aff. ¶ 12, Ex. A.

March did not file a counterstatement of facts denying or challenging plaintiff's statement of facts as required by Local Civil Rule 56.1(b)-(c). Because the plaintiff's Rule 56.1 Statement is unopposed by March, and because the facts set forth in the statement are supported by evidence in the record, they are deemed to be admitted for the purposes of this motion pursuant to Local Rule 56.1. [1] *See Jackson v. Fed. Exp.,* 766 F.3d 189, 194 (2d Cir.2014) ("[A] non-response runs the risk of unresponded-to statements of undisputed facts proffered by the movant being deemed admitted.").

DISCUSSION

A. *The Legal Standard for Summary Judgment*
A court may grant summary judgment if the moving party shows that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (citation omitted).

 **\*2** On the other hand, in order "[t]o survive summary judgment ... the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Reiseck v. Universal Commc'ns of Miami,* No. 06–CV–777 (TPG), 2012 WL 3642375, at \*2 (S.D.N.Y. Aug.23, 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.,* 475 U.S. 574, 586 n. 11, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact [,]" *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998), and the "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Anderson,* 477 U.S. at 252. Summary judgment is appropriate if the evidence produced would not allow a reasonable juror to find in favor of the nonmoving party. *See Mitchell v. Shane,* 350 F.3d 39, 47 (2d Cir.2003).

### B. *The Plaintiff's Prima Facie Case for Foreclosure*

"Under New York law, summary judgment on a mortgage foreclosure action is appropriate where the Note and Mortgage are produced to the Court along with proof that the Mortgagor has failed to make payments due under the Note." *Regency Sav. Bank, F.S.B. v. Merritt Park Lands Assoc.,* 139 F.Supp.2d 462, 465 (S.D.N.Y.2001). "Once the plaintiff has established its prima facie case by presenting the Note, Mortgage and proof of default, the Mortgagee has a presumptive right to foreclose which can only be overcome by an affirmative showing by the Mortgagor." *Id.* at 465–66.

Madison Street has established its prima facie case for foreclosure. First, it has produced the Note and Mortgage. *See* Spitz Aff. ¶ 10, Ex. 4. Next, it has submitted unrefuted evidence of March's failure to make payments under the Mortgage. *See id.* ¶ 9. As there are no facts that undermine these elements, I will turn to March's affirmative defenses.

### C. *March's Affirmative Defenses*

Once the mortgagee's prima facie case is established, the mortgagor must make an "affirmative showing" that a defense to the action exists. *Regency Sav. Bank,* 139 F.Supp.2d at 465–66. The evidence must be submitted in an admissible form "sufficient to require a trial (of that defense) .... [M]ere conclusions or unsubstantiated assertions are insufficient." *Resolution Trust Corp. v. J.I. Sopher & Co., Inc.,* No. 94–CV–7189 (DC), 1995 WL 489671, at *2 (S.D.N.Y. Aug.15, 1995) (citations omitted). With that standard in mind, I will consider the defenses that March asserts.

#### 1. *The Statute of Limitations*

March argues that the action is barred by the statute of limitations. Opp. Br. at 1–2. "The Statute of Limitations in a mortgage foreclosure action begins to run six years from the due date for each unpaid installment or the time the mortgagee

is entitled to demand full payment, or when the mortgage has been accelerated by a demand or an action is brought." *Saini v. Cinelli Enterprises, Inc.,* 289 A.D.2d 770, 733 N.Y.S.2d 824, 826 (3d Dep't 2001). Once the mortgage is accelerated, the statute of limitations begins to run on the entire mortgage debt. *Loiacono v. Goldberg,* 240 A.D.2d 476, 658 N.Y.S.2d 138, 139 (2d Dep't 1997). Here, the Mortgage was accelerated on May 5, 2014, when a Notice of Default was served on March, thus six years have not passed and the action is timely. *See* Pl. Rule 56.1 Stmt. ¶ 8; Lanza Aff. ¶ 12, Ex. A.

#### 2. *Standing*

**\*3** March contends that Madison Street lacks standing to bring this action. Opp. Br. at 1–2. To commence a foreclosure action, "a plaintiff must have a legal or equitable interest in the mortgage." *U.S. Bank Nat. Ass'n v. Faruque,* 120 A.D.3d 575, 991 N.Y.S.2d 630, 632 (2d Dep't 2014). A plaintiff establishes standing by showing that it is the holder or assignee of the mortgage and the holder or assignee of the underlying note at the time the action is commenced. *Id.* The Mortgage was assigned to Madison Street on June 20, 2014, Spitz Aff. ¶ 10, Ex. 4, and the original promissory note was tendered on that date. Spitz Aff. ¶ 10. March claims that there is a question as to the chain of title of the Mortgage, but Madison Street has established the chain of assignments set forth in its statement of facts. *See* Spitz Aff., Exs. 1–4. As the assignee, Madison Street has an equitable interest in the Mortgage, and thus standing to bring this action.

#### 3. *The Fair Debt Collection Practices Act*

March argues that Madison Street cannot accelerate the Mortgage or commence this action because it is not a lender as defined by 15 U.S.C. § 1692, a provision of the Fair Debt Collection Practices Act ("FDCPA"), and that it was acting as a debt collector within the meaning of the FDCPA. Opp. Br. at 6–8. The FDCPA prohibits deceptive and misleading practices by "debt collectors." 15 U.S.C. § 1692. Debt collectors are defined as those engaged in "any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect ... debts owed or due or asserted to be owed or due another." *Id.* § 1692a. Thus, the FDCPA limits its reach to those collecting the dues "of another" and does not restrict the activities of creditors seeking to collect their own debts. *Maguire v. Citicorp Retail Services, Inc.,* 147 F.3d 232, 235 (2d Cir.1998). Madison Street is the creditor in this case, not a debt collection agency attempting to collect the debt of another, and therefore the FDCPA is inapplicable.

CONCLUSION

In his answer to the complaint, March also claimed improper service. However, that defense is without merit. *See* Lanza Dec., Ex. A (Aff. of Service). Accordingly, for the reasons stated above, Madison Street's motion for summary judgment is granted. The parties are directed to confer regarding the disposition and assignment of a referee for the remaining proceedings in the case.

So ordered.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 6455145

---

**Footnotes**

1    The facts are not admitted automatically, as I must first "ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Jackson,* 766 F.3d at 194.

---

**End of Document**                                           © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4680023
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Hepzibah Z. ALLEN, Plaintiff,
v.
UNITED STUDENT AID
FUNDS, INC., et al., Defendants.

17-CV-8192 (VSB)
|
Signed 09/28/2018

**Attorneys and Law Firms**

Hepzibah Z. Allen, New York, New York, Pro Se Plaintiff.

Silvia L. Serpe, Serpe Ryan LLC, New York, New York, Counsel for Defendant United Student Aid Funds, Inc.

Eric Matthew Hurwitz, Jacqueline Marie Aiello, Stradley Ronon Stevens & Young, LLP, New York, New York, Counsel for Defendants Navient Solutions LLC & Pioneer Credit, Inc.

**OPINION & ORDER**

VERNON S. BRODERICK, United States District Judge

**\*1** Pro se Plaintiff Hepzibah Allen brings this action against Defendants Navient Solutions LLC ("NSL"), Navient,[1] Pioneer Credit Recovery, Inc. ("Pioneer," and collectively with NSL and Navient, the "Navient Defendants"), and United Student Aid Funds, Inc. ("USAF"), alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq. Before me are the motions of the Navient Defendants and USAF to dismiss the Complaint. Because Defendants do not qualify as debt collectors under the FDCPA, Defendants' motions are GRANTED.

**I. Background**[2]
On January 21, 2003, Plaintiff obtained a student loan (the "Loan") under the Federal Family Education Loan Program ("FFELP"). (Compl. Ex. B.)[3] FFELP loans are guaranteed by state agencies or private non-profit organizations and are reinsured and often subsidized by the Department of Education ("DOE"). See 20 U.S.C. §§ 1078, 1087-1. In the event a borrower defaults in repaying the loan, the guarantor,

pursuant to its guarantee commitment, pays on the claim to the holder of the loan, and ownership of the loan then vests with the guarantor. See 20 U.S.C. § 1078(b); 34 C.F.R. § 682.401(b)(9). After the loan vests with the guarantor, the guarantor may independently try to collect the debt from the debtor. NSL serviced Plaintiff's Loan from origination, and the guarantor at the time the Loan was originated was designated as USAF. (See Compl. Ex. A, B, D.)

On October 14, 2016, Plaintiff defaulted on the Loan, and USAF, acting as guarantor, purchased the Loan. (See id. Ex. A, D.) Thereafter, USAF sent Plaintiff a letter dated April 30, 2017 (the "April 2017 Letter"), indicating what efforts USAF could take to recover the amount due and owing under the note. (Id. Ex. C.) The April 2017 Letter also informed Plaintiff that future collection efforts might include, among other things, garnishment, offset of income tax refunds, and civil litigation. (See id.)

**\*2** Plaintiff alleges that Defendants improperly assigned the debt, misrepresented the amount owed, engaged in improper wage garnishments, and failed to supply Plaintiff with debt verification language in USAF's April 2017 Letter.

**II. Procedural History**
On October 24, 2017, Plaintiff filed her Complaint. (Doc. 1.) On January 4, 2018, the Navient Defendants filed their motion to dismiss the Complaint, (Doc. 15), along with a memorandum of law in support of their motion, (Doc. 15-1). On the same day, USAF filed its motion to dismiss the Complaint, (Doc. 16), and memorandum in support, (Doc. 17). On January 11, 2018, Plaintiff filed oppositions to Defendants' motions. (Docs. 19, 21.) The Navient Defendants filed their reply in further support of their motion on January 18, 2018, (Doc. 23); USAF did the same on February 14, 2018, (Doc. 24).

On February 20 and 21, 2018, Plaintiff filed letters in further opposition to Defendants' replies, (Doc. 25, 26), which attached, among other documents, (i) a letter dated September 18, 2017 from Navient to Plaintiff and (ii) a letter dated August 9, 2017 from USAF to Plaintiff. On February 23, 2018, the Navient Defendants submitted a letter requesting that I disregard Plaintiff's letters because the additional information was not included in the Complaint or in Plaintiff's oppositions.[4] (Doc. 27.)

**III. Legal Standards**

## A. *Motion to Dismiss*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility ... depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237. A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers*, 282 F.3d at 152 (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ).

## B. *The FDCPA*

**\*3** "[T]he FDCPA is 'primarily a consumer protection statute.' " *Avila v. Riexinger & Assocs., LLC*, 817 F.3d 72, 75 (2d Cir. 2016) (quoting *Jacobson v. Healthcare Fin. Servs., Inc.*, 516 F.3d 85, 95 (2d Cir. 2008) ). Courts construe the FDCPA liberally to further the purpose Congress intended for the Act, which was to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." *Id.* (quoting 15 U.S.C. § 1692(e) ).

In determining whether there has been a violation of the FDCPA, courts "apply the 'least sophisticated consumer' standard." *Id.* (quoting *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993) ). The "least sophisticated consumer" is a "naïve" and "credulous" person who possesses a "rudimentary amount of information about the world and a willingness to read a collection notice with some care." *Altman v. J.C. Christensen & Assocs., Inc.*, 786 F.3d 191, 193–94 (2d Cir. 2015) (quoting *Greco v. Trauner, Cohen & Thomas, L.L.P.*, 412 F.3d 360, 363 (2d Cir. 2005) ). In applying this standard, courts "ask how the least sophisticated consumer ... would understand the collection notice" at issue. *Avila*, 817 F.3d at 75. "Under this standard, a collection notice can be misleading if it is 'open to more than one reasonable interpretation, at least one of which is inaccurate.' " *Id.* (quoting *Clomon*, 988 F.2d at 1319). "Thus, even if a debt collector accurately conveys the required information, a consumer may state a claim if she successfully alleges that the least sophisticated consumer would inaccurately interpret the message." *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 216 (2d Cir. 2017). FDCPA protection, however, "does not extend to every bizarre or idiosyncratic interpretation of a collection notice, and courts should apply the standard in a manner ... that protects debt collectors against liability for unreasonable misinterpretations of collection notices." *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 173 (2d Cir. 2015) (quoting *Easterling v. Collecto, Inc.*, 692 F.3d 229, 233–34 (2d Cir. 2012) )

## C. *Pro Se Litigant*

Even after *Twombly* and *Iqbal*, a "document filed pro se is to be liberally construed and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ). Further, pleadings of a pro se party should be read "to raise the strongest arguments that they suggest." *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir 2006) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir 2003) ). Nevertheless, dismissal of a pro se complaint is appropriate where a plaintiff fails to state a plausible claim supported by more than conclusory factual allegations. *See Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). In other words, "the duty to liberally construe a plaintiff's complaint is not the equivalent of a duty

to re-write it." *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (internal quotation marks omitted).

## IV. Discussion

Defendants argue that Plaintiff fails to differentiate between each Defendant in her Complaint, (Navient Defs.' Mem. 4–5; USAF Mem. 7–8),[5] which provides an independent basis for dismissal, *see, e.g., Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order) (upholding dismissal of a complaint pursuant to Rules 8 and 12 of the Federal Rules of Civil Procedure where the complaint alleged "a host of constitutional and state common law claims" but "failed to differentiate among the defendants, alleging instead violations by 'the defendants' "). Defendants are correct, but in light of Plaintiff's pro se status, I will not dismiss the Complaint on this basis alone.

**\*4** Defendants also argue that they are not debt collectors under the FDCPA and that the Complaint otherwise fails to adequately allege that Defendants violated the FDCPA. Because I find that Defendants do not fall within the definition of debt collectors under the Act, I do not reach Defendants' remaining arguments.

### A. *"Debt Collector" Under the FDCPA*

#### 1. Applicable Law

To establish a violation of the FDCPA, a plaintiff must satisfy three elements: (i) the plaintiff must be a "consumer;" (ii) the defendant must be a "debt collector;" and (iii) the defendant must have committed some act or omission in violation of the FDCPA. *Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 508, 514 (S.D.N.Y. 2013) (quoting *Schuh v. Druckman & Sinel, L.L.P.*, 751 F. Supp. 2d 542, 548 (S.D.N.Y. 2010) ). Accordingly, "a defendant can only be held liable for violating the FDCPA if she is a 'debt collector' within the meaning of the [FDCPA]." *Feldman v. Sanders Legal Grp.*, 914 F. Supp. 2d 595, 599 (S.D.N.Y. 2012) (citing *Daros v. Chase Manhattan Bank*, 19 F. App'x 26, 27 (2d Cir. 2001)(summary order) ). A "debt collector" is a person "who regularly collects ... debts owed ... another" or a person involved "in any business the principal purpose of which is the collection of any debts." 15 U.S.C. § 1692a(6).

The same provision exempts "any person collecting or attempting to collect any debt owed or due ... to the extent

such activity ... concerns a debt which was originated by such person; [or] concerns a debt which was not in default at the time it was obtained by such person" from the FDCPA's definition of a debt collector. *Id.* "District courts in the Second Circuit have interpreted [§] 1692a(6) to exclude originating creditors and their assignees, as well as loan servicers who obtain a debt prior to default, from the definition of an FDCPA debt collector." *Vallecastro v. Tobin, Melien & Marohn*, No. 3:13–cv–1441 (SRU), 2014 WL 7185513, at \*3 (D. Conn. Dec. 16, 2014) (collecting cases); *cf. Maguire v. Citicorp Retail Serv., Inc.*, 147 F.3d 232, 235 (2d Cir. 1998) (finding that the FDCPA does not apply to entities attempting to collect debts owed to them). In other words, "[w]hen a loan servicer obtains an account prior to its default, that loan servicer operates as a creditor, not a debt collector, for the purposes of the FDCPA." *Vallecastro*, 2014 WL 7185513, at \*3.

Section 1692a(6) also exempts "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity is incidental to a bona fide fiduciary obligation." 15 U.S.C. § 1692a(6)(F)(i). "Two requirements must be satisfied for an entity to come within the exception to the FDCPA for collection activities 'incidental to a bona fide fiduciary obligation.' " *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1032 (9th Cir. 2009) (quoting § 1692a(6)(F)(i) ).[6] "First, the entity must have a 'fiduciary obligation.' " *Id.* Second, the entity's collection activity must be 'incidental to' its 'fiduciary obligation.' " *Id.* Although "[f]ew courts have addressed the fiduciary obligation exception," *Hooks v. Forman Holt Eliades & Ravin LLC*, No. 11 Civ. 2767(LAP), 2015 WL 5333513, at \*13 (S.D.N.Y. Sept. 14, 2015), at least one court explicitly concluded that USAF fits within this exemption under the FDCPA, *see Davis v. United Student Aid Funds, Inc.*, 45 F. Supp. 2d 1104, 1109 (D. Kan. 1998) ("The court thus concludes that [USAF], as a guaranty agency, 'holder' of [the plaintiff's] note, and trustee owing a fiduciary duty to the Secretary of Education, fits within the 'fiduciary' exemption stated in 15 U.S.C. § 1692[a](6)(F)(i).").

#### 2. Application

##### a. The Navient Defendants

**\*5** Accepting Plaintiff's assertions as true for the purposes of the motion to dismiss, as I must, she has not pleaded sufficient facts to classify any of the Navient Defendants

as debt collectors within the meaning of the FDCPA. As to Navient and Pioneer, there are no non-conclusory allegations in the Complaint that Navient or Pioneer was a debt collector, or that Navient or Pioneer engaged in any debt collection activity. Nor are there any allegations that Navient or Pioneer was ever the servicer of the Loan, owned the Loan, or made any efforts to collect the Loan.

As to NSL, Plaintiff concedes that NSL was the servicer of the Loan, which in turn is confirmed by the documents attached to the Complaint. (Compl. ¶ 7; *id.* Ex. B.) Moreover, Plaintiff admits that NSL was formerly known as Sallie Mae, Inc.—the originator of Plaintiff's Loan—and thus NSL has serviced the Loan since origination. *See Spyer v. Navient Sols., Inc.*, No. 15-3814 (NLH/JS), 2016 WL 1046789, at *3 (D.N.J. Mar. 15, 2016), *reconsideration denied*, No. 15-3814 (NLH/JS), 2016 WL 5852849 (D.N.J. Oct. 4, 2016) ("Navient is not a "debt collector" under the FDCPA under these circumstances because it became the loan servicer (first as Sallie Mae before it changed its name) while plaintiff's loan were not in default."). By definition, Navient began servicing the loans *prior* to any default. *See Caione v. Navient Corp.*, No. 16-0806(NLH/JS), 2016 WL 4432687, at *5 (D.N.J. Aug. 18, 2016) (holding that "the facts pled indicate Navient (as corporate successor to Sally Mae) was the loan originator" and "[b]y definition, then, Navient began servicing the loans prior to any default"). Plaintiff does not plausibly allege any facts to support the claim that any of the Navient Defendants were debt collectors, and her FDCPA claims against the Navient Defendants are therefore dismissed.

### b. USAF

Nor has Plaintiff pleaded sufficient facts to classify USAF as a debt collector within the meaning of the FDCPA. Plaintiff attempts to allege that USAF is a debt collector by stating that Defendants "admitted in ... exhibit C that they were acting collectively as 'debt collectors.' " (Compl. ¶ 19.) Exhibit C is a letter dated April 30, 2017 from USAF to Plaintiff, which states: "This is an attempt to collect a debt and any information will be used for that purpose." (Compl. Ex. C, at 3.) An attempt to collect a debt, however, does not amount to the FDCPA's definition of a "debt collector."

Plaintiff does not dispute that USAF acted in its capacity as guarantor for the Loan. (*See* Compl. ¶ 13 ("The Communication confessed that an alleged 'guarantor' purchased the loan on October 24, 2016 although the details

of the alleged purchase remains shrouded in mystery.").) Moreover, the materials attached to Plaintiff's Complaint further demonstrate that USAF acted in its capacity as guarantor. (*See id.* Exs. A, C.) USAF administers the loan program and conducts collection activities as fiduciaries of the DOE. *See, e.g., Rowe*, 559 F.3d at 1034 ("Every court that has addressed whether a guaranty agency owes a fiduciary obligation to the DOE has held that it does." (citing cases) ). Furthermore, Plaintiff does not allege that USAF's central activity (as opposed to an "incidental" activity) is that of a debt collector. 15 U.S.C. § 1692a(6)(F). Instead, "[g]enerally speaking, the collection of defaulted debts by a guaranty agency is 'incidental to' its primary function." *Rowe*, 559 F.3d at 1035 (explaining that "a central part of a guaranty agency's administrative function is—as the name suggests—guaranteeing student loans made by other entities").

*6 Further, although the fiduciary obligation exception has rarely been addressed in this Circuit, and even less so in this context, this particular issue was raised in a litigation outside of this Circuit, in which the district court explicitly exempted USAF under the fiduciary obligation exception. *See Davis v. United Student Aid Funds, Inc.*, 45 F. Supp. 2d 1104, 1109 (D. Kan. 1998). I see no reason to depart from the reasoning in *Davis* and the other cases cited herein. Because USAF, acting as a guarantor, has a bona fide fiduciary obligation to the DOE, and because USAF's collection activity is incidental to that fiduciary obligation, USAF is not a "debt collector" as defined by the FDCPA. *See* 15 U.S.C. § 1692a(6)(F)(i) (exempting "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity is incidental to a bona fide fiduciary obligation"). Plaintiff's FDCPA claims against USAF are therefore dismissed.

### B. *Declaratory Relief*

Count One of Plaintiff's Complaint seeks declaratory relief under the FDCPA. Although the Second Circuit has not had occasion to address this issue, *see Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 223 n.1 (2d Cir. 2012), district courts in this Circuit have held that neither equitable nor declaratory relief is available to private litigants under the FDCPA, *see Sparkman v. Zwicker & Assocs., P.C.*, 374 F. Supp. 2d 293, 298 (E.D.N.Y. 2005) (collecting cases and explaining that "[t]he FDCPA contains no express provision for injunctive or declaratory relief in private actions"). Similarly, courts outside of this Circuit have concluded

that neither injunctive nor declaratory relief is available to private litigants under the FDCPA. *See, e.g., Weiss v. Regal Collections*, 385 F.3d 337, 341 (3d Cir. 2004) (concluding that the FDCPA contains no express provision for declaratory or injunctive relief in private actions); *Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 882 (7th Cir. 2000) ("[A]ll private actions under the Fair Debt Collection Practices Act are for damages."). Because the FDCPA does not expressly provide for injunctive or declaratory relief in private actions, Plaintiff's claims for declaratory relief under the Act are dismissed.

### C. *Dismissal With Prejudice*

Rule 15(a) of the Federal Rules of Civil Procedure requires that courts grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a). "[I]t is within the sound discretion of the court whether to grant leave to amend." *In re Alcon S'holder Litig.*, 719 F. Supp. 2d 280, 281 (S.D.N.Y. 2010) (quoting *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994) ). Complaints brought by pro se litigants are typically dismissed without prejudice. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (leave to amend should be given unless there is no indication that the pro se plaintiff will be able to assert a valid claim); *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795–96 (2d Cir. 1999) (per curiam) (pro se complaints generally "not dismiss[ed] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated" (citation omitted) ).

Here, I granted Plaintiff leave to amend her Complaint after she received Defendants' motions to dismiss, (*see* Doc. 18), and she chose not to file an amended pleading. Nor has Plaintiff requested leave to amend in the event that Defendants' motions are granted. Although I am cognizant of Plaintiff's pro se status, a liberal reading of the Complaint does not suggest any indication that a valid claim might be stated. Accordingly, Plaintiff's claims are dismissed with prejudice.

### V. **Conclusion**

For the foregoing reasons, Defendants' motions are GRANTED, and Plaintiff's claims are dismissed with prejudice. The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 15, 16), enter judgment for Defendants, and close this case.

**\*7** SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4680023

---

### Footnotes

1    The Navient Defendants explain that Navient Corporation, the parent company of NSL and Pioneer, has been misidentified by Plaintiff as Navient, an entity that does not exist. (Navient Defs.' Mem. 1.) For the purposes of this motion, I construe any claims asserted against Navient as if they had been asserted against Navient Corporation. "Navient Defs.' Mem." refers to the Memorandum of Law in Support of Motion to Dismiss of Defendants Navient Solutions, LLC, "Navient," and Pioneer Credit Recovery, Inc., filed January 4, 2018. (Doc. 15-1.)

2    The following factual summary is drawn from the allegations of the complaint, which I assume to be true for the purposes of this motion, *see Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007), and documents attached to or relied upon in the complaint, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

3    "Compl." refers to Plaintiff's complaint ("Complaint"), filed October 24, 2017. (Doc. 1.)

4    The additional information provided in and attached to Plaintiff's letters does not change the outcome of this Opinion & Order. USAF's request to disregard Plaintiff's letters is therefore denied as moot.

5    "USAF Mem." refers to USAF's Memorandum of Law in Support of its Motion to Dismiss, filed January 4, 2018. (Doc 17.)

6    Defendants do not cite to, nor am I aware of, any Second Circuit case discussing the fiduciary obligation exception in this context. However, I see no reason to depart from the out-of-Circuit authority cited herein.

	© 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Distinguished by   Arriaga v. Logix Federal Credit Union,   C.D.Cal.,   May 21, 2021

2020 WL 5211068
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Serguei ARTEMOV, Plaintiff,
v.
TRANSUNION, LLC; Experian Information Solutions,
Inc.; Equifax Information Services, LLC; Bank of
America, N.A.; and Citibank, N.A., Defendants.

20-cv-1892 (BMC)
|
Signed 09/01/2020

**Attorneys and Law Firms**

Mark Rozenberg, Kenneth Willard, David Paul Force, Stein Saks, PLLC, Hackensack, NJ, for Plaintiff.

Camille Renee Nicodemus, Schuckit & Associates, P.C., Zionsville, IN, for Defendant TransUnion, LLC.

Ashley Diane Burman, James Matthew Gross, Jones Day, New York, NY, Victoria Dorfman, Pro Hac Vice, Jones Day, Washington, DC, for Defendant Experian Information Solutions, Inc.

Courtney Sophie Stieber, Seyfarth Shaw LLP, New York, NY, for Defendant Equifax Information Services, LLC.

Shan P. Massand, McGuireWoods LLP, New York, NY, for Defendant Bank of America, N.A.

## <u>MEMORANDUM DECISION AND ORDER</u>

COGAN, District Judge.

**\*1**  Plaintiff brings this action for alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.* He contends that multiple credit entries in his credit report were inaccurate or misleading due to the following: (1) two accounts reflected a non-zero past due balance while reporting that the account had been charged off; and (2) a third charged off account was reporting a lower past due balance than what was really owed on the account.

Before me are defendants' motions to dismiss the complaint under Fed. R. Civ. 12(b)(6) and motion for judgment on the pleadings under Fed. R. Civ. P. 12(c). [1]  Because plaintiff's first two credit entries were neither inaccurate nor misleading, the motion is granted as to all claims relating to these accounts. As to the third account, even if defendants had reported that plaintiff had a higher amount of bad debt, any alleged harm – a lower credit score and denial of credit – would have occurred regardless. Defendants' motions are therefore granted.

## BACKGROUND

Of the three challenged accounts appearing on plaintiff's credit report, the first and second accounts were with defendant Bank of America, N.A. ("BOA"), and the third was with defendant Citibank, N.A.

Defendant Equifax prepared and issued credit reports about plaintiff that included information as to the two BOA accounts. Both were listed as "charged off" and "closed" and contained a non-zero past due balance. The scheduled monthly payment line for both was "zeroed out." Plaintiff claims that representing the account as charged off, while listing a past due balance, misleads potential creditors into believing that he has an ongoing monthly liability.

As to plaintiff's Citibank account, defendants Experian and TransUnion prepared and issued credit reports reflecting that it had been charged off. But the credit entries also showed different non-zero amounts for the past due balance and overall actual balance. Specifically, the past due balance was lower than the overall balance, but plaintiff claims that these two numbers should have been equal. He does not allege that the overall balance was inaccurate. Nevertheless, since one number was lower than the other, he contends the manner in which this information was presented caused his credit score to decrease, resulting in a denial of credit.

After reviewing his credit reports, plaintiff notified the three consumer reporting agencies, Experian, TransUnion, and Equifax (the "CRAs") that he disputed the accuracy of the information they were reporting. He sent them separate letters disputing the trade lines associated with the three accounts. In response, the CRAs notified BOA and Citibank of plaintiff's dispute, but the challenged information was never deleted or changed.

**\*2** Plaintiff alleges that BOA and Citibank willfully or negligently failed to conduct a proper investigation into the accuracy of the information they reported to the CRAs, in violation of 15 U.S.C. § 1681s-2(b); and that the CRAs failed to follow reasonable procedures to assure the maximum possible accuracy of the information reported and also failed to delete inaccurate information from his credit file after receiving notice of such inaccuracies. See 15 U.S.C. §§ 1681e(b); 1681i.

## DISCUSSION

Federal Rule of Civil Procedure 12(c) states that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." The standard applicable to motions for judgment on the pleadings is the familiar one under Fed. R. Civ. P. 12(b)(6). See King v. Am. Airlines, Inc., 284 F.3d 352, 356 (2d Cir. 2002).

To survive either motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007), and to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). When assessing a complaint's sufficiency, the Court assumes that all of the factual allegations in it are true, but the Court disregards legal conclusions couched as factual allegations. Id.

### I. FCRA Claims

"Congress enacted [the] FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 52 (2007). "The FCRA creates a private right of action ... for the negligent or willful violation of any duty imposed under the statute." Casella v. Equifax Credit Info. Servs., 56 F.3d 469, 474 (2d Cir. 1995); see 15 U.S.C. §§ 1681n(a); 1681o. "A plaintiff may recover actual, punitive, or statutory damages for willful violations, but may recover only actual damages for negligent violations." Ritchie v. N. Leasing Sys., Inc., 14 F. Supp. 3d 229, 234 (S.D.N.Y. 2014).

The FCRA commands that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the

information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). If a consumer disputes information contained in his credit report to a CRA, the CRA is required to notify the entity that furnished the disputed information of the consumer's dispute. See Jenkins v. AmeriCredit Fin. Servs., Inc., No. 14-cv-5687, 2017 WL 1325369, at \*4 (E.D.N.Y. Feb. 14, 2017). In considering a challenge under § 1681e(b) or § 1681i, the "threshold question" is whether the disputed credit information is accurate; if the information is accurate, "no further inquiry into the reasonableness of the consumer reporting agency's procedure is necessary." Whelan v. Trans Union Credit Reporting Agency, 862 F. Supp. 824, 829 (E.D.N.Y. 1994); see also Khan v. Equifax Info. Servs., LLC, No. 18-cv-6367, 2019 WL 2492762, at \*3 (E.D.N.Y. June 14, 2019).

When the CRA complies with its obligation to notify the challenged information's furnisher, the furnisher must conduct an investigation, review relevant information provided by the CRA, report the results of the investigation to the CRA, report any inaccuracies to all other consumer reporting agencies to which the information was provided, and promptly modify, delete, or block the reporting of that information. See 15 U.S.C. § 1681s-2(b).

**\*3** Courts in the Second Circuit apply a "reasonable investigation" standard to determine whether a furnisher of information has satisfied its obligations under 15 U.S.C. § 1681s-2(b). See Mund v. Transunion, No. 18-cv-6761, 2019 WL 955033, at \*2 (E.D.N.Y. Feb. 27, 2019). Under this standard, furnishers of information "satisfy their investigation obligations under the FCRA by reviewing information provided by the CRA, investigating, and reporting any inaccuracies to all consumer reporting agencies to which the furnishers provide information." Jenkins, 2017 WL 1325369, at \*6 (internal quotation marks, citations, and alterations omitted). "The FCRA does not require that a furnisher of information delete a consumer's disputed account upon receiving a notice of dispute, but rather, 'simply requires the furnisher of information to investigate and to report information from the investigation.' " Id. (citation omitted).

A claim is stated under § 1681s-2(b) only if a plaintiff can show that: (1) the furnisher received notice of a credit dispute from a CRA; and (2) the furnisher then acted in "willful or negligent noncompliance with the statute." See Markovskaya v. Am. Home Mortg. Servicing, Inc., 867 F. Supp. 2d 340, 343 (E.D.N.Y. 2012). Neither BOA nor Citibank dispute that

the CRAs provided them with notice of plaintiff's dispute, so only the second prong is at issue here.

Accuracy is also an essential element of a claim for negligent or willful violation of § 1681s-2(b) of the FCRA. See, e.g., [Pittman v. Experian Info. Sols., Inc.,](#) 901 F.3d 619, 629 (6th Cir. 2018); [Chiang v. Verizon New England Inc.,](#) 595 F.3d 26, 37-38 (1st Cir. 2010); [Holland v. Chase Bank USA, N.A.,](#) —— F. Supp. 3d ——, No. 19-cv-233, 2020 WL 4340726, at \*4 (S.D.N.Y. July 28, 2020). Thus, "a threshold showing of inaccuracy or incompleteness is necessary to succeed on a claim under [§ 1681s-2(b).](#)" [Pittman,](#) 901 F.3d at 629. A credit entry is inaccurate if it "is patently incorrect, or [if] it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." [Kilpakis v. JPMorgan Chase Fin. Co., LLC,](#) 229 F. Supp. 3d 133, 141 (E.D.N.Y. 2017) (citing [Sepulvado v. CSC Credit Servs., Inc.,](#) 158 F.3d 890, 895 (5th Cir. 1998)).

## II. Charge Off
Before discussing the merits of the case, it would be useful to explain the definition of a "charge off." A charge off, as defined in Black's Law Dictionary, is "[t]o treat (an account receivable) as a loss or expense because payment is unlikely; to treat as a bad debt." [2] It qualifies as a delinquency. See [Wilson v. First Bank of Delaware,](#) No. 10-cv-11345, 2010 WL 2696981, at \*3 n.2 (E.D. Mich. July 7, 2010) ("Delinquency is defined as 'a debt that is overdue in payment.'") (quoting Black's Law Dictionary).

One court has explained that charging off a debt "is a business practice where a creditor writes off a debt and no longer considers the account balance an asset for accounting purposes." [Christian v. Equifax Info. Servs., LLC,](#) No. 18-cv-13682, 2020 WL 2087869, at \*4 (E.D. Mich. Apr. 30, 2020). Banks are in fact required under Federal Regulations to charge off debt that is past due by over 180 days. See [In re Anderson,](#) 884 F.3d 382, 386 n.2 (2d Cir. 2018) (citing 65 Fed. Reg. 36,903, 36,904). Otherwise, their balance sheets would misleadingly reflect accounts as assets that have little chance of achieving their full valuation. Thus, the generally accepted accounting principle is codified into federal regulations adopted by the Federal Reserve Board and the Office of the Comptroller of Currency. Because it is not a voluntary act, the creditor has no choice in the matter. See [Wilder v. J.C. Christensen & Assocs., Inc.,](#) No. 16-cv-1979, 2016 WL 7104283, at \*5 (N.D. Ill. Dec. 6, 2016);

[Bunce v. Portfolio Recovery Assocs., LLC,](#) No. 14-2149, 2014 WL 5849252, at \*2 (D. Kan. Nov. 12, 2014).

**\*4** Creditors also have a financial incentive to charge off bad debt. By charging off a debt, a creditor is afforded some tax benefits since the amount constitutes "a bad loss deduction against then current profits." See [In re McGarvey,](#) No. 15-28908-E-13, 613 B.R. 285, 307 n.14 (Bankr. E.D. Cal. Feb. 21, 2020). This makes sense. If creditors could not write off bad debt, the result would be an increase in the cost of doing business and likely less credit availability and at higher interest rates.

Since financial institutions are required to comply with this federal requirement, it follows that charging off an account does not equate to debt forgiveness. Any other conclusion would be illogical; it would simply encourage a consumer to take out massive amounts of debt and wait around six months for it to be wiped away. Thus, the act "does not diminish the legal right of the original creditor to collect the full amount of the debt." [Hinkle v. Midland Credit Mgmt., Inc.,](#) 827 F.3d 1295, 1297 (11th Cir. 2016); see [In re McGarvey,](#) 613 B.R. at 307 n.14 ("The creditor may continue to try and collect (or sell it to someone else to try and collect) the debt. The 'charge-off' does not change the legal enforceability of the debt."); [Dye v. TransUnion, LLC,](#) No. 13-cv-1094, 2013 WL 5663094, at \*3 (D. Nev. Oct. 15, 2013) ("[Charged off] debt is still enforceable."). Creditors, for example, could attempt to collect the debt themselves – either by utilizing internal collections staff or by contracting with a third-party agent willing to collect the debt on their behalf. Alternatively, they could sell the debt to a third-party purchaser at a discounted price based on the reduced likelihood of collection. See [Hinkle,](#) 827 F.3d at 1297-98.

But charging off an account is not the same as "accelerating" the debt. See [Christian,](#) 2020 WL 2087869, at \*1. "If a debt is accelerated, the full amount – including all monthly payments and interest – becomes due immediately." Id. Once a "debt is accelerated, the debtor would not be able to continue to make monthly payments in an amount less than the full amount due." Id. Conversely, if the debt has not been accelerated, a consumer is still able and obligated to make, and a creditor may still collect, a monthly payment on the account that is less than the full balance. [Id.](#) at \*4.

Lastly, a charge off is "one of the most adverse factors that can be listed on a credit report." [Hanks v. Talbots Classics Nat. Bank,](#) No. C 12-2612 SI, 2012 WL 3236323, at \*1 n.2

(N.D. Cal. Aug. 6, 2012); see F.T.C. v. TRW Inc., 784 F. Supp. 361, 362 (N.D. Tex. 1991) (defining "Serious Derogatory Information" as, among others, a bankruptcy, charge off, foreclosure proceedings, and repossession). In fact, according to Experian's website, a charge off is "considered a derogatory entry in your credit file – a serious negative event – and it can adversely affect your credit scores and your ability borrow additional funds." [3]

### III. BOA's reporting a past due balance

Having laid this foundation, it should be obvious that, even though the banks labeled plaintiff's accounts as charged off, they had no obligation to zero out the overall or past due balance. Plaintiff has provided no authority stating otherwise. BOA's act in charging off plaintiff's debt was mandated under federal regulation and did not absolve plaintiff of his promise to pay the debt.

 **\*5** Plaintiff takes issue with the continued listing of a non-zero past due balance for another reason. He contends that this suggests to a potential creditor that he has to make monthly payments on these accounts. This argument lacks merit.

Plaintiff's allegations against BOA fail because listing a past due balance for a charged off account was factually accurate and not misleading. At any moment, BOA could decide to collect the charged off debt and seek the delinquent amount. Furthermore, the information contained in the credit report was not misleading because it never suggested a reoccurring monthly obligation: (1) the account was marked as "charged off" and "closed"; and (2) even plaintiff concedes that the scheduled monthly payment line item in his BOA accounts had been "zeroed out."

The out-of-circuit case on which plaintiff relies, Jackson v. Equifax Info. Servs., LLC, No. 18-cv-271, 2019 WL 179570 (M.D. Ga. Jan. 11, 2019), is distinguishable. There, the plaintiff's credit report incorrectly reported a scheduled monthly payment for an account with a remaining balance of $7411, even though it had been charged off. The court reasoned that "the monthly payment trade line could materially mislead a prospective lender about the nature of [p]laintiff's obligation to make payments on this account particularly when the account continue[d] to list a balance despite being charged off." Id. at \*4. Jackson therefore hinged not only on the accuracy of the information being reported, but on whether the combined reporting of a scheduled monthly payment and a positive balance on an account that

had otherwise been charged off could materially mislead a prospective creditor.

This case is different. Plaintiff does not allege that the credit entries associated with his BOA accounts reflected a scheduled monthly payment. Merely listing a past due balance – an undisputed legal obligation – for a charged off account is quite different than incorrectly reporting a future monthly responsibility when such requirement no longer exists. See Lovelace v. Equifax Info. Servs. LLC, No. cv-18-408, 2019 WL 2410800, at \*4 (D. Ariz. June 7, 2019) (plaintiff had sufficiently pled an inaccuracy, where the complaint alleged an erroneously scheduled monthly payment even though the account was charged off and closed and the payment schedule had been accelerated); Freedom v. Citifinancial, LLC, No. 15 C 10135, 2016 WL 4060510, at \*6 (N.D. Ill. July 25, 2016) ("reporting a 'scheduled payment' could create the mistaken impression that [p]laintiff still owed on the account, which was not accurate because his debt had been discharged in bankruptcy").

Our case is more analogous to situations in which courts have held that reporting a monthly payment on a charged off debt is not actionable under the FCRA because the plaintiffs were still permitted and obligated to make monthly payments on the account in an amount less than the full balance. See, e.g., Christian, 2020 WL 2087869, at \*4; Williams, 2019 WL 3243737, at \*4-5. Here, there is no chance that a potential creditor would be misled because the monthly payment listed is zero. Any possible "confusion" plaintiff alleges is dispelled by this unequivocal declaration.

The allegations against BOA are therefore not actionable because a prospective lender, once presented with information that the account had been charged off and closed, would not be misled. Rather, a potential creditor is provided accurate information: (1) that plaintiff still owes a past due balance on the debt; and (2) that plaintiff's willingness and ability to pay back a potential loan are questionable because, at any given moment, BOA (or a third-party purchaser) could decide to seek enforcement of the remaining delinquent balance.

 **\*6** If I were to adopt plaintiff's reasoning – that a charge off categorically precludes a creditor from reporting the total past due amount – it would vitiate the entire existence and purpose of credit reporting companies: to present an evenhanded and fair representation of a particular consumer's ability and willingness to pay off debt, so as to encourage a creditor to take a risk and extend a line of credit to a particular

consumer. See Cahlin v. Gen. Motors Acceptance Corp., 936 F.2d 1151, 1158 (11th Cir. 1991). Under the regime advocated by plaintiff, potential creditors would hesitate to extend any line of credit until an independent and more thorough investigation into the consumer's financial background was completed, thereby increasing the cost of doing business and interest rates for consumers.

## IV. Citibank's reporting a lower past due balance

Plaintiff's credit report associated with his Citibank account reflected a past due balance that was lower than the true overall balance. Based on this purported inaccuracy, plaintiff advances the peculiar argument that he was harmed by Citibank's and the CRAs' failure to report the accurate and higher number for his past due balance. Even after accepting his factual assertion that the lower number was inaccurate, I am nevertheless compelled to grant defendants' motion because even a "violation of one of the FCRA's procedural requirements may result in no harm." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1550 (2016).

To satisfy Article III standing, a plaintiff must demonstrate: (1) an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision. Id. at 1547 (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)). However, a plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." Id. at 1549. Rather, to maintain an action under the FCRA, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or 'imminent' '" as a result of a violation. Id. at 1548. In other words, "not all inaccuracies cause harm or present any material risk of harm." Id. at 1550.

The denial of credit and other similarly adverse consequences are often the basis for FCRA damages. Furthermore, "emotional damages may also be freestanding ... where an inaccuracy alone causes emotional damages." See Wenning v. On-Site Manager, Inc., No. 14-cv-9693, 2016 WL 3538379, at *19 (S.D.N.Y. June 22, 2016) (citing Guimond v. Trans Union Credit Info. Co., 45 F.3d 1329, 1333 (9th Cir. 1995)).

On the face of the complaint, plaintiff has not shown an injury in fact sufficient to confer standing. To understand why, it helps to compare the situation that plaintiff says should have occurred under the FCRA, with what actually happened. Plaintiff's argument necessarily would have

required defendants to have disclosed that his past due balance was actually higher. His credit report would have listed more bad debt and the same credit score (or probably a lower credit score). The conclusion is inescapable that plaintiff would have suffered the same result.

Regardless of the amount reflected in the past due balance, plaintiff's credit report listed three charged off accounts that constituted serious derogatory information. Thus, to accept plaintiff's theory, one must believe the following scenario is plausible:

> Potential Creditor Employee A: Hey Bob, you know that guy from yesterday we rejected for a personal loan because of his low credit score?
>
> Potential Creditor Employer B: You mean the guy with three charged off accounts, where the third one listed a past due balance of $100?
>
> **\*7** Potential Creditor Employee A: That's the one. He's on the phone saying there was a mistake on his credit report. He says that his past due balance for the Citibank account was actually $200, and he's wondering whether this changes our mind.
>
> Potential Creditor Employer B: So besides being delinquent on three loans, he really had more bad debt? That's a gamechanger. Get this man a loan!

The implausible scenario above reveals how the alleged inaccuracy could not have made a difference: in either case, the denial of credit was going to happen. Plaintiff's conclusion to the contrary is just that, a conclusion, and one that makes no sense.

For the same reason, plaintiff's allegation that he suffered "emotional distress" from the denial of credit also fails. Even if the higher amount was reported, his application for credit was going to be denied, resulting in the same visceral response by plaintiff. See Shimon v. Equifax Info. Servs. LLC, 431 F. Supp. 3d 115, 123-24 (E.D.N.Y. 2020).

## V. Leave to Amend

In his opposition to these motions, plaintiff has attempted to pivot to a new legal theory for his claims associated with his Citibank account. He argues that reporting a lower past due balance on the charged off account conveys to potential creditors that he has an ongoing monthly obligation on this particular account. I decline to address that argument at this

time. Plaintiff cannot use his opposition to a motion for judgment on the pleadings to amend the complaint. See Doe v. Merck & Co., 803 F. App'x 559, 560 n.3 (2d Cir. 2020) (stating a plaintiff may not amend the complaint through any document short of an amended pleading).

Plaintiff also requested leave to amend the complaint. Fed. R. Civ. P. 15(a) provides that leave to amend a party's pleading shall be freely given when justice so requires, but a court need not grant leave to amend if it can rule out any possibility that an amended complaint would succeed. See Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795-96 (2d Cir. 1999).

It may well be that plaintiff's proposed amendment is futile. However, since neither party has provided me with a copy of the challenged credit report, I lack sufficient information to find futility. Plaintiff is therefore granted leave to file an amended complaint, limited to asserting this new theory related to the Citibank account. See Kassner v. 2nd Avenue Delicatessen, Inc., 496 F.3d 229, 244 (2d Cir. 2007).

## CONCLUSION

Defendants' [25] motion to dismiss and motion for judgment on the pleadings are granted. The complaint is dismissed. Plaintiff may file an amended complaint within 14 days of this order if he believes that he can state a claim consistent with this decision.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 5211068

---

## Footnotes

1    Four of five defendants filed a joint motion. Defendants Experian and Bank of America filed theirs under Rule 12(b)(6), but defendants Equifax and TransUnion had already filed an answer, so theirs was brought under Rule 12(c). Citibank has not entered an appearance, but as I will explain below, plaintiff has failed to state a claim against it based on the arguments raised by its consumer reporting agency co-defendants.

2    Black's Law Dictionary (11th ed. 2019).

3    See https://www.experian.com/blogs/ask-experian/what-is-a-charge-off/ (last visited Aug. 28, 2020).

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 395808
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Yonatan BUTNICK, Plaintiff,

v.

EXPERIAN INFORMATION SOLUTIONS, INC.,
Equifax Information Services, LLC, Bank of America,
N.A., and American Express Company, Defendants.

20-CV-1631 (PKC) (RLM)
|
Signed 02/04/2021

**Attorneys and Law Firms**

Kenneth Willard, David Paul Force, Stein Saks PLLC, Hackensack, NJ, for Plaintiff.

Raymond Alexander Garcia, Stroock & Stroock & LaVan, New York, NY, for Defendants.

---

**MEMORANDUM & ORDER**

PAMELA K. CHEN, United States District Judge:

 **\*1** Plaintiff Yonatan Butnick brought suit against Defendants Experian Information Solutions, Inc. ("Experian"), Equifax Information Services, LLC ("Equifax"), Bank of America, N.A. ("BANA"), and American Express Company ("AmEx"), under the Federal Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* Before the Court are Defendant BANA's motion to dismiss, Defendant Experian's motion for judgment on the pleadings, and Defendant AmEx's motion to compel arbitration. For the reasons set forth in the ensuing Memorandum and Order, the Court grants all three motions.

---

**BACKGROUND**

**I. Factual Background** [1]

Plaintiff held an account with Defendant BANA, which BANA subsequently informed Defendants Experian and Equifax was both "charged off[,] and [ ] past due." [2] (Complaint, Dkt. 1, ¶¶ 15–16.) Plaintiff claims that it is per se inaccurate for a charged-off account to be reported as having

a remaining past-due balance. (*See id.* ¶¶ 16–17.) Equifax and Experian, in turn, inaccurately reported in response to third-party inquiries that the account at issue was closed at Plaintiff's request (*id.* ¶ 18), and failed to report that the account had a balance of zero despite it being written off (*id.* ¶ 17). Plaintiff sent a dispute letter to Equifax and Experian on or around July 31, 2019 describing his issues with their reports. (*Id.* ¶ 19.) He believes that Defendants Equifax and Experian then notified Defendant BANA, which "failed to conduct a reasonable investigation and continued to report false and inaccurate adverse information on the consumer report of [ ] Plaintiff with respect to the disputed account." (*Id.* ¶¶ 20–21.) Because Equifax and Experian failed to verify that their information was accurate and continued to provide inaccurate information to third parties, Plaintiff's credit score decreased. (*Id.* ¶¶ 22, 24–25.)

Similarly, Plaintiff alleges that Defendant AmEx inaccurately reported to Defendant Experian that Plaintiff's account at AmEx had a "balance [that] was written off, charged off[,] and [ ] past due[.]" (*Id.* ¶¶ 26–27.) Experian failed to report in response to third-party inquiries the account as having a balance of zero despite it being written off (*id.* ¶ 28), and reported the account as both "never late" [3] and charged off (*id.* ¶ 29). Plaintiff sent a dispute letter to Experian on or around July 31, 2019 describing these issues (*id.* ¶ 30) and believes that Experian subsequently notified AmEx, which "failed to conduct a reasonable investigation and continued to report false and inaccurate adverse information on the consumer report of [ ] Plaintiff with respect to the disputed account" (*id.* ¶¶ 31–32). Because Experian failed to verify that the information was accurate, and continued to provide the inaccurate information to third parties, Plaintiff's credit score decreased. (*Id.* ¶¶ 34, 36–37.)

**II. Procedural History**

 **\*2** Plaintiff filed his Complaint on March 31, 2020. (Complaint, Dkt. 1.) On June 11, 2020, Defendant BANA filed a request for a pre-motion conference regarding a proposed motion to dismiss. (Dkt. 18.) The Court denied the request as unnecessary and construed Defendant BANA's request as a motion to dismiss. (6/24/20 Dkt. Entry.) Briefing in support of Defendant BANA's motion was completed on July 31, 2020. (Dkts. 21–23.) Additionally, on August 24, 2020, the Court so-ordered a stipulation of dismissal as to Defendant Equifax. (Dkt. 24; 8/24/20 Dkt. Entry.)

On August 27, 2020, Defendant AmEx filed a pre-motion conference letter requesting a conference on a proposed motion to compel arbitration. (Dkt. 25.) The Court construed the letter as a motion to compel arbitration and ordered additional briefing (9/11/20, 9/21/20 Dkt. Entries) that was completed on October 30, 2020 (Dkts. 31–36).

On September 23, 2020, Defendant Experian filed a pre-motion conference letter regarding a proposed motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). (Dkt. 28.) The Court again denied the conference as unnecessary and permitted, but did not require, supplemental briefing. (10/5/20 Dkt. Entry.) Experian did not file additional briefing within the schedule laid out by the Court, but did subsequently file a letter on December 2, 2020, highlighting some recently-decided legal authority. (Dkt. 38.)

### LEGAL STANDARD

#### I. Fed. R. Civ. P. 12(b)(6) Motion to Dismiss

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted). "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted); *see also Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013). In addressing the sufficiency of a complaint, courts are required to accept the well-pleaded factual allegations contained within the complaint as true, *see Bldg. Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 187 (2d Cir. 2012), but "need not credit conclusory statements unsupported by assertions of facts or legal conclusions and characterizations presented as factual allegations," *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Additionally, "a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *Id.* at 405–06 (collecting cases).

#### II. Fed. R. Civ. P. 12(c) Motion for Judgment on the Pleadings

"The difference between a Rule 12(b)(6) and Rule 12(c) motions 'is largely academic because the standard under Rule 12(c) is the same as the standard under Rule 12(b)(6): Accepting the non-moving party's allegations as true and viewing the facts in the light most favorable to that party, judgment on the pleadings or dismissal for failure to state a claim should be granted if the moving party 'is entitled to judgment as a matter of law.' " *Ashley v. Gonzalez*, No. 19-CV-6282 (AJN), 2020 WL 7027501, at *2 (S.D.N.Y. Nov. 30, 2020) (quoting *Richards v. Select Ins. Co.*, 40 F. Supp. 2d 163, 165 (S.D.N.Y. 1999)); [4] *see Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (explaining that a Rule 12(c) motion is evaluated under same standard as a Rule 12(b)(6) motion). Accordingly, "[t]o survive a Rule 12(c) motion, [a plaintiff's] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hayden*, 594 F.3d at 160 (quoting *Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009) (per curiam)). Again, this plausibility standard "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678).

### DISCUSSION

#### I. Defendant BANA's Motion to Dismiss

**\*3** Defendant BANA moves to dismiss Plaintiff's claims against it on the grounds that Plaintiff has failed to state a claim under the FCRA, 15 U.S.C. § 1681 *et seq.* Congress initially "enacted the FCRA 'to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.' " *Jenkins v. LVNV Funding, LLC*, No. 14-CV-5682 (SJF) (AKT), 2017 WL 1323800, at *10 (E.D.N.Y. Feb. 28, 2017) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007)); *see also* 15 U.S.C. § 1681(b) (stating the purpose of the FCRA).

Plaintiff alleges that Defendant BANA willfully and negligently violated 15 U.S.C. § 1681s-2 (Complaint, Dkt. 1, ¶¶ 66–86), which provides that "[a] person shall not furnish any information relating to a consumer to any consumer

reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate," 15 U.S.C. § 1681s-2(a)(1)(A). Section 1681s-2(b) "imposes a duty on furnishers of information to investigate disputed information after receiving notice of a dispute concerning the completeness or accuracy of information from a consumer reporting agency[.]" *Burns v. Bank of Am.*, 655 F. Supp. 2d 240, 250 (S.D.N.Y. 2008) (internal quotation marks, alteration, and citation omitted), *aff'd*, 360 F. App'x 255 (2d Cir. 2010) (summary order); *see also Ogunmokun v. Am. Educ. Servs./PHEAA*, No. 12-CV-4403 (RRM) (JPO), 2014 WL 4724707, at *7 (E.D.N.Y. Sept. 23, 2014).

To prevail on a claim under Section 1681s-2(b), a plaintiff must show that "(1) the furnisher received notice of a credit dispute from a credit reporting agency, and (2) the furnisher thereafter acted in 'willful or negligent noncompliance with the statute.' " *Markovskaya v. Am. Home Mortg. Servicing, Inc.*, 867 F. Supp. 2d 340, 343–44 (E.D.N.Y. 2012) (quoting *Redhead v. Winston & Winston, P.C.*, No. 01-CV-11475 (DLC), 2002 WL 31106934, at *5 (S.D.N.Y. Sept. 20, 2002)). "Accuracy is also an essential element of a claim for negligent or willful violation of § 1681s-2(b) of the FCRA. Thus, a threshold showing of inaccuracy or incompleteness is necessary to succeed on a claim under § 1681s-2(b)." *Artemov v. TransUnion, LLC*, No. 20-CV-1892 (BMC), 2020 WL 5211068, at *3 (E.D.N.Y. Sept. 1, 2020) (internal quotation marks and citations omitted). A credit entry is inaccurate or incomplete where it "is patently incorrect, or ... misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Kilpakis v. JPMorgan Chase Fin. Co.*, 229 F. Supp. 3d 133, 141 (E.D.N.Y. 2017) (citation omitted).

Defendant BANA contends that Plaintiff's Section 1681s-2(b) claims against it fail because Plaintiff has not pleaded the threshold showing of inaccuracy, as it is not incorrect to report a remaining balance (or indeed, a past-due balance) [5] on an account that has been charged-off. (Defendant BANA's Supplemental Brief in Support of Its Motion to Dismiss ("BANA Supp."), Dkt. 21, at 2–4.) Plaintiff cites several cases from federal courts in Georgia that have found that "reporting of a *scheduled monthly payment* with an outstanding balance on a charged-off account is inaccurate under the FCRA," and argues that reporting a past-due balance on a charged-off account is analogous to a monthly obligation, and is, by extension, "materially misleading because it suggests a current, ongoing liability notwithstanding the charge-off." (Plaintiff's Supplemental Opposition to Defendant

BANA's Motion to Dismiss ("Pl.'s BANA Opp."), Dkt. 22, at ECF [6] 2–4 (emphasis added).) The Court finds Plaintiff's argument to be meritless.

**\*4** The Court begins by defining "charge-off," one of the terms employed by Plaintiff in his Complaint. According to Black's Law Dictionary, to charge off is "[t]o treat (an account receivable) as a loss or expense because payment is unlikely." *Charge Off, Black's Law Dictionary* (11th ed. 2019); *see Anderson v. Credit One Bank, N.A. (In re Anderson)*, 884 F.3d 382, 385 (2d Cir. 2018) (charged-off debt "means the bank changed the outstanding debt from a receivable to a loss in its own accounting books"). Charging off simply means that a creditor "no longer considers the account balance an asset for accounting purposes." *Artemov*, 2020 WL 5211068, at *3 (citation omitted). "Banks are in fact required under Federal Regulations to charge off debt that is past due by over 180 days. Otherwise, their balance sheets would misleadingly reflect accounts as assets that have little chance of achieving their full valuation. *Id.* (*citing Anderson*, 884 F.3d at 386 n.2); *see also* 65 Fed. Reg. 36,903, 36,904.

But "[c]harging off a debt does not diminish the legal right of the original creditor to collect the full amount of the debt." *Ostreicher v. Chase Bank USA, N.A.*, No. 19-CV-8175 (CS), 2020 WL 6809059, at *4 (S.D.N.Y. Nov. 19, 2020) (citation omitted); *see also Artemov*, 2020 WL 5211068, at *4 ("[C]harging off an account does not equate to debt forgiveness."). "Any other conclusion would be illogical; it would simply encourage a consumer to take out massive amounts of debt and wait around six months for it to be wiped away." *Artemov*, 2020 WL 5211068, at *4. Plaintiff's contention that it was per se inaccurate for Defendant BANA to report that he still owed a balance on an account that the bank had charged off therefore conflates two unrelated concepts: namely, Plaintiff's legal responsibility to pay his debt to Defendant BANA and BANA's internal estimate of his likelihood to do so.

This case is virtually identical to a recent case in front of the Honorable Brian M. Cogan in this district, *Artemov v. TransUnion, LLC*, 2020 WL 5211068 (E.D.N.Y. Sept. 1, 2020). [7] In that case, the plaintiff (represented by the same firm that represents Plaintiff in this action), alleged that Equifax had reported the plaintiff's accounts at BANA "as 'charged off' and 'closed,' " despite the fact that they "contained a non-zero past due balance," and also claimed that "representing the account as charged off, while listing a past due balance, misle[d] potential creditors into believing

that he has an ongoing monthly liability." *Id.* at *1. The only distinction between the allegations in *Artemov* and the instant case is that in *Artemov*, the plaintiff alleged that the "scheduled monthly payment" line for his BANA accounts was "zeroed out," *id.* at *1, whereas here, Plaintiff is silent as to the monthly payments line (*see generally* Complaint, Dkt. 1).

Judge Cogan soundly rejected Artemov's claims, finding that "even though [BANA] labeled plaintiff's accounts as charged off, [it] had no obligation to zero out the overall or past due balance," because charging off the account "did not absolve plaintiff of his promise to pay the debt," and further noting that "[m]erely listing a past due balance ... for a charged off account is quite different than incorrectly reporting a future monthly responsibility when such requirement no longer exists." *Artemov*, 2020 WL 5211068, at *4–5. Judge Cogan also distinguished one of the Georgia cases on which Artemov and Plaintiff both rely, *Jackson v. Equifax Information Services, LLC*, No. 18-CV-271, 2019 WL 179570 (M.D. Ga. Jan. 11, 2019). (*See* Pl.'s BANA Opp., Dkt. 22, at ECF 3– 4; *see also Artemov*, 2020 WL 5211068, at *5. In *Jackson*, the court found an FCRA violation where the plaintiff's credit report "incorrectly reported a scheduled monthly payment for an account with a remaining balance ... even though it had been charged off." *Artemov*, 2020 WL 5211068, at *5 (describing and citing *Jackson*, 2019 WL 179570, at *4). As Judge Cogan noted, however, *Jackson* hinged on the finding that "the *combined reporting of a scheduled monthly payment and a positive balance* on an account that had otherwise been charged off" could "materially mislead a prospective lender about the nature of plaintiff's obligation to make payments" by suggesting an ongoing monthly incursion of new charges. *Id.* at *5 (emphasis added) (quoting *Jackson*, 2019 WL 179570, at *4). By distinction, in *Artemov*, as in the instant case, Defendant BANA did not "incorrectly report[ ] a future monthly responsibility when such requirement no longer exists," *id.*, rendering *Jackson* inapposite.

**\*5** This Court, like other courts in this Circuit to have considered similar claims[8], finds persuasive Judge Cogan's thorough reasoning in *Artemov* and *Lieberman*. *See, e.g., Ostreicher*, 2020 WL 6809059; *Ostreicher v. Experian Information Solutions, Inc. et al.*, No. 20-CV-1215 (S.D.N.Y.), Dkt. 38, at ECF 27 (Transcript of Nov. 19, 2020 Hearing). Because Plaintiff has failed to sufficiently allege that Defendant BANA provided accurate or misleading information regarding his accounts, his FCRA claims against Defendant BANA are dismissed.

## II. Defendant Experian's Motion for Judgment on the Pleadings

Defendant Experian's motion for judgment on the pleadings is granted for largely the same reasons as Defendant BANA's motion to dismiss.[9] Plaintiff brings claims against Defendant Experian under 15 U.S.C. §§ 1681(e) and 1681i(a) for willful and negligent violations of the FCRA, based on allegations that Defendant Experian failed to appropriately evaluate or verify the "incorrect" information it reported regarding Plaintiff's accounts with Defendants BANA and AmEx. (Complaint, Dkt. 1, ¶¶ 38–51.) Specifically, Plaintiff alleges that Experian failed to report his accounts at BANA and AmEx as having balances of zero and instead inaccurately reported them as having past-due balances despite their being charged off[10] (and reported that Plaintiff's account at AmEx was both never late and charged off). (*Id.* ¶¶ 15–17; 26–29.)

Just as with violations of Section 1681s-2(b), the "threshold question" for challenges under Section 1681e(b) or 1681i(a) "is whether the disputed credit information is accurate; if the information is accurate, no further inquiry into the reasonableness of the consumer reporting agency's procedure is necessary." *Artemov*, 2020 WL 5211068, at *2 (internal quotation marks and citations omitted). Because the Court finds, as discussed above, that it was not inaccurate for Defendant Experian to report that Plaintiff's accounts had a past-due balance despite being charged off[11], no further inquiry is needed with respect to Plaintiff's FCRA claims against Defendant Experian, which are dismissed.

## III. Defendant AmEx's Motion to Arbitrate and Motion to Stay

**\*6** Defendant AmEx seeks to compel arbitration of Plaintiff's FCRA claims against it pursuant to the arbitration clause in Plaintiff's AmEx Cardmember Agreement, which Plaintiff received upon opening his AmEx account. (*See generally* Dkts. 25, 32.) Plaintiff's response is slightly confusing, but he appears to argue both that enforcement of the arbitration clause should be enjoined because the clause is so "absurdly" broad that no reasonable person could have agreed to it (Plaintiff's Supplemental Opposition to Defendant AmEx's Motion to Compel Arbitration ("Pl.'s AmEx Opp."), Dkt. 34, at 5–17), and that because enforcing the scope of the arbitration agreement would lead to absurd results, the agreement is unconscionable and cannot be enforced (*id.* at 17–25). For the reasons set forth below, the Court rejects

Plaintiff's contentions and compels arbitration of his claims against Defendant AmEx.

The Federal Arbitration Act ("FAA") "embod[ies] [a] national policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (citation omitted). This Circuit considers two factors to determine whether claims are arbitrable: "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). "The party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (summary order). Once this burden is met, the party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Alfonso v. Maggies Paratransit Corp.*, 203 F. Supp. 3d 244, 247 (E.D.N.Y. 2016). Under this burden-shifting framework, a motion to compel arbitration must be denied "[i]f there is an issue of fact as to the making of the agreement for arbitration," *Brown v. St. Paul Travelers Cos., Inc.*, 331 F. App'x 68, 69 (2d Cir. 2009) (summary order) (citation omitted), or "where the court is [not] satisfied that the parties agreed to arbitrate th[e] dispute" at issue, *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 297 (2010) (emphasis and citation omitted).

Here, Defendant AmEx, the party seeking to compel arbitration, satisfies its initial burden of demonstrating an agreement to arbitrate. *See Hines*, 380 F. App'x at 24. It has submitted evidence demonstrating that after approving Plaintiff's application for an account, it gave Plaintiff a Cardmember Agreement (Declaration of Keith Herr ("Herr Decl."), Dkt. 33, ¶ 3), which provided that "[w]hen [Plaintiff] use[s] the Account (or [he] sign[s] or keep[s] the card), [he] agree[s] to the terms of the Agreement" (Cardmember Agreement, Dkt. 33-1, at ECF 4). The Cardmember Agreement also contains the following provisions:

### Definitions

As used in this Arbitration provision, the term *claim* means any claim, dispute or controversy between you and us arising from or relating to your Account, this Agreement, the Electronic Funds Transfer Services Agreement, and any other related or prior agreement that you may have had with us, or the relationships resulting from any of the above

*agreements*, except for the validity, enforceability or scope of this Arbitration provision....

### Initiation of Arbitration

Any claim shall be resolved, upon the election by [Plaintiff] or [Defendant AmEx], by arbitration pursuant to this Arbitration provision and the code of procedures of the arbitration organization to which the claim is referred in effect at the time the Claim is filed (*code*), except to the extent the code conflicts with this Agreement....

### Significance of Arbitration

IF ARBITRATION ... IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER [Plaintiff] NOR [Defendant AmEx] WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM.

**\*7** (Cardmember Agreement, Dkt. 33-1, at ECF 9.)

On its face, the Cardmember Agreement appears to contain a valid agreement to arbitrate. The parties agree that Utah law, named in the Cardmember Agreement's choice of law clause (Dkt. 33-1, at ECF 8), governs the agreement. (*See* Defendant AmEx's Supplemental Brief in Support of Its Motion to Compel Arbitration ("AmEx Supp."), Dkt. 32, at 6; Pl.'s AmEx Opp., Dkt. 34, at 6); *see also Klein v. Experian Info. Sols., Inc.*, No. 19-CV-11156 (PMH), 2020 WL 6365766, at *4 (S.D.N.Y. Oct. 29, 2020) ("[S]tate contract law determines whether the parties entered into a valid agreement to arbitrate." (citation omitted)). Utah law provides that an unsigned credit agreement is enforceable when, *inter alia*,

(i) the debtor is provided with a written copy of the terms of the agreement;

(ii) the agreement provides that use of the credit offered shall constitute acceptance of those terms; and

(iii) after the debtor receives the agreement, the debtor, or a person authorized by the debtor, requests funds pursuant to the credit agreement or otherwise uses the credit offered.

Utah Code § 25-5-4(2)(e); *see also* Utah Code § 70C-4-102(2)(b) (allowing "an open-end consumer credit contract ... to include arbitration ... mechanism[s]"); *Klein*, 2020 WL 6365766, at *4. It is undisputed that Defendant AmEx provided Plaintiff with the Cardmember Agreement when he opened his account with Defendant, and that Plaintiff

subsequently used the account. (Herr Decl., Dkt. 33, ¶¶ 3, 5.) The Cardmember Agreement thus appears to contain a binding agreement to arbitrate under Utah law. *See, e.g., Klein*, 2020 WL 6365766, at *4 (finding similar Cardmember Agreement used by Defendant AmEx to be valid under Utah law); *Khanna v. Am. Express Co.*, No. 11-CV-6245 (JSR), 2011 WL 6382603, at *3–4 (S.D.N.Y. Dec. 14, 2011) (same).

Plaintiff, however, contends that the Cardmember Agreement does not constitute a valid agreement to arbitrate because (1) no reasonable person would agree to the terms of the Cardmember Agreement, and so there was no mutual assent, which is required by Utah law to form an agreement, and (2) the arbitration clause is unconscionable because it could give rise to absurd results. (Pl.'s AmEx Opp., Dkt. 34, at 5–25.) As with Plaintiff's arguments in opposition to Defendant BANA's motion to dismiss, at least one court in this Circuit has already considered almost identical arguments (again, brought by the same counsel against Defendant AmEx) and rejected them based on reasoning that the Court finds compelling and adopts in large part. *See Klein*, 2020 WL 6365766, at *4–7.

Plaintiff's first argument is that "no reasonable person would have agreed to bind themselves to arbitrate virtually all future disputes with [Defendant AmEx], including not only those arising under the current Cardmember Agreement, but all other agreements with [Defendant AmEx] now and in the future." (Pl.'s AmEx Opp., Dkt. 34, at 5–6.) In essence, Plaintiff's circular argument is that the ostensible limitation of "claim" in the Cardmember Agreement to claims "arising from or relating to [Plaintiff's] Account, [Cardmember] Agreement, the Electronic Funds Transfer Services Agreement, [or] any other related or prior agreement that [he] may have had with [Defendant AmEx]" (Cardmember Agreement, Dkt. 33-1, at ECF 9), is really no limitation at all because the *only* claims a cardholder-plaintiff might have against Defendant Amex would fall within these categories. (Pl.'s AmEx Opp., Dkt. 34, at 14–15.) This argument, on its face, is nonsensical. Indeed, Plaintiff cites no authority for the proposition that a credit card company cannot require arbitration of the types of claims a cardholder would logically be expected to bring. As the court in *Klein* found, the cases Plaintiff cites in support of this argument are "distinguishable" and not "controlling" because they involved incredibly broad arbitration clauses, as well as distinct fact patterns not at issue here.[12] *See Klein*, 2020 WL 6365766, at *6 n.7 (describing and distinguishing the same three cases cited by Plaintiff in this matter, *Smith v. Steincamp*, 318 F.3d 775, 776 (7th Cir. 2003) (arbitration clause at issue

included "all common law claims" as well as "any claims based upon a violation of any state or federal constitution, statute or regulation," in addition to claims arising out of the agreement); *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1262 (S.D. Cal. 2012) (clause included "any and all disputes, controversies or claims ... including breach of warranty, contract, tort or any other claim"); and *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 501 (E.D.N.Y. 2016) (covering "all disputes and claims between us")).

**\*8** Furthermore, Plaintiff's argument depends on a willful misreading of the Cardmember Agreement. " ' "Looking to the plain language within the four corners' of the document 'in light of the reasonable expectations of the parties, looking to the agreement as a whole and to the circumstances, nature, and purpose of the contract,' " *Klein*, 2020 WL 6365766, at *5 (quoting *Wittingham, LLC v. TNE Ltd. P'ship*, 469 P.3d 1035, 1053 (Utah 2020)), the Cardmember Agreement limits the scope of the arbitration clause to claims arising from and related to *existing* accounts and agreements. The Court sees no basis for Plaintiff's claim that the arbitration clause would cover "any future dispute" with Defendant AmEx. (*See* Pl.'s AmEx Opp., Dkt. 34, at 15.) Nor do the cases cited by Plaintiff, which all involved attempts to compel arbitration of claims arising out of different contracts, conduct, or with different parties than those covered by the arbitration clauses at issue, suggest that the arbitration clause in this case is susceptible to the absurd results at issue in those cases. *See Smith*, 318 F.3d at 778 (declining to compel arbitration of claims raised regarding payday loan contracts where arbitration clauses were present only in *other* payday loan contracts from the same creditor); *Jiffy Lube Int'l, Inc.*, 847 F. Supp. 2d 1262–63 (finding that an arbitration clause contained in a contract regarding a plaintiff's oil change did not preclude the same plaintiff from bringing suit under the Telephone Consumer Protection Act ("TCPA")); *Wexler*, 211 F. Supp. 3d at 504–05 (E.D.N.Y. 2016) (finding that an arbitration clause in plaintiff's cell phone service contract did not mandate arbitration of plaintiff's TCPA claim against her cell phone service provider's subsidiary). As the Honorable Philip M. Halpern found in *Klein*, all three cases are distinguishable from the instant circumstances, in which the dispute arises from conduct related to the same credit card account Plaintiff opened when he entered the Cardmember Agreement. *See* 2020 WL 6365766, at *6 n.7. Because the Court does not agree with Plaintiff's wholly unsupported argument that "no reasonable person" would have accepted the arbitration clause at issue, it does not find that the agreement to arbitrate was made without mutual assent, and

therefore rejects the argument that no agreement was formed between Defendant AmEx and Plaintiff.

The Court also finds unpersuasive Plaintiff's contention that because the arbitration clause *could* be read overbroadly in some hypothetical circumstances, it is unconscionable and should not be enforced in the instant situation where the claims are clearly covered. As Plaintiff himself acknowledges, this is essentially another version of the same argument dismissed above (*see* Pl.'s AmEx Opp., Dkt. 34, at 17); *see also Klein*, 2020 WL 6365766, at *5 n.6, and it merits dismissal for similar reasons. As an initial matter, even if the arbitration clause at issue here could be read to require absurd results in some circumstances not present in the instant case, the Court need not consider the hypothetical boundaries of an arbitration clause not implicated by the claims at issue. *See Ostreicher v. TransUnion, LLC*, No. 19-CV-8174 (KMK), 2020 WL 3414633, at *9 (S.D.N.Y. June 22, 2020); *Ahmed v. Citibank, N.A.*, No. 19-CV-4439 (MKB) (SJB), 2020 WL 2988666, at *7 (E.D.N.Y. June 2, 2020) ("[E]ven if the [arbitration] provisions here were facially overbroad, [plaintiff]'s claims do not implicate the outer boundaries of what is properly arbitrable.").

Even if the Court were to consider the potential boundaries of the clause at issue, "[t]he standard for proving that a contract provision is unconscionable is very high (that is, the provision or circumstances must shock the conscience)." *Town Park Hotel Corp. v. Priskos Invs., Inc.*, No. 02-CV-164 (TC), 2006 WL 658896, at *10 (D. Utah Mar. 14, 2006) (internal quotation marks and citations omitted). Under Utah law, when "determining whether a contract is unconscionable, [courts] use a two-pronged analysis. The first prong—substantive unconscionability—focuses on the agreement's contents. The second prong—procedural unconscionability—focuses on the formation of the agreement. But substantive unconscionability alone may support a finding of unconscionability." *Com. Real Estate Inv., L.C. v. Comcast of Utah II, Inc.*, 285 P.3d 1193, 1203 (Utah 2012) (internal citations and quotation marks omitted). A contract is substantively unconscionable "when contract terms are so lopsided as to unfairly oppress or surprise an innocent party, or where there is an overall imbalance in rights and responsibilities imposed by the contract, excessive price or a significant cost-price disparity, or terms which are inconsistent with accepted mores of commercial practices." *Mitchell v. Wells Fargo Bank*, 280 F. Supp. 3d 1261, 1292 (D. Utah 2017) (internal quotation marks omitted). Plaintiff contends that the arbitration clause

is substantively unconscionable for the same reasons he argues that no reasonable person would have agreed to it, *i.e.*, because (he argues) that it would "compel [him] to arbitrate claims having nothing to do with the Cardmember Agreement, but extending to every agreement ever fashioned between [Defendant AmEx] and Plaintiff for the rest of his natural born life." (Pl.'s AmEx Opp., Dkt. 34, at 19.) For the same reasons outlined above (and in Judge Halpern's well-reasoned opinion in *Klein*), this argument is meritless.

**\*9** Nor has Plaintiff shown that the contract at issue is procedurally unconscionable. Procedural unconscionability "centers on the relative positions of the parties and the circumstances surrounding the execution of the contract, and occurs where there is an absence of meaningful choice and where lack of education or sophistication results in no opportunity to understand the terms of the agreement." *Mitchell*, 280 F. Supp. 3d at 1292 (internal quotation marks and citation omitted). The Utah Supreme Court has outlined six factors to evaluate the presence of procedural unconscionability:

> (1) whether each party had a reasonable opportunity to understand the terms and conditions of the agreement; (2) whether there was a lack of opportunity for meaningful negotiation; (3) whether the agreement was printed on a duplicate or boilerplate form drafted solely by the party in the strongest bargaining position; (4) whether the terms of the agreement were explained to the weaker party; (5) whether the aggrieved party had a meaningful choice or instead felt compelled to accept the terms of the agreement; and (6) whether the stronger party employed deceptive practices to obscure key contractual provisions.

*Feacher v. Hanley*, No. 13-CV-92 (EJF), 2014 WL 119382, at *6 (D. Utah Jan. 13, 2014) (quoting *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 403 (Utah 1998)). "None of the factors is dispositive; rather, [courts] consider all the circumstances in light of the doctrine's purpose to prevent oppression and unfair surprise." *Id.* (quoting *Ryan*, 972

P.2d at 403) (internal quotation marks omitted, alteration in original). Unlike substantive unconscionability, procedural unconscionability by itself will "rarely render[ ] a contract unconscionable." *Knight Adjustment Bureau v. Lewis*, 228 P.3d 754, 757 n.4 (Utah 2010) (internal quotation marks and citation omitted).

As in *Klein*, Plaintiff claims that the arbitration clause meets "four of the six" indicia of procedural unconscionability, namely the second, third, fifth, and sixth, because (1) the Cardmember Agreement is a standard form contract of adhesion that Plaintiff did not have an opportunity to negotiate, (2) the agreement was drafted by Defendant AmEx, which held a "far superior bargaining position as a sophisticated financial institution," and (3) the typeface containing the arbitration clause is smaller than some of the other language in the agreement. (Pl.'s AmEx Opp., Dkt. 34, at 20–24); *see also Klein*, 2020 WL 6365766, at *6. The Court again finds Plaintiff's arguments unpersuasive. "[W]hile 'courts acknowledge that standardized consumer contracts are generally adhesive,' that does not mean that [such] contract[s are], *ipso facto*, unconscionable." *Klein*, 2020 WL 6365766, at *7 (quoting *Mitchell*, 280 F. Supp. 3d at 1292–93). Moreover, while Plaintiff claims that the Cardmember Agreement did not contain an opt-out option for the arbitration clause, the declaration submitted by Defendant AmEx indicates that Plaintiff was subsequently offered an opportunity to opt-out of the arbitration clause that he did not take. (Herr Decl., Dkt. 33, ¶ 4.) Nor can Plaintiff credibly claim to have been overwhelmed by Defendant AmEx's bargaining position when he "could have sought another credit card from another company." *Klein*, 2020 WL 6365766, at *7 (citing *Ryan*, 972 P.2d at 404). And as to Plaintiff's argument that Defendant AmEx obscured the arbitration clause in small text, "the face of the Cardmember Agreement belies that claim." *Id.* at *7. The arbitration clause is located on page eight of twelve, underneath a bold, oversized page heading labeled "**Arbitration**." (Cardmember Agreement, Dkt. 33-1, at ECF 9.) Moreover, parts of the arbitration clause, including the section describing the "Significance of Arbitration," are printed in all capital letters. (*Id.*) In sum, Plaintiff has not made the requisite showing that the clause at issue was procedurally unconscionable.

**\*10** Having rejected Plaintiff's various arguments as to why no valid agreement to arbitrate exists, the Court finds that Plaintiffs have satisfied the first prong of the arbitrability analysis: the existence of a valid agreement to arbitrate. *See In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 128.

Plaintiff does not meaningfully dispute the second prong: that the FCRA claims at issue, which involve his payments on the account for which he received the Cardmember Agreement, come within the scope of the arbitration clause, which covers claims arising out of or relating to his account or the Cardmember Agreement. (*See generally* Pl.'s AmEx Opp., Dkt. 34.) Because Defendant AmEx has satisfied both prongs of the arbitrability test, the Court grants its motion to compel arbitration. *See In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 128.

\* \* \* \*

The Court also grants Defendant AmEx's motion to stay the claims against it pending the conclusion of arbitration. (AmEx Supp., Dkt. 32, at 9.) The FAA instructs that when a

> suit or proceeding [is] brought ... upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration ... shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]

9 U.S.C. § 3; *see also Katz v. Cellco P'ship*, 794 F.3d 341, 343 (2d Cir. 2015) (holding that the FAA "requires a stay of proceedings when all claims are referred to arbitration and a stay requested"). Because Defendant AmEx has requested such a stay, the Court grants its motion and stays Plaintiff's claims against it.

## CONCLUSION

For the reasons stated above, the Court grants Defendant BANA's motion to dismiss, Defendant Experian's motion for judgment on the pleadings, and Defendant AmEx's motion to compel arbitration. Plaintiff's request for leave to amend his complaint is denied as futile. The remaining claims against Defendant AmEx are stayed pending arbitration, while the claims against Defendant BANA and Defendant Experian are

dismissed with prejudice. The Clerk of Court is respectfully directed to update the docket accordingly.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 395808

---

## Footnotes

1   For purposes of this Memorandum and Order, the Court assumes the truth of Plaintiff's non-conclusory, factual allegations. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

2   Plaintiff does not dispute that he failed to make payments on his account or that the account was in fact past due. He simply challenges the credit agencies' continued reporting of a past-due balance on his account after Defendant BANA had already "charged off" the account (a process defined below).

3   Plaintiff does not allege that he was in fact never late in making payments on the account, but simply that the account was represented on his credit report as both never late and charged off.

4   "The difference between the two motions is that a motion pursuant to Rule 12(b)(6) seeking dismissal for failure to state a claim is made prior to the filing of an answer to the claim for which dismissal is sought, whereas a motion pursuant to Rule 12(c) seeking judgment on the pleadings is made after the relevant pleadings are closed." *Fisher-Price, Inc. v. Kids II, Inc.*, No. 10-CV-988A(F), 2011 WL 6409665, at *6 (W.D.N.Y. Dec. 21, 2011); *see Optigen, LLC v. Animal Genetics, Inc.*, No. 10-CV-940 (FJS) (DEP), 2011 WL 13234395, at *2 (N.D.N.Y. May 23, 2011) (noting that the only "modest difference between Rule 12(c) and Rule 12(b)(6) motions" is that Rule 12(c) motions "implicate[ ] the pleadings as a whole" (quoting *Aponte-Torres v. Univ. of Puerto Rico*, 445 F.3d 50, 54–55 (1st Cir. 2006))).

5   In his opposition to Defendant BANA's supplemental letter to dismiss, Plaintiff moves to amend his complaint to clarify that he is challenging the reporting of the "past-due balance, not the balance itself, and [that he] otherwise concedes that the reporting of a balance on a charged-off account is accurate for purposes of the FCRA[.]" (Plaintiff's Supplemental Opposition to Defendant BANA's Motion to Dismiss ("Pl.'s BANA Opp."), Dkt. 22, at ECF 3, ECF 3 n.1.) "Generally, leave to amend should be 'freely given.'" *Matima v. Celli*, 228 F.3d 68, 81 (2d Cir. 2000). However, "a motion for leave to amend a complaint may be denied when amendment would be futile." *Tocker v. Philip Morris Cos.*, 470 F.3d 481, 491 (2d Cir. 2006) (citation omitted). Because, as discussed below, the Court finds that Plaintiff's FCRA claims would fail even if he amended his complaint to allege that Defendant BANA reported a past-due balance on his account, the Court denies Plaintiff's motion to amend.

6   Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

7   Two weeks after deciding *Artemov*, Judge Cogan issued *Lieberman v. American Express Company*, No. 19-CV-6989 (BMC), 2020 WL 5517271 (E.D.N.Y. Sept. 14, 2020), a case in which he employed essentially the same reasoning while considering the same question. *See id.* at *4–5.

8   As Judge Seibel of this Circuit noted in one of the nearly identical cases brought by the same plaintiff's counsel as in this suit, Plaintiff's position in this case "takes some nerve. The FCRA was enacted to remedy real abuses in credit reporting, not for imaginative attorneys to advance farfetched, if not absurd, interpretations

of the statute on behalf of unharmed debtors. The statute is a shield for debtors, not a sword for lawyers." *Ostreicher*, 2020 WL 6809059, at *6. Plaintiff's counsel appears to be bringing multiple meritless FCRA suits, presumably in hopes of scoring a quick settlement and attorney's fees. While the Court does not find that Rule 11 sanctions are appropriate in this case because there is not a sufficient indication of subjective bad faith, *see Muhammad v. Walmart Stores E., L.P.*, 732 F.3d 104, 108–09 (2d Cir. 2013) (per curiam), it cautions Plaintiff's counsel to review its claims carefully or face such sanctions in the future.

9   Defendant Experian adopted Defendant BANA's briefing in support of its motion. (Dkt. 28, at 1.)

10   As described above, Plaintiff clarifies in his papers that he now does not challenge Defendant Experian's report of his account at Defendant BANA as having a remaining balance, but rather challenges that Experian reported that balance as past-due when the account had been charged off. (Pl.'s BANA Opp., Dkt. 22, at ECF 2–3.)

11   As both parties' briefing on the instant motion focuses on the allegations that Plaintiff's accounts were reported with non-zero, past-due balances despite being charged off, neither party addresses Plaintiff's allegation in the Complaint that Defendant Experian reported Plaintiff's account with Defendant AmEx as both "never late" and "charged off." (*See* Dkts. 28–29.) Because Plaintiff does not explain or show how this reporting was inaccurate, however, the Court dismisses this claim as well. *Cf. Khan v. Equifax Info. Servs., LLC*, No. 18-CV-6367 (MKB), 2019 WL 2492762, at *4 (E.D.N.Y. June 14, 2019) (dismissing Sections 1681(e) and 1681i(a) claims regarding account that was reported as both "paid and/or charged off" because plaintiff failed to explain how or why the report was inaccurate.)

12   Indeed, Plaintiff acknowledges that the arbitration clauses at issue in these cases were all broader than the one in Plaintiff's Cardmember Agreement. (Pl.'s AmEx Opp., Dkt. 34, at 13–14.)

---

🚩 KeyCite Yellow Flag

Distinguished by  Sanders v. Sanders,  S.D.N.Y.,  September 24, 2021

Cited in uploaded document as:

Dash v. Bank of Am. Corp., No. 18-cv-4807 (RWL), 2019 U.S. Dist. LEXIS 68789 (S.D.N.Y. Apr. 23, 2019)

2019 WL 1780140
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

John P. DASH III, Plaintiff,

v.

BANK OF AMERICA CORPORATION
and Real Time Resolutions, Inc., Defendants.

18-cv-4807 (RWL)
|
Signed 04/23/2019

**Attorneys and Law Firms**

John P. Dash, III, New York, NY, pro se.

Jason Robert Lipkin, Winston & Strawn LLP, New York, NY, for Defendants.

### OPINION AND ORDER

ROBERT W. LEHRBURGER, United States Magistrate Judge

**\*1** Plaintiff John P. Dash ("Dash"), proceeding *pro se*, brings this action pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. He alleges that Defendant Bank of America Corporation ("BAC") has violated the statute by, *inter alia*, using improper means to collect on debt from a real estate mortgage loan.[1] BAC has moved for dismissal pursuant to Rules §§ 12(b)(1), 12(b)(3) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is GRANTED and the action is dismissed with prejudice.

### Factual Background[2]

On March 1, 2006, Dash, a New York resident, obtained a mortgage from non-party Bank of America, N.A. for real property located at 2325 NW 9th Place, Cape Coral, Florida.[3] (Complaint ¶¶ 2, 4; Ex. A ("Note") and B ("Mortgage") attached to Motion to Dismiss, dated March 8, 2006). Dash made the last mortgage payment on December 30, 2008, but the account then went into default because "plaintiff was attempting to get a short sale approved." (Complaint ¶ 5.) Almost seven years later in September 2015, BAC "started changing the last payment date to re-age the debt." (Complaint ¶ 6.) Dash alleges that this practice violated the Fair Debt Collection Practices Act, which prohibits a debt collector from attempting to collect on a debt more than six years after the last payment date. (Pl. Opp. ¶ 1.) Dash alleges that BAC has "a history of trying to either collect on time-barred debts or ruining consumers credit reports by re-aging or changing last payment dates or dates of first delinquencies." (Complaint ¶ 6.)

The Complaint alleges two causes of action. First, Dash alleges that BAC violated 15 U.S.C. § 1692, "1692k(b) (1)i".[4] Dash claims that as a result of this conduct, he suffered damages and "future damages" including "worry, mental anguish, distress and frustration." (Complaint ¶ 11.) He seeks actual damages, punitive damages, and attorneys' fees.[5] (Complaint ¶¶ 11-14.)

**\*2** In the Second Cause of Action, Dash alleges that BAC violated 15 U.S.C. § 1692k because it "negligently failed to comply with the requirements imposed under the FDCPA, including but not limited to" (i) "failing to validate the debt;" (ii) "false representation or legal status of the debt;" (iii) "frequency and persistence of noncompliance, the nature of such noncompliance and the extent to which was intentional;" and (iv) "threaten[ing] to take legal action [against Dash]." (Complaint ¶¶ 15-16.) Again, Dash claims to have suffered damages and "future damages" including "worry, mental anguish, distress and frustration" (Complaint ¶ 17.) On the Second Cause of Action, Dash seeks actual damages and attorneys' fees.[6] (Complaint ¶¶ 18-19.)

### Procedural Background

This action is not the first time that Dash has raised claims against BAC in connection with his Florida residential mortgage. On May 30, 2017, Dash filed a case in this District, bearing the case number 17 Civ. 4122, assigned to Judge William H. Pauley, III (hereinafter, the "Prior Litigation"). Though both lawsuits relate to the same

mortgagee-mortgagor relationship, the primary difference between the Prior Litigation and this instant litigation is that the Prior Litigation made allegations against BAC based upon the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq., ("FCRA"), whereas this lawsuit makes allegations based on the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq., ("FDCPA").

The Prior Litigation lasted for approximately five months. In that relatively brief period, Dash filed an Amended Complaint, a Second Amended Complaint, and a Third Amended Complaint. (Prior Litigation, Dkt. Nos. 8, 11, and 15.) In those pleadings, Dash alleged that in July and August of 2014, BAC began misreporting loan accounts in his credit reports for several months. (Prior Litigation, Dkt. No. 1 at ¶ 5-7.) Dash alleged that he demanded a "reasonable investigation" into the matter and that it be corrected, and that BAC was "negligent" and "willful" with respect to the alleged reporting errors. (*Id.* at ¶ 7-8.)

The Prior Litigation asserted two causes of action under the FCRA. First, Dash claimed that BAC failed to comply with the reinvestigation requirement of 15 U.S.C. § 1681i, causing him various unspecified damages. Second, he claimed that BAC failed to comply with various mandatory procedures under the FCRA, including (i) failing to follow reasonable procedures to assure maximum possible accuracy of the information in consumer reports, pursuant to 15 U.S.C. § 1681e(b); (ii) failing to comply with the reinvestigation requirements of 15 U.S.C. § 1681i; (iii) providing Dash's credit file to third-party companies without determining that those companies had a permissible purpose to obtain it; and (iv) failing to provide Dash with his credit file pursuant to 15 U.S.C. § 1681g. (*Id.* at ¶ 15.)

The parties appeared for an initial pre-trial conference on September 1, 2017 before Judge Pauley, and on that same day a case management schedule was entered. (Prior Litigation, Dkt. No. 14.) About one month later, Dash filed his Third Amended Complaint. (Prior Litigation, Dkt. No. 15.)

On October 3, 2017, with no explanation on the docket, Dash filed a "Notice of Dismissal with Prejudice" in which he "hereby dismisses this action, with prejudice, and without costs, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i)." (Prior Litigation, Dkt. No. 16.) Dash's Notice of Dismissal terminated the Prior Litigation, and no further filings were made on that docket.

**\*3** Approximately seven months after termination of the Prior Litigation, on May 31, 2018, Dash filed this action. [7] Dash initially named two Defendants: BAC and Real Time Resolutions, Inc. ("Real Time"). Real Time was a debt collection agency hired by non-party Bank of America, N.A. to collect on the past-due mortgage. (Pl. Opp., Ex. D, Contract Between Bank of America N.A. and Real Time, dated December 7, 2017.) On August 8, 2018, Dash voluntarily dismissed his claims against Real Time. (Dkt. No. 24.) Thus, BAC is the only remaining defendant. On September 26, 2018, the parties consented to the jurisdiction of the undersigned for all purposes. (Dkt. No. 27.)

BAC moved for dismissal on November 5, 2018. The motion papers included a Memorandum of Law ("Def. Mem.") and the Declaration of Jason R. Lipkin ("Lipkin Decl."), and Exhibits A through E. (Dkt. No. 29.) [8] Dash filed his opposition on November 8, 2018 in the form of a two-page numbered letter to the Court, attaching Exhibits A through D ("Pl. Opp."). (Dkt. No. 30.) BAC filed a Reply Memorandum of Law on December 17, 2018 ("Def. Reply"). (Dkt. No. 31.) Four days later, Dash filed a sur-reply consisting of a narrative letter of approximately one-page, and 58 pages of unlabeled exhibits ("Pl. Surreply"). [9] (Dkt. No. 32.)

Legal Standards

A. Standard for Reviewing *Pro Se* Pleadings

Dash proceeds *pro se* in this litigation, as he did in the Prior Litigation. As an initial matter, the Court notes the well-settled principle that "[a] document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however, inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). A court must interpret such complaints "to raise the strongest arguments they suggest," the idea being that "[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.' " *Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 474-75 (2d Cir. 2006) (per curiam) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir. 1983)).

That said, "even *pro se* plaintiffs cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level.' " *Martinez v. Ravikumar*, 536 F.Supp.2d 369, 370 (S.D.N.Y. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Nor does *pro se* status excuse a party from meeting deadlines. *Santos v. General Electric Co.*, No. 10 Civ. 6948, 2011 WL 5563544, at *7 (S.D.N.Y. Sept. 28, 2011) ("plaintiff's *pro se* status does not excuse [his] noncompliance with statutory deadlines"); *Lobaito v. Chase Bank*, No. 11 Civ. 6883, 2012 WL 3104926, at *5 (S.D.N.Y. July 31, 2012), *affirmed*, 529 F. App'x 100 (2d Cir. 2013) (summary order) (same).

B. Standards for Motion to Dismiss

**\*4**  BAC seeks dismissal based on three different provisions of the Federal Rules of Civil Procedure: Rules 12(b)(1), 12(b)(3) and 12(b)(6).

On a motion to dismiss pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction, a court must dismiss a claim if it "lacks the statutory or constitutional power to adjudicate it." *Morrison v. National Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *affirmed*, 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transportation System, Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). In deciding a Rule 12(b)(1) motion to dismiss, the Court " 'must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff.' " *Morrison,* 547 F.3d at 170 (quoting *Natural Resources Defense Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (internal quotation omitted)). In deciding the motion, a court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue...." *J.S. ex rel. N.S. v. Attica Central Schools,* 386 F.3d 107, 110 (2d Cir. 2004); *see also Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court ... may refer to evidence outside the pleadings").

On a motion to dismiss pursuant to Rule 12(b)(3) for improper venue, "the plaintiff bears the burden of establishing that venue is proper." *Luxexpress 2016 Corp. v. Government of Ukraine*, No. 15 Civ. 4880, 2018 WL 1626143, at *4 (S.D.N.Y. March 30, 2018) (quoting *French Transit, Ltd. v. Modern Coupon Systems, Inc.*, 858 F.Supp. 22, 25 (S.D.N.Y.

1994)). When considering a motion to dismiss for improper venue under Rule 12(b)(3), "the plaintiff need only make a *prima facie* showing of venue." *Gulf Insurance Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005) (brackets omitted) (quoting *CutCo Industries, Inc. v. Naughton*, 806 F.2d 361, 364-65 (2d Cir. 1986) (citations omitted)). As with a motion to dismiss for lack of subject matter jurisdiction, "in deciding a motion to dismiss for improper venue, the 'court may examine facts outside the complaint to determine whether venue is proper. The Court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff.' " *Concesionaria DHM, S.A. v. International Finance Corp.*, 307 F.Supp.2d 553, 555 (S.D.N.Y. 2004) (quoting *U.S. Environmental Protection Agency ex rel. McKeown v. Port Authority of New York and New Jersey*, 162 F.Supp.2d 173, 183 (S.D.N.Y. 2001)).

Finally, to survive a Rule 12(b)(6) motion to dismiss a complaint for failure to state a claim upon which relief can be granted, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

**\*5**  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955). In considering a motion to dismiss for failure to state a cause of action, a district court "accepts all factual claims in the complaint as true, and draws all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Industry Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (internal quotation marks omitted). However, this tenet is "inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. "Rather, the complaint's factual allegations must be enough to raise a right to relief above the speculative level ... *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir. 2010) (quotation marks and brackets omitted). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly,* 550 U.S. at 558, 127 S.Ct. 1955.

For the purposes of considering a motion to dismiss pursuant to Rule 12(b)(6), a court generally is confined to the facts alleged in the complaint. *Cortec Industries v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991). A court may, however, consider additional materials, including documents attached to the complaint, documents incorporated into the complaint by reference, public records, and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit. *See Kleinman v. Elan Corp.,* 706 F.3d 145, 152 (2d Cir. 2013) (quoting *ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007)). In that regard, if "a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." *Poindexter v. EMI Record Group Inc.,* No. 11 Civ. 559, 2012 WL 1027639, at *2 (S.D.N.Y. March 27, 2012) (citing *Barnum v. Millbrook Care Ltd. Partnership,* 850 F.Supp. 1227, 1232-33 (S.D.N.Y. 1994)). [10]

C. FDCPA Standards

Congress enacted the FDCPA "to eliminate abusive debt collection practices by debt collectors, to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and ... to protect consumers against debt collection abuses." *Vincent v. The Money Store,* 736 F.3d 88, 96 (2d Cir. 2013) (quoting 15 U.S.C. § 1692(e)). To further these ends, the FDCPA "establishes certain rights for consumers whose debts are placed in the hands of professional debt collectors for collection." *DeSantis v. Computer Credit, Inc.,* 269 F.3d 159, 161 (2d Cir. 2001). Among those rights, the FDCPA "grants a private right of action to a consumer who receives a communication that violates the Act." *Jacobson v. Healthcare Financial Services, Inc.,* 516 F.3d 85, 91 (2d Cir. 2008) (citing 15 U.S.C. § 1692k).

As relevant here, "[a] debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. A debt collector also "may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Such prohibited misrepresentations include, but are not limited to, the "false representation of the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A). Finally, a "debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

*6 To establish a violation under the FDCPA: (1) the plaintiff must be a "consumer" who allegedly owes the debt or a person who has been the object of efforts to collect a consumer debt; (2) the defendant collecting the debt must be considered a "debt collector" as defined by the statute; and (3) the defendant must have engaged in an act or omission in violation of FDCPA. *Plummer v. Atlantic Credit and Finance, Inc.,* 66 F.Supp.3d 484, 488 (S.D.N.Y. 2014) (quoting *Healy v. Jzanus Ltd.,* 02 Civ. 1061, 2002 WL 31654571, at *2 (E.D.N.Y. Nov. 20, 2002)); *Schuh v. Druckman & Sinel, L.L.P.,* 751 F.Supp.2d 542, 548 (S.D.N.Y. 2010).

D. Standards for Res Judicata and Collateral Estoppel

The common law doctrines of res judicata and collateral estoppel are "related but distinct [and] operate to prevent parties from contesting matters that they have had a full and fair opportunity to litigate, thereby conserving judicial resources and protecting parties from the expense and vexation of multiple lawsuits." *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir. 2002) (citing *Montana v. United States,* 440 U.S. 147, 153-54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)).

"Res judicata [or claim preclusion] precludes parties from litigating issues 'that were or could have been raised' in a prior proceeding." *Perez v. Danbury Hospital,* 347 F.3d 419, 426 (2d Cir. 2000) (quoting *Monahan v. New York City Department of Corrections,* 214 F.3d 275, 284-85 (2d Cir. 2000)); *Irish Lesbian and Gay Organization v. Giuliani,* 143 F.3d 638, 644 (2d Cir. 1998). "To prove that a claim is precluded under this doctrine, 'a party must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the parties or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action.' " *Pike v. Freeman,* 266 F.3d 78, 91 (2d Cir. 2001) (brackets omitted) (quoting *Monahan,* 214 F.3d at 284-85); *see also Truong v. Hung Thi Nguyen,* No. 10 Civ. 386, 2011 WL 1198254, at *3 (S.D.N.Y. March 3, 2011).

Collateral estoppel operates slightly differently than res judicata. "Collateral estoppel [or issue preclusion] prevents the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding." *Jim Beam Brands Co. v. Beamish & Crawford Ltd.,* 937 F.2d 729, 734 (2d Cir. 1991) (citing *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 326-27, 75 S.Ct. 865, 99 L.Ed. 1122 (1955)). A party asserting collateral estoppel must establish

four elements: "(1) the issues in the prior proceeding and the current proceeding are identical; (2) the issue raised in the current action was, in fact, actually decided in the prior proceeding; (3) there was a full and fair opportunity to litigate the issue in the prior proceeding; and (4) the issue previously litigated and decided was necessary to support a valid and final judgment on the merits." *GemShares, LLC v. Kinney,* No. 17 Civ. 844, 2017 WL 2559232, at *8 (S.D.N.Y. June 2, 2017) (citing *In re PCH Associates,* 949 F.2d 585, 593 (2d Cir. 1991)).

## Discussion

BAC asserts several arguments in support of its motion to dismiss. Three of those arguments each independently require dismissal of the Complaint. First, Dash's action is barred by the doctrine of res judicata based on the Prior Litigation. Second, Dash's action is barred by the applicable one-year statute of limitations within the FDCPA. Third, Dash's action fails to state a claim because BAC is not actually a "debt collector" within the meaning of the FDCPA. [11]

### A. Dash's Action is Precluded by the Prior Litigation

**\*7** Citing the Prior Litigation, BAC argues that "collateral estoppel and/or res judicata bar Plaintiff's FDCPA claim as a matter of law" and the action should therefore be dismissed. (Def. Mem. at 7-8.) BAC is correct.

As outlined above, courts consider a three-factor analysis to determine whether a plaintiff's claim is precluded under res judicata. A defendant must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the parties or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action.' " *Pike v. Freeman,* 266 F.3d 78, 91 (2d Cir. 2001) (brackets omitted) (quoting *Monahan,* 214 F.3d at 284-85); *see also Truong v. Hung Thi Nguyen,* No. 10 Civ. 386, 2011 WL 1198254, at *3 (S.D.N.Y. March 3, 2011).

As for the first factor, the Prior Litigation did not conclude with a trial verdict or judicial decision; it concluded with Dash's filing of a "Notice of Dismissal with Prejudice." (Prior Litigation, Dkt. No. 16.) This distinction, however, is irrelevant for purposes of the res judicata analysis. "Res judicata bars 'subsequent litigation of any ground of recovery that was available in [a] prior action, whether or not it was

actually litigated or determined.' " *Falardo v. New York City Police Department,* 566 F.Supp.2d 283, 285 (S.D.N.Y. 2008) (quoting *Balderman v. United States Veterans Administration,* 870 F.2d 57, 62 (2d Cir. 1989)). "A judgment on the merits for purposes of res judicata is not necessarily a judgment based upon a trial of contested facts." *Gianatasio v. D'Agostino,* 862 F.Supp.2d 343, 349 (S.D.N.Y. 2012) (quoting *Dillard v. Henderson,* 43 F.Supp.2d 367, 369 (S.D.N.Y. 1999)).

Rather, a discontinuance with prejudice serves as a final adjudication on the merits. *NBN Broad., Inc. v. Sheridan Broadcasting Networks, Inc.,* 105 F.3d 72, 78 (2d Cir. 1997) ("a discontinuance with prejudice is deemed a final adjudication on the merits for *res judicata* purposes on the claims asserted, or which could have been asserted, in the suit"); *Allianz Insurance Co. v. Lerner,* 296 F.Supp.2d 417, 421 (E.D.N.Y. 2003) ("discontinuance with prejudice has the same effect as a final judgment on the merits for res judicata purposes"); *accord Cora v. Ranjan,* 98 A.D.3d 598, 599, 949 N.Y.S.2d 503, 504 (2d Dep't 2012); *Fifty CPW Tenants Corp. v. Epstein,* 16 A.D.3d 292, 294, 792 N.Y.S.2d 58, 60 (1st Dep't 2005) (stipulation of discontinuance with prejudice is a judgment on the merits for the purposes of *res judicata*). [12] Accordingly, the fact that Dash discontinued the action with prejudice is enough to satisfy the requirement that there was an adjudication on the merits in the Prior Litigation.

Second, the parties involved are identical in the Prior Litigation as the current litigation: John P. Dash III as Plaintiff and Bank of America Corporation as Defendant. Although Real Time was initially named as a defendant, a stipulation of voluntary dismissal removed that party, leaving only Dash and BAC. (Dkt. No. 25.) Therefore, the parties are identical.

**\*8** Third, and finally, the claims asserted in this action could have been asserted in the Prior Litigation. Parties are "barred from relitigating not only matters actually litigated in [a] preceding action but also any matters that could have been litigated in that action ... [if those matters involve] the same nucleus of facts as that of any claim asserted in the prior action." *West v. Ruff,* 961 F.2d 1064, 1065 (2d Cir. 1992) (citing *Smith v. Russell Sage College,* 54 N.Y.2d 185, 192-93, 445 N.Y.S.2d 68, 429 N.E.2d 746 (1981)); *Reilly v. Reed,* 45 N.Y.2d 24, 407 N.Y.S.2d 645, 379 N.E.2d 172 (1978). That is the case here. The allegations made in both the Prior Litigation and this one stem from the identical "nucleus of facts," namely Dash's residential mortgage and BAC's conduct with respect to the mortgage. Moreover, had Dash wanted to add a claim to his pleadings in the Prior Litigation,

he had ample opportunity to do so. Indeed, Dash filed three amended complaints in the Prior Litigation without adding the legal claim Dash asserts here, despite the fact that both claims arising out of the same factual subject matter.

In his Opposition, Dash does not address the res judicata argument in any significant detail. He states that "Plaintiff has never filed a FDCPA against BAC previously ... [and] has only previously filed a Fair Credit Reporting Act case in May 2017, which was settled in September 2017." (Pl. Surreply at ¶ B.) But rather than helping his case, this statement only illuminates the reason for applying res judicata; Dash could have brought his FDCPA claim against BAC in the Prior Litigation but failed to do so.

Moreover, the Complaint in this case does not allege any new conduct subsequent to resolution of the Prior Litigation. In other words, there are no new events concerning BAC's conduct with respect to Dash's mortgage that could not have been raised in the Prior Litigation. Yet Dash waited over seven months before initiating this litigation after discontinuance of the Prior Litigation. These circumstances reflect precisely the sort of activity that the doctrine of res judicata seeks to prevent: relitigating issues that were, or should have been, already addressed through a single action. *See, e.g., EDP Medical Computer Systems, Inc. v. United States,* 480 F.3d 621, 624 (2d Cir. 2007) ("*Res judicata* is a rule of fundamental repose important for both the litigants and for society' [because] [i]t 'relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication' ") (internal citations omitted); *Alaimo v. General Motors Corp.,* No. 07 Civ. 7624, 2008 WL 4695026, at *6 n.2 (S.D.N.Y. Oct. 20, 2008) ("the fundamental principles of *res judicata* [are] to prevent duplicative litigation, conserve judicial resources and prevent inconsistent decisions").

In short, Dash cannot now raise new claims regarding his mortgage that could have been raised in the Prior Litigation. Dash could have asserted his FDCPA claims against BAC in the Prior Litigation alongside his FCPA claims. He did not. That matter was long ago settled between the parties, and the case dismissed with prejudice. For this reason, this action must be dismissed pursuant to Rule 12(b)(6) based on the doctrine of res judicata. [13]

### B. Dash's FDCPA Claims Are Barred By the Statute of Limitations

Even if the Complaint were not barred by res judicata, Dash's claims would still be barred under the applicable statute of limitations contained in the FDCPA.

**\*9** In relevant part, 15 U.S.C. § 1692k(d) provides: "An action to enforce any liability created by this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy ... within one year from the date on which the violation occurs." *See also Wright v. Zabarkes,* 347 F. App'x 670, 671-72 (2d Cir. 2009) ("an action under the FDCPA must be brought within one year from the date the violation occurred"); *Sierra v. Foster & Garbus,* 48 F.Supp.2d 393, 395 (S.D.N.Y. 1999) (dismissing FDCPA action against bank because all claims under the FDCPA must be brought "within one year from the date on which the violation occurs"); *Shieh v. Flushing Branch, Chase Bank USA, N.A.,* No. 11 CV 5505, 2012 WL 2678932, at *6 (E.D.N.Y. July 6, 2012) (same). The one-year period begins to run on "the date when [the consumer] receives an allegedly unlawful communication." *Somin v. Total Community Management Corp.,* 494 F.Supp.2d 153, 158-59 (E.D.N.Y. 2007) (dismissing FDCPA claim as time-barred under one-year limitations period); *Donchatz v. HSBC Bank USA, N.A.,* No. 14-CV-194, 2015 WL 860760, at *9-10 (W.D.N.Y. Feb. 27, 2015) (same), *affirmed,* 648 F. App'x 158 (2d Cir. 2016).

Here, Dash alleges that BAC "re-aged the debt" in violation of the FDCPA in or about September 2015. [14] (Complaint, ¶ 6.) Accordingly, the statute of limitations for his claims expired no later than September 30, 2016 – over a year before he filed the instant Complaint in May 2018.

The plain fact is that Dash had notice of any alleged FDCPA violations by September 2015, yet he waited more than three years to file his lawsuit. Consequently, because of the one-year statutory deadline imposed by the FDCPA, the Complaint must be dismissed for failure to state a cause of action upon which relief can be granted pursuant to Rule 12(b)(6). [15]

### C. BAC is not a "Debt Collector" for Purposes of FDCPA

Even if Dash could survive the res judicata and statute of limitations bars, his Complaint would still be subject to dismissal for failure to state a cause of action upon which

relief could be granted because BAC is not a proper defendant under the FDCPA. As BAC correctly argues, it is not a "debt collector" within the meaning of the statute. [16]

Under the FDCPA, the term "debt collector" means: "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). Meanwhile, the FDCPA defines a "creditor" as "any person who offers or extends credit creating a debt or to whom a debt is owed." 15 U.S.C. § 1692a(4); *see also Vincent v. The Money Store*, 736 F.3d 88, 98 (2d Cir. 2013). Although debt collectors are subject to the FDCPA, creditors generally are not. The FDCPA "limits its reach to those collecting the dues 'of another' and does not restrict the activities of creditors seeking to collect their own debts." *1077 Madison Street LLC v. March*, No. 14-CV-4253, 2015 WL 6455145, at *3 (E.D.N.Y. Oct. 26, 2015) (citing *Maguire v. Citicorp Retail Services, Inc.*, 147 F.3d 232, 235 (2d Cir. 1998)).

 **\*10** Additionally, "a creditor that is not itself a debt collector is not vicariously liable for the actions of a debt collector it has engaged to collect its debts." *Burns v. Bank of America*, 655 F.Supp.2d 240, 255 (S.D.N.Y. 2008) (quoting *Doherty v. Citibank (South Dakota) N.A.*, 375 F.Supp.2d 158, 162 (E.D.N.Y. 2005), *affirmed*, 360 Fed. App'x. 255 (2d Cir. 2010)). Where an entity is assigned "a debt in default solely for the purpose of facilitating collection of such debt for another," it falls outside the definition of a "creditor" under the FDCPA. *See* 15 U.S.C. § 1692a(4); *Johnson-Gellineau v. Steine & Associates*, P.C., No. 16 Civ. 9945, 2018 WL 1605574, at *8 (S.D.N.Y. March 29, 2018).

The distinction between creditors and debt collectors was highlighted in a recent opinion by the U.S. Supreme Court, *Henson v. Santander Consumer USA Inc.*, 582 U.S. ——, 137 S.Ct. 1718, 198 L.Ed.2d 177 (2017). There, the Court considered the possible definitions of a "debt collector" and what sorts of entities should be subject to the FDCPA. The Court held that "entities who regularly purchase debts originated by someone else and then seek to collect those

debts for their own account" are not debt collectors within the meaning of the statute. *Id.* at 1721.

BAC does not meet the definition of a "debt collector" within the meaning of the FDCPA. Dash himself acknowledges that BAC – or, more correctly, Bank of America, N.A. – merely contracted its debt collection services to Real Time. (Pl. Opp., Ex. D.) The Complaint does not articulate any activities that BAC engaged in, separate and apart from Real Time, that would constitute violations of the FDCPA.

Dash's opposition papers do not address BAC's argument in this regard, except by stating that BAC violated the FDCPA and attaching voluminous documents and statements bearing the Bank of America corporate logo, some dating back to 2006, which discuss the terms of his mortgage. (*See* Pl. Sur-reply, attachments). But none of these attachments show how BAC is anything more than a creditor within the definition of the FDCPA, or how it has violated the provisions of the FDCPA.

In short, Dash has failed to plead facts to show that BAC is actually a debt collector within the meaning of the statute. Consequently, the action is subject to dismissal as a matter of law. *See, e.g., Frederick v. Capital One Bank (USA), N.A.*, No. 14 Civ. 5460, 2018 WL 1583289, at *12 (S.D.N.Y. March 27, 2018) (dismissing FDCPA claims where plaintiff failed to establish that defendant was a debt collector).

<u>Conclusion</u>

For the foregoing reasons, Defendant's motion to dismiss is GRANTED and this action is dismissed. The Court has considered the remaining arguments raised by the parties, and to the extent they are not addressed herein, finds them to be without merit. The Clerk of the Court is respectfully directed to terminate Dkt. No. 29 and close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1780140

## Footnotes

1     As discussed further below, named defendant Real Time Resolutions, Inc. is no longer a defendant in this case.

2     In accordance with the standard for assessing a motion to dismiss, the following facts are derived from Plaintiff's Complaint, dated May 31, 2018 (Dkt. No. 1), and accepted as true. *See Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013). In addition to the Complaint, the Court also draws upon statements and documents incorporated into the Complaint by reference, as well as matters of which judicial notice may be taken, including public records and documents that Plaintiff either possessed or knew about, and relied upon, in bringing the suit. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013) (citing *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

3     In his Complaint and opposition papers, Dash incorrectly states that Defendant Bank of America Corporation was the mortgagee. But in fact, the face of the mortgage and note indicate that Bank of America, N.A. is the actual mortgage. (Plaintiff's Opposition to Motion to Dismiss ("Pl. Opp."), Ex. D; Ex. A and B attached to the Motion to Dismiss.)

4     The First Cause of Action cites "15 U.S.C. § 1692k(b)(1)i", but "(i)" does not exist in the statute. The Court construes that 15 U.S.C. § 1692k(b)(1) was intended. This section states: "In determining the amount of liability in any action under subsection (a), the court shall consider, among other relevant factors (1) ... the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional...."

5     On the First Cause of Action, Dash alleges that he is entitled to attorneys' fees "pursuant to 15 U.S.C. § 1681k(a)(3)." This provision is part of the Fair Credit Reporting Act – the law that formed the basis for Dash's separate lawsuit against BAC, discussed in detail below. Even if this legislation were relevant here, that provision does not involve attorneys' fees; nor does it include a Subsection 3.

6     On the Second Cause of Action, Dash alleges that he is entitled to attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3). That section provides, in relevant part: "[A]ny debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of ... (3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court."

7     Dash refers to the Prior Litigation as having been "settled" in September or October 2017. (Pl. Opp. at ¶ 4.; Pl. Sur-reply (Dkt. No. 32) at ¶ B.) BAC does not reference settlement of the Prior Litigation in its motion papers or reply.

8     BAC attached all motion papers to its Motion to Dismiss. (*See* Dkt. No. 29.)

9     Dash did not receive permission to file a sur-reply as required by Part III(E) of this Court's Individual Rules. *See also* Fed. R. Civ. P. 7(a)(7). Nevertheless, mindful of its duty to extend special solicitude to *pro se* plaintiffs, the Court has exercised its discretion to accept and consider the sur-reply. *See Munoz-Nagel v. Guess, Inc.*, No. 12 Civ. 1312, 2013 WL 1809772, at *1 (S.D.N.Y. April 30, 2013) (reviewing sur-reply of *pro se* litigant in connection with motion to dismiss); *accord Gadson v. Goord*, No. 96 Civ. 7544, 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997) (citing *Gil v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987)) (same).

10     As relevant here, the Court may consider Dash's Note and Mortgage, as both documents are referenced in the Complaint and form the basis for Dash's claims. BAC's motion papers attach the two documents, both

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

dated March 8, 2006. (Dkt. No. 29, Ex. A, B). The Court may also consider Dash's Prior Litigation, which is a matter of public record, referenced in Dash's opposition papers (Pl. Opp. at ¶ 4), and pleadings from which are attached to BAC's moving papers. (Dkt. No. 29, Ex. C, D.)

11    BAC asserts additional arguments based on lack of subject matter jurisdiction and improper venue. The Court has considered these arguments and determined them to be without merit. Nevertheless, dismissal is warranted based on BAC's three other arguments discussed below.

12    In cases before a federal court on the basis of a federal question, the court applies federal common law in considering the preclusive effects of res judicata. *Taylor v. Sturgell* 553 U.S. 880, 891, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008) (holding that a federal court vested with federal question jurisdiction must apply federal common-law res judicata rules); *accord Paramount Pictures Corp. v. Allianz Risk Transfer AG*, 31 N.Y.3d 64, 88, 96 N.E.3d 737, 754 (2018) (same).

13    BAC argues that Dash's claims are barred by "collateral estoppel and/or res judicata." (Def. Mem. at 7.) Although courts sometimes refer to these two doctrines interchangeably, res judicata is the better doctrinal fit for this case. Collateral estoppel, or issue preclusion, bars the relitigation of *issues* previously decided in another action (rather than res judicata, which bars the relitigation of *claims*). Here, the specific "issue" of FDCPA liability was never raised or decided in the Prior Litigation.

14    Implicit in Dash's allegation is that he learned of BAC's having re-aged the debt through a communication he received in or about September 2015.

15    Dash does not address BAC's statute of limitations arguments in any detail in his Opposition.

16    BAC argues that the Complaint should be dismissed because Dash incorrectly named "Bank of America Corporation" in this lawsuit rather than "Bank of America, N.A." The former is merely a holding company, BAC asserts, and therefore never formally serviced Dash's loan or attempted to collect on the debt owed within the meaning of the FDCPA. (Def. Mem. at 10.) The face of the Note and Mortgage indicate that the agreements are between Dash and non-party "Bank of America, N.A." This may be so, but this argument for dismissal is unavailing. Courts construe the pleadings of *pro se* plaintiffs liberally. *Triestman,* 470 F.3d at 474-75. To the extent that Dash improperly named an affiliated entity, such an error could be forgiven at this early stage of the litigation, especially if it could be cured through an amendment of the pleadings. For reasons discussed elsewhere in this opinion, however, such an amendment would be futile.

---

     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1234042

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Robert GIULIANO a/k/a Robert P. Giuliano, Plaintiff,

v.

Mackie BARCH, Richard A. Wolpow, Danny
M. Barnes, Stephen M. Perry, David S.
Rowley, Boyd R. Relac, Russell Skibsted,
Justin Barch, and Eric Clarke, Defendants.

No. 16 CV 0859 (NSR)

|

Signed 03/31/2017

**Attorneys and Law Firms**

Jennifer J. Bock, Keri Ann Joeckel, Law Firm of Elias C.
Schwartz, PLLC, Great Neck, NY, Susan Joy Deith, Levitt
LLP, Mineola, NY, for Plaintiff.

Brendan Markham Goodhouse, Cuddy & Feder, LLP, White
Plains, NY, Joshua E. Kimerling, Cuddy & Feder LLP, New
York, NY, George J. Szary, Degraff, Foy & Kunz, LLP,
Albany, NY, Nicole Roman Rodgers, DeGraff, Foy & Kunz,
LLP, Saratoga Springs, NY, for Defendants.

Mackie Barch, Kensington, MD, pro se.

Justin Barch, Kensington, MD, pro se.

## OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

**\*1** Robert Giuliano ("Giuliano" or "Plaintiff") is suing
several corporate directors and officers of Pharmagen, Inc. [1]
("Pharmagen"), in their individual capacity. Giuliano founded
and solely owned Bryce Rx Laboratories ("Bryce Labs") until
he sold it to Pharmagen in 2012 for $1,875 million. (Am.
Compl. ¶ 1, ECF No. 29.) The sale was memorialized by
a Stock Purchase Agreement, an Employment Agreement,
and a Restrictive Covenant, (see generally Am. Compl., Exs.
A-C, respectively.) Giuliano alleges, among other things,
that defendants knew Pharmagen never intended to fulfill
its obligations under the Agreements and engaged in fraud
and misconduct to lure Giuliano into selling Bryce Labs.
(Am. Compl. ¶¶ 60, 66-67, 79, 81.) The instant case

involves the following defendants: Richard A. Wolpow
("Wolpow"), David S. Rowley ("Rowley"), Boyd R. Relac
("Relac"), Russell Skibsted ("Skibsted"), Mackie Barch ("M.
Barch"), Justin Barch ("J. Barch"), and Eric Clarke ("Clarke")
(together, the "Defendants").

Giuliano pleads causes of action that sound in contract
(breach and anticipatory breach of contract), tort (tortious
interferences, conversion), equity (pierce the corporate
veil, unjust enrichment, promissory estoppel), and state
employment law (non-payment of wages). All the defendants,
except for Clarke, move to dismiss the Amended Complaint
(the "Complaint") in its entirety pursuant to Rules 12(b)(2)
and 12(b)(6) for lack of personal jurisdiction and failure
to state a claim upon which relief can be granted. (see
Defs.' Wolpow, Rowley, Relac, and Skibsted's Mem. Law
Supp. Mot. to Dismiss Am. Compl. ("Wolpow Defs.' Mem.")
17-19, ECF No. 47); (Def. M. Barch's Mem. Law. Supp.
Mot. to Dismiss. Am. Compl. ("Def. M. Barch's Mem."),
ECF No. 59); (Def. J. Barch's Mem. Law. Supp. Mot. to
Dismiss. Am. Compl. ("Def. J. Barch's Mem."), ECF No.
63.) Defendant Clarke moves to dismiss pursuant to Rule 8,
Rule 9(b), and Rule 12(b)(6) of the Federal Rules of Civil
Procedures. For the reasons explained below, the collective
motion by Defendants Wolpow, Rowley, Relac, and Skibsted
is GRANTED, Defendant M. Barch's motion is GRANTED,
Defendant J. Barch's motion is GRANTED, and Defendant
Eric Clarke's motion is GRANTED.

## BACKGROUND

The following facts—taken from the Amended Complaint,
exhibits attached thereto, statements or documents
incorporated by reference, and documents that Plaintiff either
possesses or knew about, and relied upon, in bringing suit—
are assumed to be true for purposes of this motion. See, e.g.,
Kleinman v. Elan Corp., 706 F.3d 145, 152 (2d Cir. 2013);
LaFaro v. N.Y. Cardiothoracic Grp., PLLC, 570 F.3d 471, 475
(2d Cir. 2009); Kerman v. Kurz-Hastings, Inc., 175 F.3d 236,
240 (2d Cir. 1999).

### A. Relevant Facts

Giuliano founded and individually operated Bryce Labs until
December 13, 2012, when he sold it to Pharmagen for a "total
purchase price" of $1,875,000. (Am. Compl. ¶¶ 1, 40.) On
March 4, 2013, approximately three months after acquiring
Bryce Labs, Pharmagen registered a name change from Bryce

Labs to "Pharmagen Laboratories, Inc." ("Bryce Labs"). [2] (Am. Compl. ¶ 31.) Bryce Labs was incorporated in New York and has its principal place of business in Connecticut. The purchase was memorialized in three separate documents: the Stock Purchase Agreement, the Employment Agreement, and Restrictive Covenant Agreement. (Am. Compl. ¶ 42, collectively referred to as "the Agreements.") Executed as separate documents, the Employment and Restrictive Covenant Agreements "were ancillary to, and a part of, the SPA in order to subsidize the monies to be paid to [Plaintiff] under the terms of the SPA." (Am. Compl. ¶ 42.) The Agreements were all signed on the same day, December 13, 2012, by Pharmagen (formerly known as Sunpeaks Ventures), [3] Bryce Labs, and Giuliano. (Am. Compl. ¶¶ 40-41; Ex. A, Securities Purchase Agreement ("SPA"), at 1.)

**\*2** Pharmagen agreed to pay a total purchase price of $1,875,000, plus benefits. (Am. Compl. ¶ 77.) The parties apportioned the total purchase price for Bryce Labs between the Agreements. First, Pharmagen agreed to pay Giuliano a "sale price" of $1.1 million to acquire all of Bryce's outstanding securities. (SPA § 1.2.1.) Pursuant to the SPA, the "sale price" would be paid in four installments, with $100,000 due at closing, and the remaining $1 million in payments of $250,000. Under this scheme, Pharmagen would pay Giuliano a yearly sum of $250,000 over four years, starting on December 31, 2013 and continuing through December 31, 2016. (Am. Compl. ¶ 44; SPA §§ 1.2.1.1, 1.2.1.2.) The parties further agreed that the SPA "shall be governed by and construed in accordance with, the laws of the State of Maryland." (Am. Compl. ¶ 54; SPA § 7.11.)

Second, Pharmagen agreed to employ Giuliano for a period of four years, with the option to extend Giuliano's term for one additional year. [4] The Employment Agreement, incorporated by reference in the SPA, explains that "the Board of Directors ... consider[ed] it to be in the best interests of [Pharmagen] that Giuliano remain ... and continue to devote his attention," to Bryce Labs given his "great deal of knowledge about [its] business affairs." (Am. Compl., Ex. B ("Emp't Agreement"), at 1.) Most relevant here, the Employment Agreement provided that Pharmagen would pay Giuliano a total of $775,000 in wages as part of the deal's "subsidized price." (Am. Compl. ¶ 45; Emp't Agreement §§ 1, 3.) Giuliano alleges that while the Employment Agreement was separately executed, it was "ancillary to, and a part of the, [SPA] in order to subsidize the monies to be paid to Giuliano under the terms of the [SPA]." (Am. Compl. ¶ 42.) The Employment Agreement also provided that if Pharmagen

terminated Giuliano "without cause" "[Pharmagen] [was required to] continue pay[ing] [Giuliano] his compensation" through "December 31, 2017." (Emp't Agreement § 6(c).) Like the SPA, the parties designated Maryland as the law governing the "validity, interpretation, construction, and performance" of the Employment Agreement. (Am. Compl. ¶ 55; Emp't Agreement § 10.) Finally, pursuant to the Restrictive Covenant Agreement Giuliano agreed to "... the covenants and promises made ... [here as] a material inducement to the Company to continue" employing Giuliano and providing him with "other benefits and consideration." (*Id.* § 15.)

Plaintiff's factual allegations as to the individual defendants relate exclusively to their roles as directors or officers of Pharmagen, Inc. The majority of the Complaint asserts that Defendants committed fraud when they lured" Plaintiff into selling his company "knowing full well they had neither the means nor the intention of fulfilling their obligations under the terms of the Agreements." (¶¶ 79, 83, 100.) Additionally, Defendants allegedly undercapitalized Pharmagen, ignored corporate formalities, and dominated its affairs. Lastly, on April 22, 2013, Defendants fired Giuliano from Bryce Labs. (Am. Compl. ¶ 52.) Giuliano asserts that he "was wrongfully terminated, without cause," (*id.*) after "Defendant Officers blamed [Plaintiff] for errors made by another employee (pharmacist) when the other employee sent the wrong medications to a client." (*Id.* ¶ 92.) According to Plaintiff, this was a pretext to avoid paying him the monies due for acquiring Bryce Labs. (*Id.* ¶¶ 84, 96.)

### B. Procedural Background

On December 11, 2015, Giuliano commenced this action in the Supreme Court of the State of New York, specifically Westchester County, but former defendants [5] removed the case here by invoking the federal courts' diversity jurisdiction established by 28 U.S.C. § 1332. After a pre-motion conference on March 16, 2016, the Court granted Giuliano leave to file an amended complaint to address issues raised by Defendants, and granted Defendants leave to file separate motions to dismiss. [6] Giuliano timely amended the initial complaint (ECF No. 29), [7] after which Defendants Relac, Rowley, Wolpow, and Skibsted separately filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6). (See ECF Nos. 43, 46, 47.) Defendants M. Barch and J. Barch, each proceeding *pro se,* filed separate 12(b)(2) and (b)(6) motions to dismiss. (ECF Nos. 59, 63.) Defendant Clarke filed

a motion dismiss pursuant to Rules 8, 9(b), and 12(b)(6). Fed. R. Civ. P. (ECF No. 51.)

**\*3** Plaintiff's Amended Complaint, filed on April 9, 2016, alleges that up to, during, and after this sale, the named defendants perpetrated various frauds on Plaintiff, (see *generally* Am. Compl. ¶¶ 56-77.) Notably, neither Pharmagen nor Bryce Labs (a wholly owned subsidiary of Pharmagen) is a named party in the instant action. In filing suit against individual corporate defendants rather than Pharmagen itself, Giuliano is essentially asking the Court to pierce the corporate veil on an alter ego theory so that he may assert claims against (and potentially recover from) the individual directors and officers for (1) piercing the corporate veil due to fraud, (2) breach of contract, (3) tortious interference, (4) indemnification, (5) declaratory judgment and specific performance, (6) unjust enrichment, (7) promissory estoppel, (8) conversion, (9) attorneys' fees, (10) non-payment of wages, and (11) twice the amount of unpaid wages and attorneys' fees under Connecticut state law.

### LEGAL STANDARD

"The lawful exercise of personal jurisdiction by a federal court requires satisfaction of three primary requirements." *Jonas v. Estate of Leven,* 116 F. Supp. 3d 314, 323-24 (S.D.N.Y. 2015) (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 673 F.3d 50, 59 (2d Cir. 2012)). First, "the plaintiffs service of process upon the defendant must have been procedurally proper"; second, "there must be a statutory basis for personal jurisdiction that renders such service of process effective"; and third, "the exercise of personal jurisdiction must comport with constitutional due process principles." *Licci ex re. Licci,* 673 F.3d at 59-60.

The plaintiff bears the burden of establishing jurisdiction and must make a prima facie showing that jurisdiction exists. *See Penguin Grp. (USA) Inc. v. Am. Buddha,* 609 F.3d 30, 34-35 (2d Cir. 2010). "Such a showing entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant." *Id.* at 35 (internal quotation marks omitted). The plaintiff must also "establish the court's jurisdiction with respect to *each* claim asserted." *Sunward Elecs., Inc. v. McDonald,* 362 F.3d 17, 24 (2d Cir. 2004).

"Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good

faith, *see* Fed. R. Civ. P. 11, legally sufficient allegations of jurisdiction." *Ball v. Metallurgie Hoboken-Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir. 1990); *accord Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 566 (2d Cir. 1996). In deciding a 12(b)(2) motion, the district court may consider materials outside the pleadings, including affidavits and other written materials.[8] *MacDermid, Inc. v. Deiter,* 702 F.3d 725, 727 (2d Cir. 2012); *Bensusan Rest. Corp. v. King,* 937 F.Supp. 295, 298 (S.D.N.Y. 1996), *aff'd,* 126 F.3d 25 (2d Cir. 1997). The court assumes the verity of the allegations "to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc.,* 702 F.3d at 727 (internal quotation marks omitted). Nonetheless, all factual doubts or disputes are to be resolved in the plaintiff's favor. *See, e.g., A.I. Trade Fin., Inc. v. Petra Bank,* 989 F.2d 76, 79-80 (2d Cir. 1993).

In diversity cases such as this, a district court looks to the law of the state in which it sits to determine whether it has personal jurisdiction over foreign defendants. *See Int'l Shoe Co. v. State of Wash., Office of Unemp't Comp. & Placement,* 326 U.S. 310 (1945); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 784 (2d Cir. 1999). This Court will therefore look to New York law to determine whether it may exercise personal jurisdiction over the Defendants.

**\*4** Pursuant to N.Y. C.P.L.R. § 301, a defendant is subject to personal jurisdiction if he is domiciled in New York, served with process in New York, or continuously and systematically does business in New York. *See Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.,* 77 N.Y.2d 28, 33, 563 N.Y.S.2d 739, 565 N.E.2d 488 (1990); *Pichardo v. Zayas,* 122 A.D.3d 699, 702, 996 N.Y.S.2d 176, 180 (2d Dept. 2014); *see also Wells Fargo Bank Minnesota, N.A. v. ComputerTraining.Com, Inc.,* No. 04-CV-0982, 2004 WL 1551510, at *2-3 (S.D.N.Y. July 9, 2004). In addition, a defendant may be subject to New York's long-arm statute, N.Y. C.P.L.R. § 302, if he engages in the following acts either in person or through an agent *and* such acts relate to an asserted claim: (1) transacts any business within the state or contracts anywhere to supply goods or services in the state; (2) commits a tortious act within the state; (3) commits a tortious act outside the state but injures a person or property in the state; or (4) owns, uses, or possesses any real property in the state. N.Y. C.P.L.R. § 302(a).

By contrast, a Rule 12(b)(6) motion challenges the sufficiency of the allegations in the complaint. *See ATSI Commnc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007). To service such a motion, a complaint must "state a claim to relief that

is plausible on its face. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. at 556). More specifically, the plaintiff must allege facts sufficient to show "more than a sheer possibility that a defendant acted unlawfully," *id.,* and cannot rely on mere "labels or conclusions" to support a claim. *Twombly,* 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

### DISCUSSION

Plaintiff alleges that Defendants, in their individual capacities, "committed fraud when they lured" Plaintiff into selling his company "knowing full well they had neither the means nor the intention of fulfilling their obligations under the terms of the Agreements." (Am. Compl. ¶ 79.) Specifically, Defendants misrepresented the company's intent to pay Plaintiff the total purchase price of $1.875 million and wrongfully terminated Plaintiff's employment at Bryce Labs to further avoid paying the total purchase price. Defendants also failed to assume operational debt or observe corporate formalities. As a result, Plaintiff alleges he "suffered compensable injury ... in the amount of at approximately at least ... $2.5 [million]." (Am. Compl. ¶ 64.)

Defendants seek to dismiss on several grounds pursuant to Rule 12(b). The Court considers the jurisdictional questions first, *see Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574 (1999), finds that they dispose of each of the pending motions, and therefore does not reach the issue of whether the complaint sets forth valid claims for relief pursuant to Rule 12(b)(6).[9] *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 425 (2007) (stating that if "a court can readily determine that it lacks jurisdiction over the cause or the defendant, the proper course would be to dismiss on that ground."). "This is also prudent as the motions have different consequences for a litigant, for instance, the plaintiff's ability to re-file a claim." *Bidonthecity.com LLC v. Halverston Holdings Ltd.,* No. 12-CV-9258 (ALC) (MHD), 2014 WL 1331046, at *2 (citing *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 221 ("A dismissal for lack of jurisdiction or improper venue does not preclude a subsequent action in

an appropriate forum, whereas a dismissal for failure to state a claim upon which relief can be granted is with prejudice.")).

### A. The Amended Complaint Fails to Allege Facts Sufficient for the Court's Exercise of Personal Jurisdiction over Defendants Wolpow, Rowley, Relac and Skibsted

**\*5** In moving to dismiss, Defendants dedicate one paragraph to this jurisdictional issue. They argue that "Plaintiff has not pled facts sufficient to establish this Court's jurisdiction over the Defendants." (Wolpow Defs.' Mem. at 17, ECF No. 47.) Because Defendants do not substantiate their claim, presumably they argue that (1) they are foreign individuals who have not conducted any business in New York, and (2) Plaintiff's commencement of a lawsuit in New York, effectively availing himself of the protections of New York state and its laws, does not confer personal jurisdiction because the Complaint fails to allege that Pharmagen was the agent or alter ego of Defendants. In opposition, Plaintiff puts forth a theory of jurisdiction by proxy, namely, that personal jurisdiction exists pursuant to N.Y. C.P.L.R. § 302 because Plaintiff negotiated the contracts from New York and Defendants caused economic injury to Plaintiff in New York. Although it is unclear based on Plaintiff's generalized allegations, it appears Plaintiff contends personal jurisdiction exists pursuant to N.Y. C.P.L.R. §§ 302(a)(1) and 302(a)(3).

New York's long-arm statute, N.Y. C.P.L.R. 302(a), sets out four paths to personal jurisdiction. Because there is no factual assertions or allegations that Defendants either own real property in New York, *see id.* 302(a)(4), or committed any tortious act within New York state, *see id.* 302(a)(2), Plaintiff must establish either (1) that defendants transacted "business within" New York or have contracted "anywhere to supply goods or services in" New York, *see id.* 302(a)(1); or (2) that Defendants have committed a "tortious act ... causing injury to person or property within the state" *and* that a defendant either:

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in [New York], or

(ii) expects or should reasonably expect the act to have consequences in [New York] and derives substantial revenue from interstate or international commerce[,]

*id.* 302(a)(3)(i)-(ii).

1. N.Y. C.P.L.R. § 301 [10]

Defendants Wolpow, Rowley, Relac, and Skibsted are not subject to general personal jurisdiction pursuant to N.Y. C.P.L.R. § 301. They are all foreign individuals that do not systematically and continuously do business in New York, and Plaintiff does not argue otherwise. Further, individuals acting on a corporation's behalf are not subject to general personal jurisdiction under Section 301.

A federal court sitting in diversity has general personal jurisdiction over a party pursuant to CPLR § 301 where the defendant "engaged in such a continuous and systematic course of 'doing business' in New York as to warrant a finding of its 'presence' in the state." *Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181, 184 (2d Cir. 1998) (internal quotation marks and citation omitted). In evaluating whether a defendant is "doing business" in New York, courts look to a nonexclusive number of factors, none of which is conclusive, including: (1) "the existence of an office in New York"; (2) "the solicitation of business in the state"; (3) "the presence of bank accounts and other property in the state"; and (4) "the presence of employees of the foreign defendant in the state." *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 58 (2d Cir. 1985). Section 301 has been construed to confer jurisdiction over non-corporate entities, such as charities or nonprofit organizations and *individuals*, under the "doing business" test. *See Thorsen v. Sons of Norway,* 996 F. Supp. 2d 143, 153 (E.D.N.Y. 2014) (internal citations omitted).

Here, Plaintiff alleges that Defendants Wolpow, Rowley, Relac, and Skibsted—in their capacities as directors and officers of Pharmagen—breached their obligations pursuant to the Agreements. Plaintiff specifically states:

**\*6** "that the Agreements were negotiated and entered into in New York, that Pharmagen Labs is a New York Corporation, and as a result, Pharmagen and Pharmagen Labs transacted sufficient business within the State of New York to subject them to long-arm jurisdiction pursuant to N.Y. C.P.L.R. § 302. The Plaintiff has further alleged that the Moving Defendants exercised control over the New York Defendant (Pharmagen Labs), which in actuality was merely a subsidiary and operating unit and not a separate corporate entity from Pharmagen."

(Pl.'s Opp'n to Wolpow at 23, ECF No. 49.) (internal citations omitted). Under Plaintiff's theory of jurisdiction by proxy, the Court has personal jurisdiction over the Defendants by virtue of its long-arm jurisdiction over Pharmagen and Pharmagen Labs. (*Id.*)

As an initial matter, Plaintiff incorrectly refers to Pharmagen Labs as "the New York Defendant," because he has not named the subsidiary (nor its parent) as a party to this action. Moreover, jurisdiction over the representatives of a corporation "may not be predicated on jurisdiction over the corporation itself, and jurisdiction over the individual officers and directors must be based on their individual contacts with the forum state." [11] *Charas v. Sand Tech. Sys. Int'l Inc.,* No. 90-CV-5638 (JFK), 1992 WL 296406. At \*4 (S.D.N.Y. Oct. 7, 1992); *see also Duravest,* 581 F. Supp. 2d at 634 (citing *Arch Specialty Ins. Co. v. Entm't Specialty Ins. Servs.,* 2005 WL 696897 (S.D.N.Y. Mar. 24, 2005)) (citing *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 470, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988) ("[I]t does not follow automatically that New York may exercise personal jurisdiction over all of a corporation's officers as a consequence of having jurisdiction over the corporation.")). Indeed, an individual acting on a corporation's behalf is not subject to general personal jurisdiction under Section 301. *See Duravest,* 581 F. Supp. 2d at 635 ("Rather, an individual defendant may be subject to specific personal jurisdiction (*but not general jurisdiction*) based on his actions in his corporate capacity....") (emphasis added); *Big Apple Pyrotechnics and Multimedia Inc. v. Sparktacular Inc.,* 2007 WL 747807, at \*6 (S.D.N.Y. Mar. 9, 2007) (quoting *Laufer,* 55 N.Y.2d at 313, 449 N.Y.S.2d 456, 434 N.E.2d 692) ("Although a corporation can act only through an employee or agent, the employee or agent being a live rather than a fictional being can act on behalf of himself or his employer or principal. He does not subject himself, individually, to the CPLR 301 jurisdiction of our courts, however, unless he is doing business in our State individually."). [12] Plaintiff has failed to allege any facts to suggest that Defendants systematically and continuously do business in New York. Therefore, Defendants are not subject to general personal jurisdiction pursuant to Section 301. [13]

2. N.Y. C.P.L.R. § 302(a)(1)—transaction of business within the state

**\*7** Turning to specific personal jurisdiction pursuant to N.Y. C.P.L.R. § 302(a)(1), Plaintiff's allegations fail to establish that any of the defendants transacted business in New York within the meaning of the statute.

Plaintiff alleges he "has fully performed his duties and obligations under the Agreements" (¶ 80), which Defendants

have breached when they (1) failed to assume credit line; (2) failed to make scheduled payments for the sale price ($750,000 still outstanding); (3) anticipatorily repudiated making final scheduled payment of $250,000; (4) failed to make payments for the 'total purchase price'; (5) wrongfully terminated Plaintiff; and (6) failed to reimburse Plaintiff for expenses paid during his employment. (Am. Compl. ¶ 70.)

"Whether a non-domiciliary is transacting business within the meaning of CPLR 302(a)(1) is a fact based determination, and requires a finding that the non-domiciliary's activities were purposeful and established 'a substantial relationship between the transaction and the claim asserted.' " *Paterno v. Laser Spine Inst.,* 24 N.Y.3d 370, 376, 998 N.Y.S.2d 720, 23 N.E.3d 988 (2014). "Purposeful activities are volitional acts by which the non-domiciliary 'avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Id.* (quoting *Fischbarg v. Doucet,* 9 N.Y.3d 375, 380, 849 N.Y.S.2d 501, 880 N.E.2d 22 (2007)). "More than limited contacts are required for purposeful activities sufficient to establish that the non-domiciliary transacted business in New York." *Paterno,* 24 N.Y.3d at 376, 998 N.Y.S.2d 720. New York case law makes clear that "it is the quality of the defendants' New York contacts that is the primary consideration" in a 302(a)(1) analysis. *Fischbarg,* 9 N.Y.3d at 380, 849 N.Y.S.2d 501, 880 N.E.2d 22; *see also Royalty Network Inc. v. Dishant.com, LLC,* 638 F. Supp. 2d 410, 417-18 (S.D.N.Y. 2009).

The U.S. Court of Appeals for the Second Circuit has also delineated four factors that guide the section 302(a)(1) inquiry:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires ... payments into the forum state or subjects [defendants] to supervision ... in the forum state.

*Sunward Elecs., Inc.,* 362 F.3d at 22. [14] The "pivotal inquiry" is whether the defendant has "performed purposeful acts in New York in relation to the contract." *Bonsey v. Kates,* 13-CV-2708, 2013 WL 4494678, at *4 (S.D.N.Y. Aug. 21, 2013) (internal quotation marks omitted).

***8** As a starting place, it is helpful to review some of the key facts in support of Plaintiff's claims against Defendants Wolpow, Relac, Rowley, and Skibsted. In 2012, these four defendants (along with M. Barch, J. Barch, and Clarke) "exercised complete domination and control of [Pharmagen] with respect to [ ] Pharmagen Companies' negotiation and performance under the Agreements ... from on or about October 2012 through the present time." (Am. Compl. ¶ 58.)

According to the Complaint, Defendants "made deliberate false representations to [Plaintiff] when they negotiated and entered into the Agreements ..." (Am. Compl. ¶ 59.) Moreover, Defendants "lured" Plaintiff into selling his company "knowing full well they had neither the means nor the intention of fulfilling their obligations under the terms of the Agreements" (Am. Compl. ¶ 79). To corroborate this claim, Plaintiff cites to a $2 million cash infusion Defendants obtained for Bryce Labs at or about the same time it executed the Agreements. [15] (Am. Compl. ¶ 61.) Plaintiff alleges this capital infusion proves that Defendants could never intend to fulfill Pharmagen's obligations under the Agreements (Am. Compl. ¶¶ 61-68). In sum, Defendants' "deliberate misrepresentations" formed the basis of Plaintiff's decision "to consummate the transaction." (Am. Compl. ¶¶ 63, 66.) Lastly, Plaintiff claims that Defendants Wolpow, Relac, Rowley, and Skibsted knew about and failed to prevent corporate officers from improperly spending corporate funds between July 2013 and July 2014. (Am. Compl. ¶¶ 71, 69, 70, 72, respectively.)

This factual recitation reveals the substantial lack of allegations linking Defendants to New York. Addressing the *Seward* factors in turn, Plaintiff first fails to allege even a single fact in support of any defendant's involvement in the transaction, save for a bare allegation that they held board positions. There are no specific allegations that these individual defendants transacted business in the state aside from the naked, conclusory, and formulaic allegations that they undercapitalized Pharmagen, ignored corporate formalities, and dominated its affairs. (See *generally* Am. Compl. ¶¶ 61-77.) In fact, Plaintiff asserts all these allegations against the "defendants" generally, without specifying the

role of Wolpow, Rowley, Relac or Skibsted in abusing the corporate form to perpetuate a fraud. [16] *See Karabu Corp. v. Gitner,* 16 F. Supp. 2d 319, 324 (S.D.N.Y. 1998); *cf. De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir. 1996) (affirming the dismissal of claims against an alleged alter ego where the plaintiffs' allegations were conclusory and "devoid of *any* specific facts" that defendants acted to defraud plaintiffs); *Strojmaterialintorg v. Russian Am. Commercial Corp.,* 815 F. Supp. 103, 104-05 (E.D.N.Y. 1993). Instead, as Defendants argue, Plaintiff proffers "non-specific allegations without any distinction among the individual defendants with respect to transactions of which Plaintiff complains of...." (Wolpow Defs.' Reply at 2.)

**\*9** Second, the record contains no factual allegations showing that any of the Defendants visited New York for the purpose of negotiating and executing the contract. The only allegations tying the causes of actions to New York is that the agreements were negotiated and executed by Defendants in New York. (Pl's Opp'n to Wolpow at 22.) [17] Yet there are no allegations in the Complaint that the foreign defendants traveled to New York at any time whatsoever for purposes of engaging in any business transaction connected to the Agreements. Presumably, Plaintiff has personal knowledge of these facts, such as where the meetings were held, if documents were mailed or electronically transmitted, or if any of the Defendants visited New York for subsequent meetings regarding the contractual relationship. Even if the Court were to assume—without any allegation to support it—that Defendants were projecting themselves into New York when they negotiated and executed the contracts, how they did so is relevant for a personal jurisdiction analysis. The form of the contact is relevant given that courts are "generally loath to uphold jurisdiction under the transaction in New York prong of CPLR 302(a)(1) if the contract at issue was negotiated solely by mail, telephone, and fax without any New York presence by the defendant." *Mortg. Funding Corp.,* 370 F. Supp. 2d at 287 (emphasis added). [18]

Third, the Agreements are governed by Maryland law, (Am. Compl. ¶¶ 54-55), a fact Plaintiff never addresses for purpose of personal jurisdiction. *See Sumward Elecs., Inc. v. McDonald,* 362 F.3d 17, 23 (2d Cir. 2004) (explaining choice of law clause is a significant factor in a personal jurisdiction analysis because the parties, by so choosing, invoke the benefits and protections of that state's law). Fourth, there are no allegations that money ever flowed to New York nor allegations to substantiate Plaintiff's contention that the

Agreements were to be effectuated in New York. Thus, the allegations fail to satisfy any of the *Seward* factors.

Plaintiff's contention that the Court has personal jurisdiction because Plaintiff performed *his* obligations under the Agreements in New York is also unavailing. *Jonas v. Estate of Leven,* 116 F. Supp. 3d 314, 327 (S.D.N.Y. 2015) (finding no personal jurisdiction where "[Plaintiff] built out an office in New York, hired personnel, and performed trades and analyses [in New York] is also unavailing."). Notwithstanding the fact that there are no specific, but merely general, allegations about Plaintiff's work in New York in the Complaint, his unilateral activity in the proposed forum state would be insufficient to establish jurisdiction. [19] *See Int'l Customs,* 893 F. Supp. at 1262 ("The appropriate focus of an inquiry under C.P.L.R. § 302(a)(1) is on what the non-domiciliary defendant did in New York and not on what the plaintiffs did.") New York courts have consistently held that the unilateral acts of plaintiffs in the forum state do not support jurisdiction over a non-domiciliary defendant. *See, e.g., Ferrante Equip. Co. v. Lasker-Goldman Corp.,* 26 N.Y.S.2d 280, 285, 309 N.Y.S.2d 913, 258 N.E.2d 202 (1970); *SunLight Gen. Capital LLC v. CJS Invs. Inc.,* 114 A.D.3d 521, 522, 981 N.Y.S.2d 390, 391 (1st Dept. 2014); *Mortg. Funding Corp. v. Boyer Lake Pointe, LC,* 379 F. Supp. 2d 282, 287-88 (E.D.N.Y. 2005) ("Even though the Plaintiff may have expended time, energy and resources in New York ... carrying out [its] obligations under the alleged contract, the Plaintiff's business interactions with New York are not at issue when assessing personal jurisdiction. Rather, the Court must evaluate the Defendants' activities and conduct" in New York.).

**\*10** Similarly, New York law is clear that, for purposes of C.P.L.R. 302(a)(1), "the residence or domicile of the injured party within a State is not a sufficient predicate for jurisdiction." *Fantis Foods, Inc. v. Standard Importing Co.,* 49 N.Y.2d 317, 326 (1980). As a result, personal jurisdiction lies "only where a defendant's direct and personal involvement on [its] own initiative projected [itself] into New York to engage in a sustained and substantial transaction of business." *Aquiline Capital Partners LLC v. FinArch LLC,* 861 F. Supp. 2d 378, 386 (S.D.N.Y. 2012) (internal quotation marks and alterations omitted). Because Plaintiff's allegations, when considered separately from the fact that Plaintiff resides in New York, fails to establish that any of the defendants' transacted business in New York in a "sustained" or "substantial" manner, this Court finds that the first prong of C.P.L.R. 302(a) is not satisfied. *See, e.g., See DirectTV*

*Latin Am., LLC v. Park 610, LLC,* 691 F.Supp.2d 405, 423 (S.D.N.Y. 2010) (noting that cases in which the transaction of business in New York is supported by a single transfer of funds to a New York bank account "almost always" involve "far more" additional contacts with the state).

The contacts alleged between Defendants and New York —if they can be said to exist at all—are too tenuous. Accordingly, the Court finds that Plaintiff has not made a prima facie showing of personal jurisdiction over the individual Defendants pursuant to N.Y. C.P.L.R. § 302(a)(1), *see CutCo Industries,* 806 F.2d at 364, and grants Defendants' motion to dismiss for lack of personal jurisdiction.

### 3. N.Y. C.P.L.R. § 302(a)(3)—commission of a tortious act outside the state causing injury within the state

In order to establish personal jurisdiction over a non-domiciliary such as Defendants under C.P.L.R. 302(a)(3), Plaintiff must show that defendants committed a tortious act causing injury to him in New York. This limitation is "more stringent than any constitutional requirement," *Ingraham v. Carroll,* 90 N.Y.2d 592, 597, 665 N.Y.S.2d 10, 687 N.E.2d 1293 (1997) and requires a showing of contacts somewhere between the large quantity required for general jurisdiction under N.Y. C.P.L.R. 301 and the "one shot" single business transaction that can satisfy Section 302(a)(1). *Id.*

Defendants argue Plaintiff has failed to allege facts sufficient for jurisdiction because "the only allegation related to New York's jurisdiction is that the contracts at issue were negotiated in New York." (Wolpow Defs.' Mem. at 17.) In Defendants' view, Plaintiff has only alleged claims that sound in contract, rather than tort. This argument is unavailing: so long as the allegations, taken as a whole, constitute the elements of a tort, the "tortious act" element of C.P.L.R. 302(a)(3) is satisfied. *See Hargrave v. Oki Nursery, Inc.,* 636 F.2d 897, 898-99 (2d Cir. 1980).

Nevertheless, Plaintiff fails to plainly or directly state that New York is the situs of the tort. While Plaintiff, for example, states that Defendants fraudulently induced the sale, (see Am. Compl. ¶¶ 59-63), the Complaint does not name New York as the site of the fraudulent inducement. Plaintiff did not attest to this fact in a sworn affidavit either. Therefore, Plaintiff has also failed to establish a prima facie case for personal jurisdiction under Section 302(a)(3). New York courts apply a situs-of-injury test, rather than an economic-effect test, to determine the location of injury under § 302(a)(3). [20] *Pathak*

*v. Molopo Energy Ltd.,* No. 13-CV-2812 (JMF), 2013 WL 5477594, at *5 (S.D.N.Y. Oct. 2, 2013) (citing *Whitaker v. Am. Telecasting, Inc.,* 261 F.3d 196, 209 (2d Cir. 2001)). In this case, then, it is unclear whether Plaintiff's allegations sounding in tort (e.g., fraudulent inducement, conversion, unjust enrichment) relate to acts taken inside or outside of New York.

**\*11** Even assuming the tortious conduct was related to conduct within New York—an inference in Plaintiff's favor —courts in this district routinely hold that a breach of contract claim does not constitute a tortious act and may not form the basis of long-arm jurisdiction pursuant to section 302(a) (3). *See, e.g., Amigo Foods Corp. v. Marine Midland Bank-New York,* 39 N.Y.2d 391, 396, 384 N.Y.S.2d 124, 348 N.E.2d 581 (1976); *Pramer S.C.A v. Abaplus Int'l Corp.,* 76 A.D.3d 89, 97, 907 N.Y.S.2d 154, 159 (1st Dept. 2010); *see also PI, Inc. v. Quality Prods., Inc.,* 907 F.Supp. 752, 760 (S.D.N.Y. 1995) ("To satisfy New York's long arm statute, the complaint must 'adequately frame a cause of action in tort arising from [the alleged tortious acts].' ") Plaintiff's causes of action are all premised on Defendants' breach of the Agreements. Generally, a cause of action sounding in fraud is not viable when the only fraud charged relates to a breach of contract. *Trusthouse Forte (Garden City) Management, Inc. v. Garden City Hotel Inc.,* 483 N.Y.S.2d 216, 218 (N.Y. App. Div. 1984.) When a party is in essence seeking the enforcement of a contractual bargain, the claim is to be premised upon a breach of contract theory rather than a tort claim. *Sommer v. Federal Signal,* 583 N.Y.S.2d 957, 961 (N.Y. 1992); *see also, Chateaugay Corp. v. Frito-Lay, Inc.,* 10 F.3d 944, 958 (2d Cir. 1993) (citations omitted). [21]

Nonetheless, Plaintiff contends that he has alleged a tort because he included the word "fraud" in a handful of allegations and alleges that defendants intended to "commit fraud" by depriving Plaintiff of the money owed to him pursuant to the Agreements. (Am. Compl. ¶ 79.) But "[b]y merely alleging a tortious act, a plaintiff may not convert a simple breach of contract case into a tort for jurisdictional purposes." *Kulas v. Adachi,* No. 96-CV-6674, 1997 WL 256957, at *8 (S.D.N.Y. May 16, 1997); *see, e.g., Amigo Foods Corp.,* 39 N.Y.2d at 396, 384 N.Y.S.2d 124, 348 N.E.2d 581. Rather, Plaintiff must "aver facts that if credited, would suffice to establish all the requirements under one of § 302(a)'s subsections, including the commission of a tort," here, fraud. *Bank Brussels Lambert,* 171 F.3d at 785. Plaintiff's allegations of fraud—including his allegations that defendants made fraudulent statements to deprive Plaintiff

of the subsidized sale price (Am. Compl. ¶ 44) and a salary (*id.* ¶ 45)—are wholly conclusory [22] and fail to identify a legal duty separate from the contractual duty to pay monies owed, including a salary. *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 389-90, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987); *Skrodzki v. Marcello,* 810 F. Supp. 2d 501, 521 (E.D.N.Y. 2011); *Kulas,* 1997 WL 256957, at *9 ("[W]here a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." (internal quotation marks omitted)).

**\*12** Moreover, in cases involving corporate officers, personal jurisdiction over the corporation for a tortious act does not necessarily grant jurisdiction over its employees; in order to show jurisdiction over an out-of-state officer for a corporation's actions, a plaintiff must show that the officer is a "primary actor[ ] in the transaction in New York" and not merely "some corporate employee ... who played no part" in the allegedly tortious act. *Retail Software Servs., Inc. v. Lashlee,* 854 F.2d 18, 22 (2d Cir. 1988); *see also Vista Food Exch., Inc. v. Champion Foodservice, LLC,* 124 F. Supp. 3d 301, 307-08 (S.D.N.Y. 2015), *appeal dismissed sub nom. VISTA FOOD EXCHANGE INC. v. CHAMPION FOODSERVICE LLC* (Sept. 21, 2015).

Plaintiff states that Defendants "exercised complete domination and control of [Pharmagen] with respect to [the company's] performance under the Agreements." (Am. Compl. ¶ 68.) These allegations are conclusory or made on information and belief (Am. Compl. ¶¶ 57-68), and do not establish that Wolpow, Rowley, Relac or Skibsted exercised sufficient control over the breaches at issue to be considered a primary actor. *See Vista Food,* 2014 WL 3857053, at *6-7; *see also Sterling Interiors Group, Inc. v. Haworth,* No. 94-CV-9216, 1996 WL 426379, at *15 (S.D.N.Y. July 30, 1996).

Under these facts, the exercise of personal jurisdiction over Defendants Wolpow, Rowley, Relac, and Skibsted under CPLR § 302 is not supported. The Court therefore grants the motion to dismiss collectively submitted by Defendants Wolpow, Rowley, Relac, and Skibsted.

4. Due Process [23]

Since this Court finds that it lacks personal jurisdiction over the moving defendants pursuant to New York's long-arm statute, it will not address the issue of whether the exercise of personal jurisdiction would offend due process. *See, e.g., Jonas v. Estate of Leven,* 116 F. Supp. 3d 314, 334 (S.D.N.Y. 2015); *Bensusan Rest. Corp. v. King,* 126 F.3d 25, 27 (2d Cir. 1997); *Mangia Media Inc.,* 846 F. Supp. 2d at 323-24. [24]

### B. The Amended Complaint Fails to Allege Facts Sufficient for the Court's Exercise of Personal Jurisdiction over Defendant M. Barch

**\*13** In moving to dismiss, Defendant M. Barch (proceeding *pro se*) asserts that because he "has no contact with New York for purposes of this lawsuit," (Def. M. Barch's Mem. at 3, ECF No. 60), and was "not a party to the contract with [P]laintiff," (*id.* at 7), Plaintiff cannot "support the exercise of jurisdiction over him in this forum" (*id.*).

Plaintiff asserts the same naked, conclusory, and formulaic allegations against M. Barch: he undercapitalized Pharmagen, ignored corporate formalities, and dominated its affairs. (Am. Compl. ¶¶ 57-63, 65-68.) Contrary to Plaintiff's contentions (Pl.'s Opp'n to M. Barch at 1, 22, ECF No. 68), the fact that Defendant M. Barch was the Chief Executive Officer "at all relevant times" does not affect the analysis or the result.

As noted above, there is no basis for Section 301 jurisdiction where a foreign defendant who does not systematically and continuously do business in New York, and Plaintiff does not argue otherwise. (See *supra* at 13, finding that an individual defendant may be subject to *specific* personal jurisdiction, but not *general* jurisdiction, based on his actions in his corporate capacity.) Similarly, there are no allegations to substantiate Plaintiff's contention that the investments were to be effectuated in New York nor are there allegations to satisfy any of the *Sunward* factors.

First, Plaintiff fails to allege even a single fact in support of M. Barch's involvement in the transaction, save for a bare allegation that he was CEO of Pharmagen. (Am. Compl. ¶¶ 24-25, 57-58.) Second, while it seems likely that M. Barch was the authorized signatory to the Agreements—the initials "MB" appears at the bottom of all the page of the SPA—this alone is also an insufficient basis for exercising Section 302(a)(1) jurisdiction over a corporate officer. (*Id.*) *See, e.g., Nelson A. Taylor Co., Inc. v. Technology Dynamics Group Inc.,* 1997 WL 176325, *5 (N.D.N.Y. Apr. 7, 1997) (personal jurisdiction imputed when defendants were alleged

to have negotiations and signed the agreements in dispute, personally controlled all transactions, and authored virtually all correspondence). Assuming that Defendant M. Barch did sign the Agreements, Plaintiff has not alleged if and where the two met, where the Agreements were signed, or even how frequently they spoke. It is reasonable to assume that Plaintiff would have personal knowledge of these facts not requiring discovery as one of the two authorized signatories to the Agreements. Moreover, Plaintiff fails to allege facts sufficient to establish that Defendant M. Barch derived substantial revenue from interstate or international commerce. *See SunLight Gen. Capital,* 114 A.D.3d at 522, 981 N.Y.S.2d 390 (no personal jurisdiction pursuant to section 302(a)(3)(ii) "in the absence of evidence that these defendants 'derive substantial revenue from interstate or international commerce' "); *Mangia Media Inc. v. Univ. Pipeline, Inc.,* 846 F.Supp.2d 319, 323 (E.D.N.Y. 2012).

The only allegations specific to M. Barch include: (1) taking personal trips using Pharmagen's funds and (2) using Pharmagen's monies for personal use.[25] (Am. Compl. ¶ 74.) These additional facts—while certainly giving the appearance of misconduct and using the company as an alter ego—do not alter this Court's conclusion that it lacks personal jurisdiction over M. Barch. Plaintiff has not alleged any additional facts relevant to acts committed within New York, whether in the course of transacting business or committing a tortious act.

**\*14** Under these fact, the exercise of personal jurisdiction over Defendant M. Barch under CPLR § 302 is not supported. The Court therefore grants Defendant M. Barch's motion to dismiss.

## C. The Amended Complaint Fails to Allege Facts Sufficient for the Court's Exercise of Personal Jurisdiction over Defendant J. Barch

In moving to dismiss pursuant to 12(b)(2) and 12(b)(6), Defendant J. Barch argues (1) he was never a director or officer or Pharmagen; rather only an employee, and (2) lacks any contact with New York. (Def. J. Barch's Mem. at 2, Ex. 1 Aff. of Justin Barch, ECF Nos. 35 & 63.) In opposition, Plaintiff argues that Defendant J. Barch's submitted an affidavit that "is noticeably devoid of any allegation that Defendant J. Barch does not have minimum contacts with New York and/or derive income from business in New York." (Pl.'s Opp'n to J. Barch at 21.) But Plaintiff mistakenly shifts the burden of proving minimum contacts or transacting business. It is the plaintiff, and not the defendant, who must

make a prima facie showing of personal jurisdiction over the defendant. *See Ball v. Metallurgie Hoboken-Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir. 1990) ("Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, *see* Fed.R.Civ.P. 11, legally sufficient allegations of jurisdiction.").

Instead of pleading legally sufficient allegations, Plaintiff asserts the same jurisdiction by proxy theory against J. Barch.[26] In Plaintiff's view, he does not need to plead any facts regarding defendants' contacts with New York because "Defendant Officers are individually, jointly and severally liable for all the [company's] wrongdoing against, and liability to [him]." (Compl. ¶ 76.) In fact, Plaintiff's memoranda includes the same stock footnote reminding the Court to substitute individual defendants into the conclusory allegations. It specifically states:

> "The Verified Amended Complaint refers to 'Defendant Officers' collectively, a representative term of all Defendants, which includes Defendant J. Barch. For the purposes of this Opposition, J. Barch is the only relevant Defendant." (Pl.'s Opp'n to J. Barch at 10 n. 5.)

Lumping all the "defendants" together for purposes of alleging connections to New York is, however, patently insufficient. *See, e.g., Cenage Learning, Inc. v. Buckey Books,* 531 F. Supp. 2d 596, 599 (S.D.N.Y. 2008) (finding that when defendants are "separate entities and are presumptively entitled to have independent existence," plaintiff must establish a basis for subjecting each of them, individually, to the jurisdiction of the court). Therefore, the Court finds exercise of personal jurisdiction over Defendant J. Barch under CPLR § 302 is not supported, and grants Defendant J. Barch's motion to dismiss.

## D. The Amended Complaint Fails to Name a Necessary Party

Defendant Clarke's motion differs from that of the other defendant in that it does not seek to dismiss the suit on 12(b) (2).[27] Rather he seeks to dismiss the Complaint pursuant to Rule 8, Rule 9, and Rule 12(b)(6) of the Federal Rules of Civil Procedure. To start, "[i]t would have been advisable for defendant['s] counsel to be aware of any jurisdictional arguments their clients had before making an incomplete motion to dismiss. [The Court] would suggest they be more careful the next time." *Cenage Learning, Inc. v. Buckey Books,* 531 F. Supp. 2d 596, 600 (S.D.N.Y. 2008). For purposes of deciding *sua sponte* whether to dismiss an action

for lack of personal jurisdiction, courts in this circuit draw an "important distinction ... between appearing and non-appearing parties." *Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Grp.,* 619 F.3d 207, 213 (2d Cir. 2010). In cases involving the former, "a district court should *not* raise personal jurisdiction *sua sponte.*" *Id.*

**\*15** Plaintiff asserts that "[t]his Court can afford complete relief among the existing parties, without the joinder of ... Pharmagen." (Am. Compl. ¶ 35.) Not so. Defendant Clarke correctly notes that "each and every claim is premised on the theory that the Plaintiff is entitled to pierce the corporate veil of [Pharmagen] and hold [individual defendants] liable for the acts of 'Non-Party Pharmagen Companies.' " (Def. Clarke's Mem. at 6.) All the alleged misconduct in this case arises from misrepresentations made concerning the Agreements executed, and subsequently breached, by Pharmagen or Bryce Labs. It follows then that there can be no individual liability for defendants except on an alter ego or veil piercing theory. On that theory, the fact that Defendant Clarke moved to dismiss on Rules 8, 9, and 12(b)(6), as opposed to Rule 12(b)(2), does not alter the analysis because the critical question remains: does anything in federal or New York state law preclude this case from proceeding, on veil piercing and alter ego theories of liability, given that the company is not a named party? In other words, the Court must address whether the company is a necessary party to the instant action.

Defendant Clarke also appears to have abandoned his contention that dismissal is required under Federal Rule of Civil Procedure 12(b)(7) for nonjoinder of necessary parties. (See *generally* ECF No. 6.) [28] However, a court must *sua sponte* order a necessary party joined when none of the parties in the case have sued the indispensable party. Fed. R. Civ. P. 19(a)(2). To determine whether a party is indispensable to an action, courts must first analyze "whether an absent party belongs in the suit, *i.e.,* whether the party qualifies as a 'necessary' party under Rule 19(a)." *Viacom Int'l, Inc. v. Kearney,* 212 F.3d 721, 724 (2d Cir. 2000). The Rule states, in relevant part, that a party is necessary when, "in that person's absence, the court cannot afford complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A). "If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal under Rule 19(b)," which addresses when an action should be dismissed because joinder of the necessary party would destroy subject matter jurisdiction or otherwise be infeasible. *Crotona 1967 Corp. v. Vidu Bros. Corp.,* 925 F. Supp. 2d 298, 306 (E.D.N.Y. 2013) (citing *Assoc. Dry Goods Corp.*

*v. Towers Fin. Corp.,* 920 F.2d 1121, 1123 (2d Cir. 1990)). In the instant case, Plaintiff is seeking to hold individual directors and officers of a corporation liable under an alter ego theory, but has not joined the corporation in the lawsuit. The Court determines that the action cannot proceed unless the corporation is joined as a party.

As a threshold issue, Plaintiff alleges that the Pharmagen, and not the individual directors, is the signatory to the Agreements at issue. (Am. Compl. ¶ 43.) Notwithstanding Plaintiff's contention to the contrary, "[he] fail[s] to recognize that under New York law, shell companies are necessary parties in an action to pierce the corporate veil." *Miramax Film Corp. v. Abraham,* No. 01-CV-5202 (GBD), 2003 WL 22832384, at \*9 (S.D.N.Y. Nov. 25, 2003) (citing *Stewart Tenant Corp. v. Square Industries, Inc.,* 703 N.Y.S.2d 453, 454 (N.Y. App. Div. 2000)). Even if Plaintiff is correct that Pharmagen is now defunct, the concept of piercing the corporate veil is a limitation on the accepted principles that a corporation exists independently of its owners, as a separate legal entity, that the owners are normally not liable for the debts of the corporation, and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners [citations omitted]. *State v. Easton,* 169 Misc. 2d 282, 287-88, 647 N.Y.S.2d 904, 908 (Sup. Ct. 1995). Because the concept of piercing the corporate veil assumes that the corporation itself is liable for the obligation sought to be imposed, an attempt of a third party to pierce the corporate veil does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners. *See United States v. Evseroff,* No. 00-CV-06029 (KAM), 2012 WL 1514860, at \*13 (E.D.N.Y. Apr. 30, 2012), *aff'd,* 528 Fed.Appx. 75 (2d Cir. 2013) ("The alter ego doctrine arose from the law of corporations and allows a creditor to disregard the corporate form (also known as 'piercing the corporate veil' ")) either by using an owner's assets to satisfy a corporation's debt or by using the corporation's assets to satisfy the individual's debt. Therefore, to the extent that Plaintiff is asking the Court to impose corporate obligation on individual officers and directors, it must also join the corporation.

**\*16** Under Rule 12(b) (7), courts are required to dismiss an action for failure to join a necessary party under Rule 19. *See* Fed. R. Civ. P. 12(b)(7); *see also Federal Ins. Co. v. SafeNet, Inc.,* 758 F.Supp.2d 251, 257 (S.D.N.Y. 2010). Courts considering a Rule 12(b)(7) motion look to Rule 19(a) to determine whether an absent party qualifies as a

"necessary" party under Rule 19(a). *See Federal Ins. Co.,* 758 F.Supp.2d at 257 (citing *Viacom Int'l, Inc. v. Kearney,* 212 F.3d 721, 724 (2d Cir. 2000)); *LBA Intern. Ltd. v. C.E. Consulting LLC,* 2010 WL 305355 *3 (S.D.N.Y. 2010).

There are three components of Rule 19(a) that courts assess to determine whether an absent party is required. *See* Fed. R. Civ. P. 19(a)(1); *C.D.S., Inc. v. Zetler,* No. 16 CIV 3199 (VM), 2016 WL 4257745, at *7 (S.D.N.Y. Aug. 3, 2016), *reconsideration denied sub nom. C.D.S., Inc. v. Bradley Zetler, CDS, LLC,* No. 16 CIV 3199 (VM), 2016 WL 5867450 (S.D.N.Y. Sept. 30, 2016) (quoting Fed. R. Civ. P. 19(a)(1)); *see also Federal Ins. Co.,* 758 F.Supp.2d at 257. The first component asks whether the court can afford complete relief in the absence of the non-party. *See* Fed. R. Civ. P. 19(a)(1)(A); *Federal Ins. Co.,* 758 F.Supp.2d at 257 (citing *MasterCard Int'l, Inc. v. Visa Int'l Serv. Ass'n, Inc.,* 471 F.3d 377, 385 (2d Cir. 2006)). The second component focuses on whether the non-party's absence will impair or impede its ability to protect its interests. *See* Fed. R. Civ. P. 19(a)(1)(B)(i); *Federal Ins. Co.,* 758 F.Supp.2d at 257-58 (citing *MasterCard,* 471 F.3d 377, 386-87). The third component asks whether the existing parties would be subject to "double, multiple, or otherwise inconsistent obligations." *See* Fed. R. Civ. P. 19 (a)(1)(B)(ii). If any of the three components are satisfied, the absentee party constitutes a required party. *See Federal Ins. Co.,* 758 F.Supp.2d at 257.

If a party held to be necessary has not been joined, the court "must" order that the person be made a party. *See* Fed. R. Civ. P. 19(a)(2); *see also Viacom,* 212 F.3d at 725. In the event that joinder is not feasible, the court proceeds to consider "whether "in equity and good conscience," the action should proceed with the existing parties, or be dismissed. *See* Fed. R. Civ. P. 19(b).

First, it is unclear what measures could be taken to lessen or avoid the potential prejudice to Pharmagen. The Court may pursue several approaches in an effort to minimize prejudice to this absent party, including awarding monetary damages in lieu of injunctive or declaratory relief, entering a judgment conditioned on plaintiff taking certain actions, or requiring that sufficient funds be set aside to pay other claimants. None of these approaches, however, is satisfactory in the present matter because the effect of a judgment herein on the absent corporation is completely unforeseeable and therefore impossible to mitigate. Because the Court cannot anticipate the impact any judgment in this case might have

on Pharmagen, it cannot fashion appropriate precautions to mitigate the potential prejudice to Pharmagen.

Second, the Court finds the individual defendants cannot adequately protect the corporation's interest, as they may ignore questions of liability and instead focus their defense on showing that they are not the corporation's alter ego.

**\*17** Finally, the failure to join the corporation would subject it to a significant risk of incurring double, multiple, or otherwise inconsistent obligations because the corporation might be found liable in the instant action, as an alter ego, but not liable in a separate action solely against the corporation. As noted above, Pharmagen faces a significant risk of prejudice if this action proceeds without joining it as a party. A finding of liability in this action could result in multiple or inconsistent obligation for Pharmagen and defendants cannot adequately protect Pharmagen's interest in this action.

Accordingly, Pharmagen appears to be a "necessary party" for purposes of Rule 19. In light of the fact that this Court finds that Rule 19 requires dismissal, the Court need not reach issue preclusion raised by Defendant Clarke, and expresses no opinion as to the merits thereof. *Town of Huntington v. Am. Mfrs. Mut. Ins. Co.,* 267 F.R.D. 449, 453 (E.D.N.Y. 2010). Plaintiff is not precluded from recommencing the action in the proper manner naming all necessary parties. *Hitchcock v. Boyack,* 256 A.D.2d 842, 844, 681 N.Y.S.2d 659, 661 (1998).

### CONCLUSION

In accordance with the foregoing, Defendants Wolpow, Rowley, Relac, and Skibsted's motion to dismiss is GRANTED, Defendant M, Barch's motion to dismiss is GRANTED, and Defendant J. Batch's motion to dismiss is GRANTED. Furthermore, the Court concludes that Plaintiff has failed to name a necessary party as a matter of law. As such, Defendant Clarke's motion to dismiss is GRANTED. Plaintiff's Amended Complaint is dismissed without prejudice.

The Clerk of Court is respectfully requested to terminate the motions at ECF Nos. 43, 51, 59, and 63, and to terminate the case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1234042

---

## Footnotes

1      A large public company previously known as Sunpeaks Ventures, Inc. ("Sunpeaks"). (Am. Compl. ¶ 1.)

2      To avoid confusion with the parent company, Pharmagen Inc., the subsidiary is referenced as Bryce Labs herein even though it has since changed its name.

3      Sunpeaks Ventures, Inc. a Nevada Corporation, was the original "Purchaser" listed on the Stock Purchase Agreement. Sunpeaks Ventures changed its name to Pharmagen, Inc. on January 15, 2013.

4      The SPA states, in relevant part, "that following the consummation of the purchase and sale of the Shares contemplated by this Agreement, Purchaser will employ Seller" and "... in accordance with the terms of a written Employment Agreement executed by the parties at the Closing." (Am. Comp. ¶¶ 47-48; SPA §§ 4.1, 5.4.)

5      On February 3, 2016, former defendants Danny M. Barnes and Stephen M. Perry filed a notice of removal with the U.S. District Court for the Southern District of New York (ECF No. 1.)

6      Defendants Relac, Rowley, Wolpow, and Skibsted filed separately from Clarke, M. Barch, and J. Barch.

7      At the same time, Giuliano filed a notice to voluntarily dismiss, without prejudice, any and all claims against co-defendants Danny M. Barnes ("Barnes") and Stephen M. Perry ("Perry"), pursuant to *Fed. R. Civ. P. 41(a) (1)(A)*. Barnes and Perry—who were both named as defendants in the original complaint that was filed in state court—moved to remove the instant action to federal court. (*See* Notice of Partial Dismissal, ECF No. 27.)

8      Even where, as here, the Defendants have challenged the Plaintiff's factual allegations of jurisdiction, "the court may provisionally accept disputed factual allegations as true. In making such a ruling, the court need only determine whether the facts alleged by the plaintiff, if true, are sufficient to establish jurisdiction; no evidentiary hearing or factual determination is necessary for that purpose." *Credit Lyonnais Secs. (USA), Inc. v. Alcantara,* 183 F.3d 151, 153 (2d Cir. 1999).

9      *See also Bidonthecity.com LLC v. Halverston Holdings Ltd.,* No. 12-CV-9258 (ALC) (MHD), 2014 WL 1331046, at *2 (S.D.N.Y. Mar. 31, 2014) (citing *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 221 (2d Cir. 1963) ("Not only does logic compel initial consideration of the issue of jurisdiction over the defendant—a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim—but the functional difference that flows from the ground selected for dismissal likewise compels considering jurisdiction and venue questions first.")).

10     Plaintiff does not argue that the Court has general jurisdiction over Defendants under *N.Y. C.P.L.R. § 301* (*see* Pl.'s Opp'n to Wolpow at 23, ECF. No. 49), and has therefore waived that argument. Because Defendants move to dismiss on the basis of 12(b)(2) generally, the Court nevertheless conducts a *Section 301* jurisdictional analysis.

11     However, the Defendants' contrary argument that under no circumstances can the actions of a corporation be imputed to an officer is likewise incorrect, at least with respect to specific jurisdiction. *See Kreutter*

*v. McFadden Oil Corp.,* 71 N.Y.2d 460, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988); *see also Big Apple Pyrotechnics & Multimedia, Inc. v. Sparktacular, Inc.,* 2007 WL 747807 (S.D.N.Y. Mar. 9, 2007) (confirming that "a corporate officer cannot be subject to general jurisdiction under CPLR § 301 for his New York activities on behalf of a corporation" but that he can be subject to specific jurisdiction under § 302).

12   "There is some confusion among district courts as to whether Section 301 confers personal jurisdiction over individual in addition to corporations." *Thorsen v. Sons of Norway,* 996 F. Supp. 2d 143, 154 n. 5 (E.D.N.Y. 2014) (citing to *Torres v. Monteli Travel, Inc.,* 2011 WL 2670259, at \*5 n. 3) (assuming, without deciding, that individuals could be subject to personal jurisdiction under Section 301). "Nevertheless, the New York Court of Appeals spoke clearly on the issue in *Laufer,* and the Court follows that court's decision." *Thorsen,* 996 at 154 n. 5. This Court follows *Laufer* and adopts *Thorsen* in the instant case.

13   Notably, throughout the Complaint Plaintiff simultaneously alleges that Defendants were acting in both an individual *and* corporate capacity. (*Compare* Am. Compl. ¶ 68) ("Defendant Officers used Non-Party Pharmagen in their personal capacities for personal ends, acting without regard to corporate formalities and for their immediate convenience") *with* ¶ 60 ("Defendant Officers directed Non-Party Pharmagen in a concerted effort to evade their contractual obligations to [Plaintiff] under the Agreements.") The Court based its general jurisdiction analysis on Plaintiff's opposition (*specifically* Pl.'s Opp'n to Wolpow at 21-23), where he most directly argues jurisdiction. There, Plaintiff does not allege that the Defendants were acting in their personal capacities, nor does he allege any facts to support such a claim.

14   Relying only on *Soviet Pan Am Travel Effort v. Travel Committee, Inc.*, Plaintiff argues that personal jurisdiction over individual defendants may be based on the actions of original corporate defendant and not their own individual actions. 756 F.Supp. 126 (1991). Plaintiff's counsel states: "Not only is *Soviet* instructive as to the burdens of the parties in connection with jurisdiction, the actual jurisdictional facts in *Soviet* could not be more analogous to those in the instant action." (Pl. 's Opp'n to Wolpow at 22.) Not so. First, unlike the instant case, plaintiff in *Soviet* sued both the individual defendants *and* the corporations. Second, *Soviet* predates *Seward* and thus, Plaintiff's memoranda fails to account for key guidance in our Circuit.

15   Courts in New York have declined finding against defendants for misrepresenting need for additional cash infusion where plaintiffs failed to indicate that defendants made any contrary statements. *See, e.g., Jang v. Cho,* 9 Misc. 3d 1130(A), 862 N.Y.S.2d 808 (Sup. Ct. 2005) (dismissing fraud claim where plaintiff made no "allegations indicating that [defendant] made any statements upon which plaintiff relied, separate from the Agreement itself."); *see also Am. Tissue Ins. v. Donaldson,* 351 F. Supp. 2d 79, 93 (S.D.N.Y. 2004) (finding that "the equity infusion ... benefitted [the company]; it gained $25 million in equity. Under no theory can that be characterized as an injury").

16   Plaintiff's allegation that Relac once in June 2014 "[a]dmitted know[ing]" that the Agreements were improperly negotiated and executed, when he was allegedly working on behalf of Pharmagen, or that Plaintiff "had a strong case against" the "individual officers," are insufficient to establish Relac "transacted business" in New York. (Am. Compl. ¶ 69.)

17   The Court notes that the Complaint does not allege that "Defendants negotiated the Agreements in New York." In fact, none of the allegations state where the misconduct occurred. Plaintiff asserts this fact, for the first time, in his opposition memorandum to Defendant's Wolpow, Rowley, Relac, and Skibsted's motion to dismiss. (ECF No. 47.)

18   *See also Int'l Customs Assocs., Inc. v. Ford Motor Co.,* 893 F.Supp. 1251, 1261-62 (S.D.N.Y. 1995) ("Telephone calls and correspondence sent into New York, by a non-domiciliary defendant who is outside New York, generally are insufficient to establish personal jurisdiction." (collecting cases)), *aff'd,* 201 F.3d 431 (2d Cir. 1999); *Metals Alliance Corp. v. Beshay,* No. 97-CV-3401, 1998 WL 811788, at \*2 (S.D.N.Y. Nov. 19,

1998) ("[O]nly in cases where the telephone call or communication clearly shows that the defendant intends to project itself into ongoing New York commerce, such as where a defendant directly conducts market activity or securities transactions in New York over the telephone, do New York courts sustain jurisdiction based on telephone calls or facsimile transmissions alone." (internal quotation marks omitted)); *see also Kimco Exch. Place Corp. v. Thomas Benz, Inc.,* 34 A.D.3d 433, 434, 824 N.Y.S.2d 353, 354 (2d Dept. 2006) ("The defendants' acts of faxing the executed contracts to New York and of making a few telephone calls do not qualify as purposeful acts constituting the transacting of business.").

19    In fact, Plaintiff asserts, and Defendants do not contest, that Plaintiff effectuated his employment agreement in Connecticut, where Bryce Labs in located. (Am. Compl. ¶ 30.)

20    Plaintiff alleges that he "suffered compensable injury as a result of the deliberate misrepresentations made by Defendant Officers, in the amount of approximately at least Two and One-Half Million Dollars ($2,500,000.00)." (Am. Compl. ¶ 64) (*sic.*).

21    Notwithstanding the parties contractual relationship, a claim for fraud may still be maintained where plaintiff can either "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/ Firestone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13, 20 (2d Cir. 1996) (citations omitted). The Court notes, that as currently alleged, the Complaint fails to reveal that movants owed a legal duty to Plaintiff *outside* of their contractual responsibilities.

22    The Complaint is bereft of any factual allegation related to Defendants' purported misstatements to induce Plaintiff to sell Bryce Labs to Pharmagen, Inc. In fact, there is not a single allegation as to who made the statements or profited from these strategies.

23    The Court reiterates that Defendants' status as directors in itself, even if they "participated"—whatever that might mean—in the drafting and negotiating of the SPA is insufficient to establish jurisdiction. *In re Alstom SA,* 406 F. Supp. 2d at 399 (defendant's "status as a Board member in itself, even if he in some respect oversaw [corporation's] execution of the [ ] contract, is too tenuous a connection to plausibly claim that this status alone directly and foreseeably gave rise to the effects complained of by the Plaintiffs" insufficient as a matter of law for personal jurisdiction). Moreover, failures in their corporate capacity do not give rise personal jurisdiction over directors where none otherwise lies. *DaimlerChrysler AG Securities Litigation,* 247 F. Supp. 2d 579, 587 (D. Del. 2003) ("[W]here a board member's only contact with the forum has been in the scope of his corporate capacity, the individual's contact is insufficient to support the exercise of personal jurisdiction."); *see also Charas v. Sand Tech. Sys. Int'l, Inc.,* 1992 WL 296406, at *4 (S.D.N.Y. Oct. 7, 1992) (no personal jurisdiction over former outside director "charged with failing to monitor [corporation's] affairs and thereby permitting the fraudulent activities to continue").

24    The Court notes that to subject Defendants, in their individual capacity, to personal jurisdiction in New York based upon a single contract signed in their official capacity, none of whom happen to live in New York, would not—as presently alleged—"comport with traditional notions of fair play and substantial justice," and therefore fails to satisfy the Due Process Clause. *Int'l Shoe,* 326 U.S. at 316.

25    According to Complaint, M. Barch used corporate funds "to start a medical marijuana dispensary business in Maryland, whose profits would inure to M. Barch's benefit personally, with no benefits whatsoever doing to ... Pharmagen ... another expense ... Pharmagen ... could not affort that M. Barch was unauthorized to incur." (Compl. ¶ 74).

26  Complaint states that "J. Barch, upon information and belief, had knowledge of Clark's improper use of [company] funds ... during the period from [January 2014—February 2014], and made no efforts to put a stop to such activities." (Compl. ¶ 75).

27  Defendants Wolpow, Rowley, Relac, Skibted, M. Barch, and J. Barch move to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6). (ECF Nos. 43, 59, & 63.)

28  In a letter dated February 12, 2016, Defendant Clarke requested a pre-motion conference "to discuss and schedule Defendant Clarke's motion to dismiss pursuant to 12(b)(6) and 12(b)(7)." (ECF No. 6.)

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

⊞ Cited in uploaded document as:

Labreck v. Bank of Am., N.A., 2018 U.S. Dist. LEXIS 206847, at *8 (D. Del. Dec. 7, 2018)

2018 WL 6427717
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

Peter Joshua LABRECK, Plaintiff,
v.
BANK OF AMERICA, N.A., et al., Defendants.

Civil Action No. 17-015-RGA
|
Signed 12/07/2018

**Attorneys and Law Firms**

Peter Joshua Labreck, Federal Correctional Institution-Milan, Milan, Michigan. Pro Se Plaintiff.

Steven T. Margolin, Esquire, Greenberg Traurig, LLP, Wilmington, Delaware. Counsel for Defendants Bank of America, N.A. and Brian Moynihan.

Blake A. Bennett, Esquire, and Erik J. Jones, Esquire, Cooch and Taylor, Wilmington, Delaware, Counsel for Defendant Trans Union, LLC.

## MEMORANDUM OPINION

ANDREWS, U.S. District Judge

 **\*1** Plaintiff Peter Joshua Labreck, an inmate at FCI-Milan in Milan, Michigan, proceeds *pro se* and has been granted leave to proceed *in forma pauperis*. He filed this action on January 5, 2017, alleging violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.* (D.I. 2). Plaintiff has filed an Amended Complaint and an addendum to the Amended Complaint. (D.I. 9, 11). The Court has jurisdiction by reason of a federal question under 28 U.S.C. § 1331. Before the Court is a motion to dismiss filed by Defendants Bank of America, N.A. and its CEO, Brian Moynihan (together "moving Defendants"). [1] (D.I. 21). Briefing on the matter is complete. (D.I. 22, 52, 53).

## BACKGROUND

Plaintiff alleges that Defendants continue to put incorrect information and/or outdated information on his consumer credit report including a wrongly displayed mortgage and home equity line of credit showing extensive delinquencies. (D.I. 9 at 2). Plaintiff alleges the delinquencies either: (1) do not belong to him; (2) are his but were paid in full during the second half of 2007; or (3) are his but he has made no payments since January 2008 and, therefore, by January 31, 2015, Defendants were obligated to stop reporting the accounts and delete them from his consumer credit reports. (*Id.*). Plaintiff alleges that no payments were made for well over seven years. (D.I. 11 at 2).

Plaintiff alleges Defendants made it impossible for him to practice his chosen profession of real estate investor and to obtain loans/mortgages which resulted in lost wages. (D.I. 9 at 2). He also alleges that Defendants' actions are libelous. (*Id.*). Plaintiff alleges, "Defendants willing[ly], knowingly, and intentionally, and/or through gross, willful neglect failed to do an investigation, and/or a proper investigation after receiving notice of this consumer complaint." (D.I. 11 at 1-2). Plaintiff seeks judgment in the amount of $7,588,000. (D.I. 9 at 2).

Moving Defendants seek dismissal for lack of subject matter jurisdiction and for failure to state any cognizable claim for relief under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) and, in the alternative, for improper venue under Rule 12(b)(3).

## LEGAL STANDARDS

**Rule 12(b)(1).** Rule 12(b)(1) of the Federal Rules of Civil Procedure permits the dismissal of an action for "lack of subject matter jurisdiction." A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction. *See Davis v. Wells Fargo, 824 F.3d 333, 346 (3d Cir. 2016).* A facial attack contests the sufficiency of the pleadings, whereas a factual attack contests the sufficiency of jurisdictional facts. *See Lincoln Ben. Life Co. v. AEI Life, LLC, 800 F.3d 99, 105 (3d Cir. 2015).* When considering a facial attack, the court accepts the plaintiffs well-pleaded factual allegations as true and draws all reasonable inferences from those allegations in the plaintiff's favor. *See In re Horizon Healthcare Services Inc. Data Breach Litigation, 846 F.3d 625, 633 (3d Cir. 2017).*

When reviewing a factual attack, the court may weigh and consider evidence outside the pleadings. *See Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

**\*2 Rule 12(b)(3).** Federal Rule of Civil Procedure 12(b)(3) allows a defendant to move to dismiss for improper venue. The movant has the burden of proving that venue is improper in the selected forum. *See Myers v. American Dental Ass'n*, 695 F.2d 716, 724 (3d Cir. 1982). The question of whether venue is wrong or improper is generally governed by 28 U.S.C. § 1391. *See Atlantic Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 56 (2013). Section 1391 provides that "[a] civil action may be brought in – (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." 28 U.S.C. § 1391(b).

When venue is challenged, the Court must determine whether the case falls within one of the three categories set forth in § 1391(b). *See Atlantic Marine Constr. Co.*, 571 U.S. at 56. If it does, venue is proper; if it does not, venue is improper, and the case must be dismissed or transferred under 28 U.S.C. § 1406(a).

**Rule 12(b)(6).** In reviewing a motion filed under Fed. R. Civ. P. 12(b)(6), the Court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Because Plaintiff proceeds *pro se*, his pleading is liberally construed and his Amended Complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson*, 551 U.S. at 94. A Rule 12(b)(6) motion maybe granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

"Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.' " *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555). I am "not required to credit bald assertions or legal conclusions improperly alleged in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). A complaint may not be dismissed, however, "for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014).

A complainant must plead facts sufficient to show that a claim has "substantive plausibility." *Id.* at 347. That plausibility must be found on the face of the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the [complainant] pleads factual content that allows the court to draw the reasonable inference that the [accused] is liable for the misconduct alleged." *Id.* Deciding whether a claim is plausible will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## DISCUSSION

Plaintiff raises his claims under the FCRA. The Amended Complaint alleges Defendants put incorrect information and/or outdated information on Plaintiff's consumer credit report. Moving Defendants argue the Amended Complaint does not state a plausible claim for relief under the FCRA. They contend the claim against Moynihan fails because it is deficiently pled. In addition, they argue the FCRA claim fails as a matter of law because neither Bank of America nor Moynihan are consumer reporting agencies [2] under the FCRA, noting that banks and creditors like Bank of America are "merely furnishers of information." (D.I. 22 at 7-8, 9-10).

**\*3** Plaintiff responds that Defendants are being sued as both users and furnishers of information. (D.I. 52 at 4) He argues that Defendants were obligated by the FCRA to stop reporting the delinquent mortgage and home equity line of credit seven years from the date of the first delinquency. (*Id.*). Plaintiff argues that Defendants continued reporting beyond January 2015 despite the fact that they "were notified, received notice of Plaintiff's complaints/disputes regarding [the] accounts." (*Id.*).

The FCRA, enacted in 1970, "created a regulatory framework governing consumer credit reporting" that " 'was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit

reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner.' " *Seamans v. Temple Univ.*, 744 F.3d 853, 860 (3d Cir. 2014) (quoting *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) ). One consumer protection generally requires that "accounts placed for collection or charged to profit and loss" be removed from consumer credit reports after seven years. *See* 15 U.S.C. § 1681c. Under the FCRA, those who furnish information to consumer reporting agencies have two obligations: (1) to provide accurate information, 15 U.S.C. § 1681s-2(a), and (2) to undertake an investigation upon receipt of a notice of dispute regarding credit information that is furnished, 15 U.S.C. § 1681s-2(b). Violations of the obligation to provide complete and accurate information to consumer reporting agencies are not subject to a private cause of action "in the first instance," that is, before the consumer has disputed the information with a consumer reporting agency. *See Seamans*, 744 F.3d at 864. Finally, the FCRA "explicitly precludes private suits" for failure to comply with the duties set forth under 15 U.S.C. § 1681s-2(a), and "provides for enforcement of that provision by federal and state officials." *Seamans*, 744 F.3d at 864.

Duties of the furnisher of the information are not imposed until the furnisher receives notice from a consumer reporting agency, pursuant to 15 U.S.C. § 1681i(a)(2), that a consumer has disputed information furnished by that furnisher/creditor. *See Seamans*, 744 F.3d at 864-65. Notice triggers the requirements of 15 U.S.C. § 1681s-2(b). *See id.* To bring a claim under § 1681s-2(b), Plaintiff must establish three elements: (1) he notified the consumer reporting agency of the disputed information, (2) the consumer reporting agency notified Defendant furnisher of the dispute, and (3) the furnisher failed to investigate and modify the inaccurate information. *See, e.g.*, *SimmsParris v. Countrywide Fin. Corp.*, 652 F.3d 355, 359 (3d Cir. 2011).

**Claims against Moynihan.** Other than to name Moynihan as the CEO of Bank of America, the Amended Complaint does not contain any facts regarding Moynihan's alleged actions for false credit reporting of Plaintiffs loans. To the extent Plaintiff attempts to hold Moynihan liable based solely on his role as CEO of Bank of America, the FCRA claim fails. *See Bath v. Boundy*, 2018 WL 3382934, at *3 (D. Colo. June 12, 2018); *McNack v. Smith*, 2015 WL 7302218, at *5 (C.D. Cal. Nov. 16, 2015); *Sloan v. Trans Union, LLC*, 2010 WL 1949621, at *2 (E.D. Mich. Apr. 22, 2010), *report and recommendation adopted*, 2010 WL 1949622 (E.D. Mich.

May 13, 2010). Thus, the Court will grant the motion to dismiss the claims against Moynihan.

**Reporting Adverse Items of Information.** Plaintiff's main complaint is that incorrect information remained on his credit report for longer than seven years after his last nonpayment/ delinquency. (*See* D.I. 9 at 2 at ¶ 8). "[T]o protect consumers from having their credit forever impaired by aging debts, [consumer reporting agencies] are precluded from reporting accounts which have been 'placed for collection' or 'charged to profit and loss' more than seven years prior to the report." *Seamans*, 744 F.3d at 860 (citing 15 U.S.C. § 1681c(a)(4) ). "Other 'adverse item[s] of information,' aside from criminal convictions, also may be reported only for seven years after the adverse event." *Id.* (citing 15 § 1681c(a)(5) ). "When the seven-year threshold for these items is reached, [consumer reporting agencies] may no longer lawfully report that data: in industry parlance, it has 'aged off' the consumer's credit report." *Id.*

**\*4** Under the FCRA, Bank of America is a furnisher of information, not a consumer reporting agency. Although the FCRA does not define "furnishers of information," it is "generally understood to include various types of creditors, such as banks and other lenders, that provide credit information about their customers to other entities that issue consumer reports about the customers' credit worthiness." *Ross v. Washington Mut. Bank*, 566 F. Supp. 2d 468, 475 n.1 (E.D.N.C. 2008), *aff'd*, 625 F.3d 808 (4th Cir. 2010); *see also Smith v. First Nat'l Bank of Atlanta*, 837 F.2d 1575, 1578 (11th Cir. 1988) (holding that bank reporting information based solely on its own experience with one of its customers was not acting as a "consumer reporting agency" within the meaning of the FCRA).

As discussed above, the FCRA speaks expressly to the responsibility of consumer reporting agencies - not furnishers of information - in limiting the reporting of adverse items of information to only seven years after the adverse event. As a result, Plaintiff's § 1681c adverse reporting claims against the moving Defendants, neither of which are consumer reporting agencies, fail as a matter of law.

**Furnisher of Information.** As pled, the Amended Complaint does not contain the elements necessary to state a § 1681s-2(b) claim under the FCRA. While Plaintiff may have decided to change his theory of the case after reviewing Defendants' motion to dismiss, he may not amend his complaint through his opposition to the motion to dismiss. *See*

*Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988). The Amended Complaint and the addendum are based on a "furnishing" theory, not a "using" theory. Thus, Plaintiff's Brief (D.I. 52) cannot rely on a "using" theory.

The Amended Complaint does not state a claim against Bank of America as a furnisher of information. It alleges generally, "Defendant(s)... failed to do an investigation, and/or a proper investigation after receiving notice of this consumer complaint." (D.I. 11 at ¶ 3). The scant allegations do not identify any particular defendant (i.e., Bank of America or Trans Union), lack factual basis, and are conclusory. There is no allegation that Plaintiff gave notice of a dispute to a consumer reporting agency. Therefore, the Court will grant moving Defendants' motion to dismiss the § 1681s-2(b) claim to the extent Plaintiff intended to raise such a claim in his Amended Complaint. However, since it appears plausible that Plaintiff may be able to articulate a § 1681s-2(b) claim, he will be given an opportunity to amend his pleading.

## CONCLUSION

Based upon the above discussion, the Court will grant Defendants' motion to dismiss the Amended Complaint.[3] (D.I. 21). In addition, the Court will dismiss all claims against Moynihan, the § 1681c claim, and the libel claim as it is preempted by the FCRA.[4] Plaintiff will be given leave to amend the 15 U.S.C. § 1681s-2(b) claim.

**\*5** An appropriate order will be entered.

### All Citations

Not Reported in Fed. Supp., 2018 WL 6427717

---

## Footnotes

1  Trans Union, LLC, the third Defendant, answered the Amended Complaint on September 14, 2017. (*See* D.I. 29).

2  A "consumer reporting agency" is a defined term under the FCRA: "any person which ... regularly engages ... in the practice of assembling or evaluating consumer credit information ... for the purpose of furnishing consumer reports to third parties ...." 15 U.S.C. § 1681a(f).

3  I must liberally construe Plaintiff's pleadings given his *pro se* status. He will be given leave to amend and, therefore, at this time I will not address the issue of standing under Rule 12(b)(1). Nor will I address the alternative ground for dismissal for improper venue under Rule 12(b)(3), but I do note that Defendant Trans Union, LLC is subject to this Court's jurisdiction.

4  To the extent Plaintiff seeks to raise a libel claim under state law, the FCRA preempts all state statutory and common law claims with respect to all subject matter regulated under § 1681s-2 asserted against furnishers of information to credit reporting agencies. *See Story v. Citizens Bank*, 2017 WL 3173034, at *4 (W.D. Pa. June 28, 2017).

---

2015 WL 58602
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Thomas NGUYEN, Plaintiff,
v.
BANK OF AMERICA and Brian Moynihan, Defendants.

No. 14–CV–1243 (RRM)(LB).
|
Signed Jan. 5, 2015.

**Attorneys and Law Firms**

Thomas Nguyen, Brooklyn, NY, pro se.

Casey D. Laffey, David Ari Scharfstein, Pamela Lauren
Schoenberg, Reed Smith LLP, New York, NY, for Defendants.

### *MEMORANDUM AND ORDER*

ROSLYNN R. MAUSKOPF, District Judge.

**\*1** Plaintiff Thomas Nguyen ("Nguyen"), proceeding *pro
se,* commenced this action on February 26, 2014. [1] Viewed
liberally, the complaint alleges that defendants Bank of
America and Brian Moynihan, its Chief Executive Officer
("defendants"), violated 42 U.S.C. § 1983 as well as the
Fair Credit Reporting Act ("FCRA"). Before the Court
is defendants' fully-briefed motion to dismiss pursuant to
Federal Rule of Civil Procedure ("Rule") 12(b)(6). (Doc. No.
8.) For the reasons that follow, that motion is GRANTED, and
plaintiff is given thirty days from the date of this Order to file
any Amended Complaint.

### BACKGROUND [2]

In his complaint, Nguyen alleges, in general terms, that
defendants violated 42 U.S.C. § 1983 and the FCRA. (Compl.
(Doc. No. 1) at 1–2 (ECF pagination).) Nguyen seeks six
trillion dollars and one cent in damages. He includes no
supporting factual allegations apart from claiming that Bank
of America was responsible for "causing [him] severe and
extreme financial injuries; for using deceptive practices and
frauds against [his] account(s); for causing [him] mental and
physical damages, for causing [his] 'deadly' cardiac problem;

suffering emotional and mental distress; for depriving [his]
the right to life, liberty and the pursuit of happiness, and the
rights guaranteed by many statutes." (Compl. at 2.)

Nguyen attaches to his complaint an enigmatic collection of
documents. They include several letters he wrote to Bank of
America, a number of bank account statements, some press
clippings, letters from some of his former students (Nguyen
apparently teaches math in a Brooklyn public school), an
SAT registration confirmation, and a mathematical analysis of
the damages that he requests. The attachments are internally
inconsistent, but they appear to center on Bank of America
either closing his accounts or providing him with less credit
than Nguyen believes that he deserves. (*See* Compl. at 26
("That's why I am now having a cardiac problem that is
probably, in part, (largely), caused by the 'illegal' closing
of those 2 accounts as I found out, but not surely [sic],
sometimes in 2012[sic] at a BOA branch on Flatbush Avenue
in Brooklyn.").) In his letters to Bank of America, Nguyen
initially claimed that two of his accounts were improperly
closed, (*id.* at 8), then he claimed that the account number for
one of his accounts was changed, (*id.* at 26), and finally he
claimed that Bank of America misreported his available credit
on three accounts. (*Id.* at 38.)

In November 2013, when Nguyen checked his account ending
in 5233, the account number had been changed to a number
ending in 1119. (*Id.* at 26.) He noticed, too, that he did
not have $33,000 in credit, which he believed should have
been available. On November 6, 2013, Nguyen phoned Bank
of America, and he also complained to the United States
Consumer Financial Protection Bureau. (*Id.*) Nguyen attaches
additional documents and information to his complaint that
do not reasonably appear to concern any possible claim under
the FCRA or § 1983. In addition, since completion of briefing
on this motion, Nguyen has filed in this action additional
information and arguments, the bulk of which are directed to
Judge Brodie and relate to his other pending cases

### LEGAL STANDARD

**\*2** In order to withstand a motion to dismiss, the complaint
"must contain sufficient factual matter, accepted as true, to
'state a claim to relief that is plausible on its face.' " *Ashcroft
v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868
(2009) (quoting *Bell Atlantic v. Twombly,* 550 U.S. 544, 570,
127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A complaint need
not contain "detailed factual allegations," but "threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* At this stage, when considering a motion to dismiss, the Court takes all factual allegations in the complaint as true and draws all reasonable inferences in favor of the non-movant. *See Harris v. Mills,* 572 F.3d 66, 71–72 (2d Cir.2009).

Although a *pro se* plaintiff must satisfy pleading requirements, the Court is "obligated to construe a *pro se* complaint liberally." *Id.* (citations omitted). In other words, the Court holds *pro se* pleadings to a less exacting standard than pleadings drafted by attorneys. *See Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Boykin v. KeyCorp,* 521 F.3d 202, 213–14 (2d Cir.2008) (citation omitted). Since *pro se* litigants "are entitled to a liberal construction of their pleadings," the Court reads *pro se* pleadings to "raise the strongest arguments that they suggest." *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001) (citations omitted). However, the Court "need not argue a *pro se* litigant's case nor create a case for the *pro se* which does not exist. *Molina v. New York,* 956 F.Supp. 257, 259 (E.D.N.Y.1995). When a *pro se* plaintiff has altogether failed to satisfy a pleading requirement, the Court must dismiss the claim. *See Rodriguez v. Weprin,* 116 F.3d 62, 65 (2d Cir.1997) (citation omitted).

## DISCUSSION

Nguyen appears to be suing Bank of America under the FCRA in its capacity as a "furnisher" of his credit information, which would bring his claim within the scope of 15 U.S.C. § 1681s–2. "Section 1681s–2(a) prohibits furnishing, to a credit reporting agency, any information that the person knows is inaccurate or consciously avoids knowing is inaccurate." *Kane v. Guar. Residential Lending, Inc.,* No. 04–CV–4847 (ERK), 2005 WL 1153623 at *3–4 (E.D.N.Y. May 16, 2005). Subsection (a) prohibits supplying "any information to a credit reporting agency if the furnisher of information is informed by the consumer that the information is inaccurate. Moreover, if a person learns that any reported information is inaccurate, subsection (a) obligates that person to notify the credit reporting agency of the inaccuracies, and to provide corrections for any incomplete or inaccurate information." *Id.*

However, there is no private right of action for claims under § 1681s–2(a). *See* 15 U.S.C. § 1681s–2(d); *Elmore v. North Fork Bancorporation, Inc.,* 325 F.Supp.2d 336, 340– 41 (S.D.N.Y.2004); *Kane,* 2005 WL 1152623, at *3 ("It is

by now well established that an individual consumer may not bring a cause of action for the violation of Section 1681s– 2(a), since the Act provides that '[s]ubsection (a) ... shall be enforced exclusively under § 1681s of this title by the Federal agencies and officials and the State officials identified in that section.") (citations omitted); *see also Ogunmokun v. American Educ. Services/PHEAA,* No. 12–CV–4403 (RRM), 2014 WL 4724707, at *7 n. 15 (E.D.N.Y. Sept.23, 2014). Nguyen therefore cannot bring a claim under 15 U.S.C. § 1681s–2(a).

**\*3** Subsection (b) of § 1681s–2 governs a furnisher's duties upon receiving notice from a credit reporting agency that there has been a dispute concerning the accuracy of information in the agency's possession Similarly, no private right of action exists under this subsection. *See* 15 U.S.C § 1681s–2(b); *Kane,* 2005 WL 1152623, at *4–5; *Mendy v. JP Morgan Chase & Co.,* No. 12–CV–8252 (PGG), 2014 WL 1224549, at *5 (S.D.N.Y. Mar.24, 2014). And in addition, Nguyen fails to allege that he ever submitted a dispute to a credit reporting agency. There is no basis, then, for concluding that Bank of America was notified by a credit reporting agency of any dispute, or violated any of its duties under the FCRA. Nguyen's claims under the FCRA are therefore dismissed.

Nguyen also fails to state a viable civil rights cause of action. Importantly for present purposes, "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Alsaifullah v. Travis,* 160 F.Supp.2d 417, 420 (E.D.N.Y.2001) (quoting *Skyes v. James,* 13 F.3d 515, 519 (2d. Cir.1993)) (quotations omitted). Moreover, civil rights claims under § 1983 need to be stated with particularity—broad or conclusory accusations will not be sufficient to withstand a motion to dismiss. *See Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987).

In pressing his § 1983 claim, Nguyen invokes rights enumerated in the Declaration of Independence—namely, to "life, liberty, and [the] pursuit of happiness." (Compl. at 2.) But Nguyen provides no factual allegations explaining specifically how defendants deprived him of those rights. And while those rights certainly represent important American values, they are not part of the Constitution, and there is no private right of action to enforce the Declaration of Independence. *See Petitio v. Hill,* No. 04–CV–4493 (SJF), 2007 WL 1016890, at *11 (E.D.N.Y. Mar.26, 2007); *Parola v. Internal Revenue Service,* No. 98–CV–7179

(JG), 1999 WL 1215557, at *7 (E.D.N.Y. Dec.15, 1999) (citing *Coffey v. United States,* 939 F.Supp. 185, 191 (E.D.N.Y.1996)) ("Although the Constitution provides many important protections, a specific guarantee for the pursuit of happiness is not among those granted by the Constitution or its amendments."). As such, Nguyen's § 1983 claim is dismissed as well.

## LEAVE TO AMEND

Rule 15(a) contemplates that courts will "freely give leave [to amend] when justice so requires." Fed.R.Civ.P. 15(a)(2). When a cause of action is dismissed due to deficient pleading, leave to amend should generally be granted—particularly for *pro se* litigants. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Petrone v. Hampton Bays Union Free Sch. Dist.,* No. 09–CV–4303 (RRM), 2011 WL 346682, at *2 (E.D.N.Y. Jan.28, 2011) ("The standard governing leave to amend, flexible to begin with, is further liberalized for *pro se* plaintiffs.").

**\*4** Nguyen is therefore granted leave to amend his complaint to state a valid cause of action. The amended complaint must include a statement of claim that does not merely rely on legal conclusions, and must provide facts to support each claim. *See* Fed.R.Civ.P. 8. Nguyen must also provide the dates and locations of all relevant events, and identify the specific provisions of law upon which he bases his claims. If Nguyen files an amended complaint, the document must be captioned "Amended Complaint" and bear docket number 14–CV–1243. The amended complaint must be filed with the Court within thirty (30) days from the date of this Memorandum and Order. Nguyen's failure to comply will result in dismissal of the action without prejudice and closure of the case.

## CONCLUSION

For the foregoing reasons, the motion to dismiss of defendants Bank of America and Brian Moynihan, (Doc. No. 8), is hereby GRANTED. Nguyen is granted leave to file an amended complaint within thirty (30) days from the date of this Memorandum and Order.

The Clerk of Court is directed to mail a copy of this Memorandum and Order to *pro se* plaintiff Nguyen and to note the mailing on the docket.

SO ORDERED.

## All Citations

Not Reported in F.Supp.3d, 2015 WL 58602

---

## Footnotes

1    This action was originally assigned to the Honorable Jack B. Weinstein and transferred in error to the undersigned. At the time of transfer, this *pro se* plaintiff had pending in this court multiple actions against different banks based on complaints that, like here, alleged violations of § 1983 and the FCRA. *See Nguyen v. Ridgewood Savings Bank et al.,* 14–CV–1058; *Nguyen v. JPM Chase Bank et al.,* 14–CV–3464; and *Nguyen v. Santander Bank, et. al.,* 14–CV–3989. All of those cases are assigned to Judge Margo K. Brodie pursuant to Rule 50.3.1(e)(2) of this court's Guidelines for the Division of Business Among District Judges. ("In the interest of judicial economy, the following categories of civil cases shall be deemed to be 'related' without further order of the court: ... (2) all pro se civil actions filed by the same individual ....") As such, this action should have been re-assigned from Judge Weinstein to Judge Brodie. However, in an effort to expedite resolution of this action, the undersigned will handle this action only, with the understanding that all future actions filed by this plaintiff shall be assigned to Judge Brodie pursuant to the court's division of business rule.

2    Nguyen has filed a number of similar *pro se* actions in the Eastern District against different banks based on complaints that, like here, alleged violations of § 1983 and the FCRA, but that were bereft of specific factual allegations. One of those actions, *Nguyen v. Ridgewood Savings Bank et al.,* 14–CV–1058, was originally before Judge Weinstein, who recused himself after the defense filed its motion to dismiss, whereupon the

case was reassigned to the Honorable Margo K. Brodie. Two subsequently-filed cases were then immediately assigned to Judge Brodie: *Nguyen v. JPM Chase Bank et al.,* 14–CV–3464, and *Nguyen v. Santander Bank, et. al.,* 14–CV–3989. On September 17, 2014, Judge Brodie held a pre-motion conference at which Nguyen and attorneys for JPMorgan and Santander appeared. From the bench, Judge Brodie orally dismissed those complaints with leave to amend, and Nguyen has since filed amended complaints in each case. Ridgewood's motion to dismiss has already been filed and remains pending before Judge Brodie. Yet another Nguyen action before Judge Brodie is *Nguyen v. China National Offshore Oil Corp.,* 14–CV–3327, which alleges violations of § 1983 and the United Nations Convention on the Law of the Sea. Counsel for China National appeared at the September 17th conference, and Judge Brodie dismissed that complaint with prejudice for failure to state a claim, concluding that any amendment would be futile. Nguyen has since filed a notice of appeal from the judgment of dismissal.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Distinguished by   Group One Ltd. v. GTE GmbH,   E.D.N.Y.,   February 3, 2021

2020 WL 4369850

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

WALLACE CHURCH & CO. INC. f/

k/a Wallace Church, Co. f/k/a Wallace
Church, Inc. and Stan Church, Plaintiffs,

v.

WYATTZIER, LLC, d/b/a Iconic Brands,
Ronald Zier and Kenneth Wyatt, Defendant.

Civil Action No. 1:20-cv-01914-CM

|

Signed 07/30/2020

**Attorneys and Law Firms**

James M. Adrian, Anna Karin Furer Manalaysay, Adrian-Cassidy & Associates, LLC, New York, NY, for Plaintiffs.

Joseph Peter Ferri, Jr., Joseph P. Ferri, P.C, Garden City, NY, Robert Terry Parker, Rath Young Pignatelli, PC, Concord, NH, for Defendant.

### DECISION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

McMahon, CJ

 **\*1**  On February 6, 2020, Plaintiff Stan Church ("Church") and Plaintiff Wallace Church, & Co. Inc. ("Wallace Church") brought this action against Defendant Kenneth Wyatt ("Wyatt"), Defendant Ronald Zier ("Zier") (collectively "Individual Defendants"), and Defendant WyattZier, LLC dba Iconic Brands ("WyattZier"). The Complaint alleges that Defendants breached various contractual obligations owed to Plaintiffs under a Master Service Agreement and an associated Scope of Work Agreement (collectively, "the MSA Agreements") – both entered into in 2006 – which governed the parties' relationship as distiller (Defendants) and brander (Plaintiffs).

This case was originally filed in the New York State Supreme Court; it was removed by Defendants on diversity grounds. The Individual Defendants, who originally moved in the State Supreme Court for dismissal, on the ground that New York courts lack personal jurisdiction over them, press that motion here. They contend that they cannot be sued in New York because any New York-related activities they conducted were performed on behalf of the corporate defendant. This, they claim, means they are not personally amenable to suit under either CPLR § 301 (general jurisdiction) or § 302 (transactional/long arm jurisdiction).

Defendants' motion is DENIED.

### BACKGROUND

The following facts are either undisputed or are alleged in plaintiffs' complaint or the affidavits and exhibits submitted in support of and opposition to the motion to dismiss for lack of personal jurisdiction. This Court will accept these facts as true for the purposes of resolving this jurisdictional dispute. *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 27–28 (2d Cir. 1996). [1]

### I. The Parties

Plaintiff Wallace Church is incorporated and maintains its principal place of business in New York. (Dkt. No. 1-1 at ¶ 2). Wallace Church provides branding and marketing services to its clients. (*Id.* at ¶ 17). These types of services are valuable to establishing the commercial identity of products in the marketplace.

Plaintiff Church is a New York resident and a corporate officer of Plaintiff Wallace Church. (*Id.* ¶ 1; Dkt. No. 15-1).

Defendant WyattZier is a New Hampshire limited liability company with its principal place of business either in New Hampshire, (Dkt. No. 1-1 at ¶ 4), or in Rigby, Idaho. (Dkt. No. 1-2, Ex. 2 at 1). WyattZier is alleged to do business under the rubric Iconic Brands. (Dkt. No. 1-1 at ¶ 3). Iconic Brands is in the liquor business; it markets various distilled products, including beverages bearing the brands ZYGO and 44° North.

Just as the citizenship of an LLP is determined by the citizenship of each of its partners, the citizenship of an LLC is determined by the citizenship of each of its members. *See Catskill Litig. Trust v. Park Place Entm't Corp.*, 169

F. App'x 658, 659 (2d Cir. 2006) ("[T]he citizenship of a limited liability corporation is determined by reference to the citizenship of its members."); *Maxim Group LLC v. Life Ptnrs. Holdings, Inc.*, No. 07 Civ. 8099, 2010 U.S. Dist. LEXIS 405, at *1-2 (S.D.N.Y. Jan. 5, 2010) (Preska, C.J.) ("For the purposes of diversity jurisdiction, a limited liability company's ... citizenship is determined not by the LLC's place of incorporation or principal place of business, but by the citizenship of each member of the LLC."). For subject matter jurisdiction purposes, it is, therefore, relevant who the members of the LLC are. The parties, apparently ignorant of the rule, have failed to apprise the Court about that key fact. In response to an inquiry from the Court, defendants' attorneys confirmed that Wyatt and Zier are members of the LLC, but so are WZ Holdings, LLC, a New Hampshire limited liability company; Hood River Distillers, Inc., an Oregon corporation; Peter Ewing, whom the defendants understand is a citizen of New Hampshire; Lehy II Investment Partners, LLC, a Kentucky limited liability company; and Frank McDonough, whom the defendants understand is a citizen of South Carolina. [2] (Dkt. No. 19)

 **\*2** Wyatt is also alleged to be the Registered Agent of WyattZier. (Dkt. No. 1-1, Ex. 1 at ¶ 7). Zier is also alleged to be the co-founder of Idaho Mercantile Distillers Association. (*Id.* at ¶ 12).

Until 2018, Zier maintained a residence in New York. (Dkt. No. 15-3, Ex. B at 2). And in 2006, Plaintiff designed a business card for Zier that listed a New York address and phone number. (Dkt. No. 15-8, Ex. G at 2–10, 12–15). However, Zier claims that he no longer maintains a New York residence or an address for business purposes in New York. (Dkt. No. 1-2, Ex. C at ¶¶ 5–12). Zier asserts that he is a citizen of California; and Wyatt asserts that he is a citizen of New Hampshire. Plaintiffs do not contest the proposition that there is complete diversity.

## II. Background

From 2001 until 2006, Plaintiffs or their principals provided Defendants with branding and marketing services under several individual scope of work documents and contract purchase orders. (Dkt. No. 1-1 at ¶ 4; Dkt. No. 15-6, Ex. E). In particular, Plaintiffs provided branding services for two of WyattZier's beverage lines, ZYGO and 44° North. The latter line was distilled in Idaho and included a potato vodka flavored with huckleberry, and a base vodka, flavored with cherry and mint. (Dkt. No. 1-1 at ¶¶ 20, 22).

In October 2006, the parties allegedly entered into several agreements. One, a Scope of Work Agreement, related specifically to the design of various SKUs for the 44° North product line. (Dkt. No. 1-1 at ¶ 24). Another, called the Master Services Agreement ("MSA"), outlined an anticipated ongoing relationship for the parties and set the terms (including compensation) for all projects in which they intended to engage. (Dkt. No. 15-4 at ¶ 1–4). The MSA provided that Wallace Church would be compensated by payment of royalties based on the sales volume of the products it branded and other metrics. (Dkt. No. 1-1 at ¶ 30). The complaint further alleges that under the MSA, Wallace Church and/or Stan Church would retain ownership of any intellectual property it created for WyattZier, and that Defendants would use that intellectual property as licensee, not owner. (Dkt. No. 1-1 at ¶ 36–37).

The MSA also contained a "Continuing Relationship" provision giving Wallace Church the right of first refusal (essentially, first crack) at branding any new WyattZier products. (Dkt. No. 15-4 at ¶ 10). This clause also provided that, even if WyattZier terminated the parties' relationship, it remained obligated to its financial commitments for brands on which Wallace Church had already worked. (*Id.*)

Finally, the MSA provided that if there were a change in control – defined as WyattZier's either selling itself or its assets to a third party or going out of the liquor business – Wallace Church would receive ten percent of either the gross proceeds or the gross value of the brands. (Dkt. No. 1-1, Ex. 1 at ¶ 31; Dkt. No. 1-2, Ex. 1 at ¶¶ 1–4).

The MSA is governed by New York law. (Dkt. No. 15-4 at ¶ 8).

The parties' business relationship was marred, apparently from the beginning, by continual missed and late payments of royalties owed to Wallace Church—despite the fact that Individual Defendants allegedly made payments to themselves as principals of the LLC. (Dkt. No. 1-1, Ex. 1 at ¶ 42). Furthermore, Individual Defendants allegedly bought time for themselves and their corporation by making repeated misrepresentations to Plaintiffs about their intent to pay the amounts owed, which allegedly lulled Plaintiffs into sleeping on their right to bring suit to recover amounts due to them. (Dkt. No. 1-1, Ex. 1 at ¶¶ 45–46). The Complaint also asserts that Defendants stole Wallace Church's intellectual property by applying for trademarks in their own name, and that they

failed to honor Wallace Church's right of first refusal on additional work. (*Id.* at ¶ 38). The time when these things occurred is not specified.

**\*3** Finally, Plaintiffs allege that a change of control may have also occurred, though they do not identify any specific transaction that might have triggered such a change or when it might have happened. (*Id.* at ¶ 66). Needless to say, if such a transaction occurred, Wallace Church has not seen its promised 10% of the brands' proceeds.

### III. The Complaint in This Action
This case was commenced on February 6, 2020.

Plaintiffs' complaint asserts a total of 12 causes of action, including breach of contract for failure to pay royalties, breach of contract for failure to make payment upon a change in control, breach of contract for improper use and acquisition of Wallace Church intellectual property and failure to facilitate Wallace Church copyright rights, breach of contract for failure to provide Wallace Church right of first refusal, fraud, fraud in the inducement, misrepresentation, quantum meruit and unjust enrichment, breach of good faith and fair dealing, equitable estoppel, and promissory estoppel. (Dkt. No. 1-1, Ex. 1 at 9–18). The claims for fraud, fraud in the inducement and misrepresentation are asserted only against the Individual Defendants. (*Id.* at 13–15). The complaint also contains a "claim" for "piercing the LLC veil," (*Id.* at 18), but piercing the corporate veil is not a cause of action. It is, rather, a way of holding individuals who would otherwise be shielded by corporate liability rules liable for corporate misdeeds. Through its incorrect "piercing the corporate veil" claim, Plaintiffs seek to hold the Individual Defendants liable for the causes of action that are asserted against the LLC. (*Id.*).

According to the Complaint, by 2015, Defendants owed Plaintiffs approximately $500,000 in royalties (before interest). (*Id.* at ¶ 47). From January 2016 through at least 2017, Plaintiffs allegedly began making partial payments of the amounts owed. (*Id.* at ¶¶ 48, 52). On November 17, 2019, Plaintiffs, demanded that Defendants pay the entire amount owed, plus interest, that they cease and desist illegal and improper use of Plaintiff's intellectual property, and that they provide an accounting as required by the contract. (*Id.* at ¶ 56). Defendants ignored this demand.

The complaint demands money damages and an order directing WyattZier to pay attorneys' fees, costs of suit, statutory and common law interest on all unpaid moneys and

awards, pre-judgment and post-judgment interest, and any other relief deemed just and equitable by this Court.

### IV. Procedural History
On February 27, 2020, Individual Defendants' filed a notice and memorandum in support of a motion to dismiss for lack of personal jurisdiction in New York State Supreme Court pursuant to CPLR 3211(a)(7) and (a)(8). (Dkt. No. 1-2, Ex. 2 at ¶ 2). No such motion was made on behalf of the LLC; (*see* Dkt. No. 16 at 8); therefore jurisdiction over it is conceded.

On March 4, 2020, Defendants removed this case to this Court. (Dkt. No. 1 at 1). This Court will construe Individual Defendant's motion to dismiss as made pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(2).

### V. Jurisdictional Facts
The complaint and moving papers contain a number of allegations about the various New York contacts between representatives of Church and WyattZier over the years. The parties are alleged to have engaged in contract negotiations in New York, (Dkt. No. 1-1 at ¶ 15); Plaintiffs allegedly sent draft versions of what became the MSA to WyattZier in care of Zier at a New York address, (Dkt. 15-2, Ex. A at 2, 6). Zier allegedly attended at least three in-person presentations in Wallace Church's New York office during 2009, (Dkt. No. 15-6 at 23, 25, 27); and the Individual Defendants thereafter regularly communicated with Plaintiffs, who were located in New York, about payment and work plans pursuant to the MSA. (Dkt. No. 1-1, Ex. 1 at ¶ 41; Dkt. No. 15-7, Ex F). Indeed, email exchanges, provided to the Court, between Church or two of his managing directors at Wallace Church and the Individual Defendants show the parties referencing and arranging various phone conversations and in-person meetings held from 2015 to 2019 in New York at which the parties discussed payment schedules for Wallace Church's services, exchanged agreement drafts, and tried to maintain their business relationship. (Dkt. No. 15-1 at 3–4; Dkt. No. 15-7, Ex. F at 6–14, 17–21, 23–38). In each instance, the sender or recipient of the emails on behalf of WyattZier was either Wyatt or Zier. (Dkt. No. 15-7, Ex. F).

### DISCUSSION

#### I. Applicable Law
**\*4** When considering a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of

showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 206 (2d Cir. 2003) (citing *Metro. Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 566 (2d Cir. 1996)). When, as here, discovery has yet to occur, plaintiffs need only make a *prima facie* showing of jurisdiction by "pleading in good faith legally sufficient allegations of jurisdiction." *Ball v. Metallurgie Hoboken-Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir. 1990) (citing Fed.R.Civ.P. 11).

At this stage of the proceedings, courts construe all allegations and resolve any doubts in favor of the plaintiffs. *A.I. Trade Fin., Inc. v. Petra Bank,* 989 F.2d 76, 79–80 (2d Cir. 1993)*; see Pilates, Inc. v. Pilates Inst., Inc.,* 891 F. Supp. 175, 178 (S.D.N.Y. 1995) (citing *Ball,* 902 F.2d at 197). ("[Where] the defendant challenges only the legal sufficiency of the plaintiff's factual allegation by filing a Rule 12(b) motion, a plaintiff's obligation generally is easiest to fulfill.").

Under FRCP 4(k)(1)(A), a federal district court sitting in diversity applies the law of the forum state. This court applies New York law.

The court must conduct a two-part inquiry to decide questions of personal jurisdiction. *Metro. Life Ins. Co., supra.,* 84 F.3d at 567. "First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process." *Id.* (citing *Savin v. Ranier,* 898 F.2d 304, 306 (2d Cir. 1990)).

## II. Individual Defendants are Subject to Personal Jurisdiction in New York

Plaintiffs assert that Individual Defendants are subject to this Court's "general" personal jurisdiction under CPLR § 301 and "specific" personal jurisdiction under CPLR § 302(a)(1) and (a)(3).

Because Plaintiffs neither satisfactorily allege that Defendants, as individuals, "do business" in New York, nor that they were present in New York at the time the Complaint was filed, Individual Defendants are not subject to general jurisdiction under CPLR § 301. However, Individual Defendants are subject to this Court's specific jurisdiction under CPLR § 302(a)(1). They were primary actors in the business transaction giving rise to the Complaint. Furthermore, they are subject to personal jurisdiction under § 302(a)(3) for their allegedly tortious out-of-state conduct

(fraud and fraudulent inducement), which is alleged to have caused harm to Plaintiffs in state. Because this exercise of personal jurisdiction comports with the 14th Amendment's Due Process requirements, this Court retains personal jurisdiction over Individual Defendants.

### A. Individual Defendants Are Not Subject to General Jurisdiction under CPLR § 301

Under CPLR § 301, a court has general personal jurisdiction over an individual if his conduct with New York is "so 'continuous and systematic' as to render [it] essentially at home in that state." *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 919 (2011) (citing *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement,* 326 U.S. 310, 317 (1945)). To determine whether a defendant does business in the state, the Court must be able to "say from the facts" that the defendant "is present in the State not occasionally or casually, but with a fair measure of permanence and continuity." *Duravest, Inc. v. Viscardi, A.G.,* 581 F. Supp. 2d 628, 633 (S.D.N.Y. 2008) (citing *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.,* 77 N.Y.2d 28, 34 (1990)). Importantly, a defendant's presence in New York for the purposes of general jurisdiction is evaluated "at the time the complaint was filed." *Id.* at 638 (citing *Darby v. Compagnie Nat. Air France,* 735 F. Supp. 555, 560 (S.D.N.Y. 1990)).

**\*5** However, an individual defendant "cannot be subject to jurisdiction under CPLR § 301 unless he is doing business in New York as an individual rather than on behalf of a corporation." *Brinkmann v. Adrian Carriers, Inc.,* 29 A.D.3d 615, 617 (2006) (citing *Laufer v. Ostrow,* 55 N.Y.2d 305, 313, (1982)) (citing *Lehigh Val. Indus., Inc. v. Birenbaum,* 527 F.2d 87, 90 (2d Cir. 1975)).

Plaintiffs assert that Individual Defendants are subject to general jurisdiction under CPLR § 301 because they "do[ ] and/or solicit[ ] business within the State of New York," (Dkt. No. 1 at 3), and their "extensive affiliations with New York are so continuous and systematic as to render them essentially at home" in the state. (Dkt. No. 15 at 4). These affiliations include allegedly travelling to Wallace Church's New York office on behalf of WyattZier at least three times in 2009 to observe project presentations, (Dkt. No. 15-6, Ex. E at 22–23, 25–28), travelling to New York at least once in 2015 and once in 2019 to discuss issues regarding the payment schedule between the parties, (Dkt. No. 15-7, Ex. F at 17; Dkt. No. 1-2, Ex. B at ¶ 13), and engaging in contract negotiations and regular correspondence with Plaintiffs between 2001 and

2019. (Dkt. No. 15-7, Ex. F at 6–8, 17–21, 23–30; *see* Dkt. No. 15-1 at 3–4 ("I confirm that during the relevant time period, Ronald Zier and Kenneth Wyatt met with me, face to face, in the New York office several times.")).

Moreover, Plaintiffs suggest that because Defendant Zier has maintained three different New York addresses, he was "present" in New York for the purposes of general jurisdiction. (Dkt. No. 15-1 at 4–5). Documents in the record indicate that, in 2004, Plaintiffs sent WyattZier a draft of a Brand and Ownership Royalty Agreement, addressed to Zier at a New York Address, (Dkt. 15-2, Ex. A at 2, 6), and in 2006, Wallace Church created various business card designs for Zier that listed a second New York Address and phone number. (Dkt. No. 15-8, Ex. G at 2–10, 12–15). Additionally, Zier owned property in New York at a third address until 2018. (Dkt. No. 15-3, Ex. B at 2).

In response, Individual Defendants refute that they in their personal capacities do business in or derive revenue from New York, reside in New York, or own any property in New York. (Dkt. No. 1-2, Ex. B at ¶¶ 9–12; Dkt. No. 1-2, Ex. C at ¶¶ 9–12). Additionally, Individual Defendants deny "negotiate[ing], draft[ing], and finaliz[ing]" the MSA Agreements with Plaintiffs in New York in 2006, and claim that Wyatt travelled to New York only once within the last year on business related to the complaint. (Dkt. No. 1-2, Ex. B at ¶¶ 2, 5, 13; Dkt. No. 1-2, Ex. C at ¶¶ 2, 5, 13).

Plaintiffs assert that Wyatt and Zier, as individuals, do business and have "extensive affiliations" in New York. (Dkt. No. 15 at 4). However, Plaintiffs' only support for these legal conclusions rests on activity conducted by the Individual Defendants' alleged conduct as WyattZier corporate principals. (*See id.* at 4; Dkt. No. 15-7, Ex. F (providing email exchanges between parties' using corporate email addresses and corporate signatures)). They do not identify any other business that Wyatt or Zier conducts in New York, or any other current contacts with New York that would be sufficient to permit an exercise of general jurisdiction. Because "a corporate officer cannot be subject to general jurisdiction under CPLR § 301 for his New York activities on behalf of a corporation," and because Plaintiffs allege only that Individual Defendants did business in New York within their role as corporate principals, Individual Defendants are not subject to personal jurisdiction pursuant to CPLR § 301. *Big Apple Pyrotechnics & Multimedia Inc. v. Sparktacular Inc.*, No. 05 CIV. 9994 (KMW), 2007 WL 747807, at *6 (S.D.N.Y. Mar. 9, 2007) (citing *Laufer*, 55 N.Y.2d at 312).

**\*6** Additionally, presence for the purposes of general jurisdiction under § 301 is determined at the time of the complaint. As this Complaint was filed on February 6, 2020, Plaintiffs' allegations that Zier owned property in New York until 2018, and that he formerly maintained New York addresses and a New York phone number for business purposes, are irrelevant to this court's determination of general jurisdiction.

*B. Individual Defendants Are Subject to Personal Jurisdiction under CPLR § 302(a)*

CPLR § 302, New York's long-arm statute, provides New York courts with a second path to specific personal jurisdiction over nonresident defendants. In relevant part, CPLR § 302(a) provides:

(a) ... As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

(1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or

(2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

(3) commits a tortious act without the state causing injury to a person or property within the state....

CPLR § 302(a).

Because § 302(a) is a so-called "single act" statute, even a single purposeful transaction conducted in New York can give rise to specific jurisdiction, as long as the plaintiff's claims raised have a "substantial relationship" to the transaction. *Pilates, Inc.*, 891 F. Supp. at 179 (citing *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 527); *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 548 (2d Cir. 2007) (citing *PDK Labs, Inc. v. Friedlander*, 103 F.4d 1105, 1109 (2d Cir. 1997)). Furthermore, because "technological advances in communication and travel systems" allow for "an enormous volume of business [to] be transacted within a State without a party ever entering it," a nonresident defendant need not actually enter the forum state to be subject to its specific jurisdiction. *Kreutter*, 71 N.Y.2d at 467.

Unlike CPLR § 301, CPLR § 302 allows courts to exercise specific jurisdiction over corporate principals based on transactions made or acts taken in a corporate capacity. In fact, the fiduciary shield doctrine, which shelters an individual from personal jurisdiction when his transactions in the forum state were done solely in a corporate capacity, has been explicitly rejected by the Court of Appeals and Second Circuit for the purposes of § 302(a). *Id.* at 470 ("Turning then to the interpretation of CPLR 302, we determine that it is neither necessary nor desirable to adopt the fiduciary shield doctrine in New York ... Nor is the rule necessary as a matter of fairness."); *Retail Software Servs., Inc., v. Lashlee* 854 F.2d 18, 22 (citing *Kreutter*, 71 N.Y.2d at 463) (finding a corporate officer acting within a corporate capacity subject to New York's personal jurisdiction under *Kreutter*).

In order to establish personal jurisdiction over an individual for conduct performed in a corporate capacity, a plaintiff need only establish that the principal engaged in purposeful activities in the forum state on the behalf of the corporation, with the corporation's knowledge and consent, and subject to that corporation's control. *Arch Specialty Ins. Co. v. Entm't Specialty Ins. Servs., Inc.*, No. 04 CIV. 1852 (RCC), 2005 WL 696897, at *3 (S.D.N.Y. Mar. 24, 2005) (citing *Kreutter*, 71 N.Y.2d at 527). "At its core, this inquiry turns on whether the corporate employee was the 'primary actor in the transaction in New York' or merely 'some corporate employee who played no part in' it." *Advanced Video Techs. LLC v. HTC Corp.*, No. 11 CIV. 06604 (CM), 2019 WL 4198769, at *11 (S.D.N.Y. Aug. 12, 2019) (citing *Retail Software Servs., Inc.*, 854 F.2d at 22) (citing *Kreutter*, 71 N.Y.2d at 470) (alterations omitted).

   i. *Personal Jurisdiction under CPLR § 302(a)(1)*
 **\*7** CPLR § 302(a)(1) states that specific jurisdiction may be exercised over a nonresident defendant when he or she "transacts business within the state," and the claims asserted arise from that New York transaction. CPLR § 302(a). It is well established that under 302(a)(1), "[a] non-domiciliary transacts business in New York by fully availing him or herself of the privilege of conducting activities within the State, thus invoking the benefits and protections of its laws." *Ehrenfeld*, 489 F.3d at 548 (internal quotation marks and alterations omitted); *see Big Apple Pyrotechnics*, 2007 WL 747807, at *4 (quoting *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 763 (2d Cir. 1983) (" 'Transacting business requires a lesser showing than 'doing business' because even one isolated transaction may give rise to New York jurisdiction.")).

When evaluating whether a defendant has transacted business in New York, courts consider the totality of the circumstances. *Agency Rent A Car Sys., Inc.*, 98 F.3d at 29. However, the Second Circuit has established four factors for courts to consider when making such a determination:

> (1) whether the defendant has an ongoing contractual relationship with a New York corporation; (2) whether the contract was negotiated or executed in New York and whether the defendant visited New York to meet with the parties after the contract was executed; (3) whether there is a choice-of-law clause in the contract; and (4) whether the contract requires the defendant to send notices and payments into the forum state.

*Id.*

Here, all the conditions set forth by the Second Circuit are met.

The Individual Defendants, acting on behalf of WyattZier, were the "primary actors" in the creation and negotiation of the Mast Service Agreement—the contract underlying this action. Zier concedes, in reference to the MSA Agreements, that he "did reside in New York in 2006 and, on behalf of WyattZier, engaged in negotiations with Wallace Church." (Dkt. No. 1-2, Ex. C at ¶ 5).

It is equally patent that, through the actions of Wyatt and Zier, the corporation maintained an ongoing contractual relationship with Wallace Church, a New York corporation, and its principals for many years. Plaintiffs provide records indicating that that Individual Defendants regularly discussed work streams and payment schedules with Plaintiffs on behalf of WyattZier; negotiated contracts with Plaintiffs; retained Plaintiffs' services under various Scopes of Works; attended project presentations in Plaintiffs' office; and agreed to a "Continuing Relationship" provision giving Plaintiffs the right of first refusal for any new brands WyattZier might create. The Individual Defendants visited New York to meet with Church representatives on multiple occasions after the contract was executed – Wyatt even admits that he did so at

least once within the last year (*see* Dkt. No.1-2, Ex. B at ¶ 13) – and as the email chains demonstrate, Zier and Wyatt also communicated with Wallace Church representatives via email on behalf of the LLC.

Third, the contract contains a New York choice of law clause. (Dkt. No. 1-2, Ex. 1, at ¶ 8).

Finally, the MSA Agreements establish compensation and payment schedules that require Defendants to send payments to Plaintiffs in New York. (*Id.* at ¶¶ 1–3; Dkt. No. 15-5, Ex. D at 2–5).

Individual Defendants have no response, except to assert yet again that they are protected by the fiduciary shield doctrine because they transacted all their business in New York on behalf of WyattZier, and gained no personal benefit from the transactions related to this Complaint. (Dkt. No 16 at 4–5). But while that argument works when discussing general jurisdiction under CPLR § 301, it has been long disavowed for the purposes of specific jurisdiction under CPLR § 302(a). *See Kreutter*, 71 N.Y.2d at 470; *Retail Software Servs., Inc.*, 854 F.2d at 22.

**\*8** Moreover, Individual Defendants, as co-founders of WyattZier, signatories to the Mast Service Agreement, and primary representatives of WyattZier in all correspondence and negotiations with Plaintiffs, are indisputably "primary actors" in the transaction at issue. Furthermore, at least a portion of the argument is not plausible, because, as members of the corporate defendant – a limited liability corporation – they share in the profits and losses of the corporation and so stand to benefit from the transactions underlying the complaint. N.H. Rev. Stat. Ann. § 304-C:12; N.H. Rev. Stat. Ann. § 304-C:15; Mark A. Sargent & Walter D. Schwidetzky, *Limited Liability Company Handbook* § 1:3 (2019). This is entirely without regard to whether the LLC is, in fact, their alter ego, as alleged by Plaintiffs.

And even if they did not stand to benefit directly from the earnings of the LLC, the New York Court of Appeals explained in *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 470 that § 302 does not "accord any special treatment to fiduciaries acting on behalf of a corporation or ... insulate them from long-arm jurisdiction for acts performed in a corporate capacity" because "rarely, if ever, does a corporate agent not derive some benefit from acting on behalf of his principal." *See Arch Specialty Ins. Co.*, 2005 WL 696897, at \*4 ("The court in *Kreutter* held that 'the fiduciary shield rule

is not available to defeat jurisdiction under the NY long-arm statute' and did not leave room for any exceptions.").

Therefore, Wyatt's and Zier's business activities in New York and with a New York corporation over the past 14 years, even though conducted on behalf of their LLC, subject them to personal jurisdiction in New York as long as the exercise of jurisdiction comports with due process – which, as will be seen, it plainly does.

ii. *Personal Jurisdiction under CPLR § 302(a)(3)* [3]
Because jurisdiction under CPLR 302(a)(1) ropes Wyatt and Zier into this New York Court on claims sounding in both contract and tort, it is really not necessary to explore Plaintiffs' alternative argument, which is that the Individual Defendants are subject to specific jurisdiction under CPLR § 302(a)(3), because they, on behalf of WyattZier, committed "tortious act[s] without the state causing injury to [Plaintiffs] within the state," (Dkt. No. 15 at 5, 8; Dkt. No.1). That inquiry would also require the Court to examine whether Defendants (1) regularly solicited business in New York; or (2) should have reasonably expected their New York transaction to have consequences in the state and derived substantial revenue from interstate commerce. CPLR 302(a)(3).

Specifically, Plaintiffs allege that Defendants Zier made various fraudulent misrepresentation that were aimed at Plaintiffs – New York residents. They also allege that Zier wrongfully diverted WyattZier's resources to co-found the Idaho Mercantile Distillers Association, which (in ways that are not altogether clear from the pleading) allegedly damaged Plaintiffs. (*Id.*; Dkt. No. 1-1, Ex. 1 at ¶ 54).

Defendants deny the factual sufficiency of Plaintiffs' allegations. (Dkt. No. 2 at 9–10). However, this is not a motion to dismiss the Complaint (which does indeed appear to suffer from some deficiencies). The Individual Defendants chose to make a motion limited to the issue of personal jurisdiction. When that issue is raised at the pleading stage and prior to discovery, plaintiffs need only plead in good faith "legally sufficient allegations of jurisdiction" when challenged by a jurisdiction-testing motion. *Ball*, 902 F.2d at 197 (citing Fed.R.Civ.P. 11). Moreover, "the plaintiff's *prima facie* showing may be established solely by allegations" at this preliminary stage. *Id.* Therefore, at this point in the proceedings, Plaintiffs' allegation that fraudulent representations were made to them by Wyatt and Zier presumptively gives rise to specific jurisdiction

over Individual Defendants under CPLR § 302(a)(3) for claims arising out of those alleged misrepresentations. "Once a plaintiff has alleged facts that, if proved, would support jurisdiction, a defendant cannot win a Rule 12(b)(2) motion merely by denying plaintiff's allegations." *Melnick v. Adelson-Melnick*, 346 F. Supp. 2d 499, 503 (S.D.N.Y. 2004), (citing *Bialek v. Racal-Milgo, Inc.*, 545 F.Supp. 25, 33 (S.D.N.Y. 1982)).

*C. Jurisdiction Comports with Due Process*

**\*9** Finally, this Court's exercise of personal jurisdiction over Individual Defendants must comport with the requirements of Due Process. It does.

This analysis first requires courts to determine whether a nonresident defendant has "certain minimum contacts" with the forum state. *Int'l Shoe*, 326 U.S. at 416 (internal citations omitted). Second, a "reasonableness inquiry" must be conducted to ensure that personal jurisdiction does not "offend traditional notions of fair play and substantial justice." *Metro. Life Ins. Co.*, 84 F.3d at 568 (citing *Int'l Shoe*, 326 U.S. at 316).

Defendants argue that, even if they are subject to § 302(a) jurisdiction, they have insufficient contacts with New York to satisfy the requirements of the Due Process Clause. (Dkt. No. 16 at 7–8). However, this is a "difficult argument to make" because "it is well established that Rule 302(a) 'does not extend New York's long arm jurisdiction to the full extent permitted by the constitution.' " *Arch Specialty Ins. Co.*, 2005 WL 696897, at \*5 (citing *Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys., Inc.*, 10 F. Supp. 2d 334, 339 (S.D.N.Y. 1998)). Therefore, where a court exercises jurisdiction over an individual based on a business transaction in the forum state under 302(a), "the requirements of due process are typically satisfied." *Advanced Video Techs. LLC*, 2019 WL 4198769, at \*12 (citing *Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 264 (S.D.N.Y. 2019)).

Here, the Individual Defendants plainly had sufficient minimum contacts with New York so as not to run afoul of International Shoe. They elected to do business with a New York entity; they negotiated a contract in New York and conducted the affairs of that LLC with their New York counterparts; they came into New York on business relating to that contract; and they elected to have their business relationship be governed by New York law. Indeed, the short answer to the "minimum contacts" question is found in *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002), where the Second Circuit noted, "If a court has specific jurisdiction over a defendant, then 'minimum contacts exist where the defendant purposefully availed itself of the privilege of doing business in the forum state and could foresee being haled into court there."

Turning to the "reasonableness" inquiry, the Supreme Court has articulated five factors for a court to consider, including: (1) any burden imposed on Defendant; (2) the forum state's interest in hearing the case; (3) Plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interests of the states in furthering fundamental substantive social policies. *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113–14 (1987). Under this five-factor analysis, it is clearly reasonable for a New York court to exercise personal jurisdiction over Individual Defendants in this lawsuit.

First, Defendants will not be unduly burdened by being made party to this litigation. In fact, they will not be burdened at all. The LLC Defendant does not contest that this court has personal jurisdiction over it, and the Individual Defendants – who, per such evidence as the court has seen to date, conducted the business of the LLC in connection with the business relationship that lies at the heart of this case – will be the key witnesses on behalf of WayttZier. So they will have to participate in this lawsuit no matter what. "[A]s a result, notions of fairness do not require us to shield him from the reach of the long-arm statute." *Kreutter*, 71 N.Y.2d at 471.

**\*10** Second, New York has an interest in hearing cases concerning injuries against its citizens and disputes over contracts negotiated in New York to which New York corporations are party. *See Retail Software Servs., Inc.*, 854 F.2d at 24; *Arch Specialty Ins. Co.*, 2005 WL 696897, at \*6.

Third, a New York court would provide the most convenient and effective relief to Plaintiffs, who are located in New York, not in New Hampshire or California or Idaho.

Fourth, adjudicating Plaintiff's claims against Individual Defendants and against WyattZier in the same forum will resolve this controversy in the most efficient way. If the Individual Defendants had to be sued elsewhere, Plaintiffs would have to maintain two overlapping lawsuits in two different jurisdictions.

Finally, the shared interests of the states in furthering social policy "do[ ] not affect the reasonableness of exercising personal jurisdiction over Defendants." *Arch Specialty Ins. Co.*, 2005 WL 696897, at *6.

As is obvious from the foregoing analysis, the exercise of jurisdiction over Wyatt and Zier would not violate traditional notions of fair play and substantial justice, and so would comport with Due Process. That being the case, the Individual Defendants are subject to specific personal jurisdiction in New York.

## CONCLUSION

For the reasons discussed above, Defendant's motion to dismiss for lack of personal jurisdiction is DENIED.

The Clerk of Court is directed to remove the motion at Docket No 1-2 from the Court's list of pending motions.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 4369850

---

## Footnotes

1      Courts may consider affidavits and documents submitted by the parties when deciding a Rule 12(b)(2) motion. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981); *Arch Specialty Ins. Co.*, 2005 WL 696897, at *1 (citing *ESI, Inc. v. Coastal Corp.*, 61 F.Supp.2d 35, 50 (S.D.N.Y. 1999)).

2      The court still has no idea whether there is actually complete diversity, because I would need to know the citizenship of every member of WZ Holdings (which is a citizen of every state where any of its members is a citizen) and Lehy II Investment Partners, LLC (ditto). *The states of incorporation are IRRELEVANT for the purpose of assessing diversity.* Defense counsel must immediately apprise the court whether any member of either of these LLC members of Wyatt Zier is a citizen of New York. And if some other LLC is a member of either WZ Holdings or Lehy II Investment Partners, then counsel must advise whether any member of those LLCs is a citizen of New York. If any is, then the case must be remanded to the New York State Supreme Court for lack of complete diversity. Counsel has 72 hours to advise the court.

3      Plaintiffs do not claim that Individual Defendants are subject to jurisdiction pursuant to CPLR § 302(a)(2).

---

**End of Document** <span style="float:right">© 2025 Thomson Reuters. No claim to original U.S. Government Works.</span>

# Williams v. Hernandez

United States District Court for the Southern District of New York

July 22, 2009, Decided; July 28, 2009, Filed

08 Civ. 3858

**Reporter**

2009 U.S. Dist. LEXIS 64800 *; 2009 WL 2252103

CARMAN Y. WILLIAMS, Plaintiff, -against- FLORENTINO HERNANDEZ, Chair, Official Capacity, NEW YORK CITY HOUSING AUTHORITY, DEAN ROBINSON, GLORIA BUSH, NEW YORK CITY HOUSING AUTHORITY, Its agents, employees, successors, assigns and all others in active concert with them, Defendants.

**Counsel:** [*1] Carman Y. Williams, Pro se, New York, NY.

For Defendants: SONYA M. KALOYANIDES, ESQ., New York City Housing Authority, New York, NY.

**Judges:** ROBERT W. SWEET, United States District Judge.

**Opinion by:** ROBERT W. SWEET

# Opinion

**Sweet, D.J**.

Defendants Tino Hernandez (incorrectly identified in the Complaint as "Florentino" Hernandez ("Hernandez" or "the Defendant") and the New York City Housing Authority ("NYCHA" or the "Defendant Authority," collectively, the "Defendants") have moved under Rules 4(m) and 12(c), F. R. Civ. P., to dismiss the complaint of plaintiff Carman Y. Williams, pro se ("Williams" or the "Plaintiff"). On the conclusions set forth below, the motion is granted.

## I. BACKGROUND

### The Parties

Williams has been the tenant of record of an apartment located in Nathan Straus Houses ("Straus Houses"), a NYCHA development located at 344 East 28th Street, since on or about May 8, 1990. Defendant NYCHA is a public housing authority. Defendants Robinson and Bush are employees of NYCHA and are assigned to Strauss Houses as the Housing Manager and Housing Assistant, respectively.

### Prior Proceedings

On October 20, 2007, Williams filed her complaint against the Defendants in the Pro Se Office. Plaintiff alleges five causes of [*2] action: (1) violation of 42 U.S.C. § 1983 arising out of the denial of her requests for a grievance hearing; (2) violation of 42 U.S.C. § 1437a(a)(3)(B) arising out of the denial of her request for a hardship exemption; (3) retaliation and racial discrimination in violation of 42 U.S.C. § 3604, et. seq., arising out of eviction proceedings initiated by the NYCHA; (4) violation of 24 C.F.R. § 966, et. seq., arising out of the denial of her requests for a grievance hearing; and (5) negligent hiring and supervision of employees by the NYCHA.

By Order dated April 24, 2008, Williams' request for injunctive relief following her receipt of a notice from NYCHA that the continuation of her tenancy was under review was denied.

NYCHA and Hernandez were served with the Summons and Complaint on August 18, 2008. NYCHA and Hernandez answered the Complaint on September 17, 2008.

The instant motion was marked fully submitted on March 9, 2009.


## II. THE FACTS

In accordance with its state-authorized and federally-mandated powers, the Housing Authority takes administrative action pursuant to its Termination of Tenancy Procedures ("Termination Procedures") to terminate the tenancy of tenants who are, *inter alia,* [*3] chronically delinquent in the payment of rent. *See* Exh. E to the Declaration of Mindy Merdinger Blackstock in Support of Defendants' Motion to Dismiss the Complaint ("Blackstock Decl."). Before termination of tenancy charges are brought against any NYCHA tenant, the tenant is given an opportunity to discuss the problem with the manager of the development. *Id.* P 2. If the tenant will not meet with the manager, and/or if, following such a meeting, the manager believes that termination of tenancy is the appropriate course of action, the case is referred to the Tenancy Administrator who reviews the file and, if appropriate, prepares administrative charges. *Id.* P 3. If tenancy termination charges are brought, the tenant is entitled to a hearing, on specific written charges, before an impartial hearing officer. *Id.* P 4, 5. The tenant is apprised of her right to appear with an attorney, or other representative, to confront and cross-examine witnesses against her, and to present her own witnesses. *Id.* P 6. The Hearing Officer must issue a written decision regarding whether the charges are found to be proven and, if so, the penalty to be imposed. *Id.* P 9. The decision of the Hearing Officer [*4] is then reviewed by NYCHA's Board to determine if the Hearing Officer's decision is contrary to any applicable laws or regulations. *Id.* P 11. If NYCHA concludes that the tenancy should be terminated, it must then serve the tenant with a notice to vacate, commence an action in Housing Court, and obtain a judgment of possession and a warrant of eviction against the tenant before any eviction action may commence. *Id.* P 25. Meanwhile, a tenant may obtain judicial review of NYCHA's determination to terminate her tenancy through an Article 78 proceeding. *Id.* P 12.

By letter dated October 3, 2007, Williams was advised by Defendants that her lease was being considered for termination for Chronic Rent Delinquency ("CRD") and an appointment was made for Williams to discuss the matter with management on October 9, 2007. Blackstock Decl. Exh. F. On October 9, 2007, Robinson sent Williams a follow-up letter advising her that she was being granted another opportunity to meet with the management office on October 12, 2007 to discuss her CRD charges before her tenant folder would be forwarded to the Central Office for review. *Id.* On October 12, 2007, Robinson sent a third letter setting an October [*5] 16, 2007, or in the alternative, October 18, 2007 meeting date to discuss Williams' CRD. *Id.* According to the letters, Williams did not attend any of the meetings, and by letter dated October 18, 2007, Robinson advised Williams that her folder was being forwarded to NYCHA's Tenancy Administrator for review. *Id.* NYCHA served formal charges of Chronic Rent Delinquency on Williams on October 16, 2007. *Id.* Exh. G. The hearing on those charges commenced on September 19, 2008 before an impartial hearing officer, was continued on October 8, 2008, and December 10, 2008, and was scheduled to resume on January 22, 2009. Blackstock Decl. P 17.

In addition to the CRD action, the NYCHA commenced a non-payment proceeding in Housing Court resulting from Williams' alleged failure to pay nearly a year of back rent. *See* Blackstock Decl. 1 19, Exh. H & I. Williams unsuccessfully moved to dismiss the action and, on appeal to the Appellate Term, First Department, unsuccessfully moved for a stay of the Housing Court non-payment proceeding until resolution of her appeal. *Id.* Exh. I. On December 17, 2008, the non-payment proceeding was adjourned to January 28, 2009. Blackstock Decl. P 19.


## III. DISCUSSION


### A. [*6] **Plaintiff's First, Second, and Fourth Claims**

## 1. Legal Standards

On a motion to dismiss pursuant to Rule 12, all factual allegations are accepted as true, and all inferences are drawn in favor of the pleader. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

However, while the pleading standard set forth in Rule 8 of the F. R. Civ. P. is a liberal one,

> the pleading standard Rule 8 announces . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusion or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (internal cites and quotes omitted). Thus, a complaint must allege sufficient factual matter to "state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). [*7] In meeting this "plausibility standard," the plaintiff must demonstrate more than a "sheer possibility" of unlawful action; pleading facts that are "'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557); *see also Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 131 (2d Cir. 2007) ("Although the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice. To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." (internal quotes and cites omitted)); *Gavish v. Revlon, Inc.*, No. 00 Civ. 7291 (SHS), 2004 U.S. Dist. LEXIS 19771, 2004 WL 2210269, at *10 (S.D.N.Y. Sept. 30, 2004) ("[B]ald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations and will not defeat a motion to dismiss.").

Although the allegations of a pro se complaint are reviewed under less stringent standards than pleadings drafted by counsel, the "duty to liberally construe plaintiff's complaint is not the equivalent of [*8] a duty to re-write it." *Joyner v. Greiner*, 195 F. Supp. 2d 500, 503 (S.D.N.Y. 2002) (dismissing pro se plaintiff's complaint for failing to allege facts to support a necessary element of his claim). Moreover, this is "not a case involving an uneducated, naive plaintiff who may have inartistically stated a valid cause of action." *Raitport v. Chemical Bank*, 74 F.R.D. 128, 133 (S.D.N.Y. 1977). Williams is a graduate of the Benjamin N. Cardozo School of Law and passed the New York State bar examination. She has appeared pro se in seven prior proceedings against NYCHA, its employees, and her fellow tenants of Straus Houses, which include: several adversary proceedings in Bankruptcy Court; a sexual harassment lawsuit in federal court; a state court defamation action against the NYCHA attorney in the sexual harassment lawsuit and another attorney for responding to a document request from the Appellate Division's Character and Fitness Committee in connection with Williams' application to the bar; a defamation action in state court against several of her neighbors at Straus Houses; a discrimination complaint before the New York State Division of Human Rights; and a 2005 federal action based [*9] upon NYCHA's consideration of potential termination of tenancy charges against Williams. *See* Blackstock Decl. PP 26-44. As the *Raitport* court noted for a comparably educated pro se litigant:

> He comes before this Court wearing the cloak of a pro se applicant, and seeks to extract from us the solicitude ordinarily afforded one appearing without counsel. But this should not shield him from rebuke when merited. He is an intelligent, able and sophisticated litigant . . . . [W]e are not to be manipulated by resourceful but meritless moves . . . which serve only to distract us from important judicial business.

*Id.* at 133 (quoting *Ackert v. Bryan*, Docket No. 27240 (2d Cir. June 21, 1963)).

Finally, the courts will not "excuse frivolous or vexatious filings by pro se litigants," *Iwachiw v. State Dep't of Motor Vehicles*, 396 F.3d 525, 529 n.1 (2d Cir. 2005), and pro se status "does not exempt a party from compliance with

relevant rules of procedural and substantive law." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

**2. The First, Second, and Fourth Claims Do Not Allege Sufficient Facts to State a Claim Upon Which [*10] Relief May Be Granted.**

Williams' first and fourth claims, alleging violations of 42 U.S.C. § 1437d(k) and 24 C.F.R. § 966, respectively, arise from Defendants' refusal to grant Williams' request for a grievance hearing. [1] Williams' second claim alleges violations of 42 U.S.C. § 1437a(a)(3)(B) arising from the NYCHA's denial of Williams' request for a hardship exemption.

The relevant factual allegations set forth in Plaintiff's claims are minimal. The first claim alleges, in relevant part:

5. Plaintiff has made numerous requests for grievances that have been ignored by the Defendant management employees.
6. Plaintiff is entitled under the Housing Act to make grievances arising out of her tenancy and to have grievance hearings scheduled when dissatisfied with the results of any such informal efforts to resolve any grievances.

Complaint P 5, 6. The second claim alleges, in relevant part:

9. Plaintiff applied for a hardship exemption in or about October 2007.
10. The Defendant Dean Robinson, without complying with the statute denied plaintiff's request one day after it had been made.

Complaint P 9, 10. The fourth claim incorporates the allegations contained in the prior claims and further alleges:

21. Defendants have refused to adhere to its own policies and have repeatedly denied to the Plaintiff on at least three (3) occasions the right to have a grievance hearing in connection with proposed actions - adverse and detrimental to the Plaintiff and her family - and thus Plaintiff's rights have been violated as a direct and proximate [*12] cause.

Complaint P 21.

Taking as true that Plaintiff was denied a grievance hearing on several occasions, nothing pled in the Complaint, aside from Plaintiff's assertions that Defendants acted unlawfully, suggests that such denials were improper. Similarly, the fact that Plaintiff's request for a hardship exemption was denied "one day after it had been made" fails to establish more than the "sheer possibility" of unlawful action by Defendants. *See Iqbal*, 129 S.Ct. at 1949. That Plaintiff's factual allegations are "consistent with" her claims against Defendants does not render her factual allegations sufficient to satisfy the "plausibility standard" set forth in *Iqbal* and *Twombly. Id.; Twombly*, 550 U.S. at 557. Because Plaintiff's first, second, and fourth claims contain "no more than [legal] conclusions" unsupported by factual allegations, they are dismissed for failure to state a claim upon which relief may be granted. [2]

**B. Plaintiff's Third Claim for Race Discrimination and Retaliation Is Not Ripe for Review**

---

[1] NYCHA, as a public housing authority, is subject to Housing and Urban Development ("HUD") regulations, which "set forth the requirements, standards and criteria for a grievance procedure to be established and implemented by public housing authorities (PHAs) to assure that a PHA tenant is afforded an opportunity for a hearing if the tenant disputes . . . any PHA action or failure to act involving the tenant's lease with the PHA or PHA regulations . . . ." 24 C.F.R. § 966.50. Pursuant to these regulations, NYCHA maintains a Grievance Policy governing individual grievances between the tenant and NYCHA. *See* Blackstock Decl. Exh. B. Under NYCHA's policy a tenant may invoke the grievance procedure if the grievance is eligible for processing, the tenant meets deadlines for filing a grievance and the tenant is current in her [*11] rent paying obligations. *Id.*

[2] Defendants also argue that no private right of action exists under 42 U.S.C. § 1983 to enforce the provisions of 42 U.S.C. § 1437a(a)(3)(B), 42 U.S.C. § 1437d, or 24 C.F.R. § 966. Because Plaintiff's claims fail to allege sufficient facts to state a viable claim, it [*13] is unnecessary to address this argument at this time. As a general matter, however, the Supreme Court has expressed a reluctance to find an implied right of action where none was explicitly granted by Congress. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002).

Plaintiff's third claim alleges violation of 42 U.S.C. § 3601, et seq., arising from Defendant's alleged racial discrimination and attempts at retaliation as a result of Plaintiff's prior lawsuit against the NYCHA. The claim alleges, in relevant part:

> 16. Based on Plaintiff's past allegations of violations and a recent complaint the defendants each and all have engaged in retaliatory acts against the Plaintiff in the form of threats of eviction and other harassment beginning subsequent to the disposition of a previous suit against the Authority in [. . .] Similarly situated white and non-black tenants have not been subjected to similar onerous terms and conditions of tenancy, and in fact have been subjected to more favorable terms and conditions.

Complaint P 16. Defendants seek dismissal of Williams' third claim for discrimination and retaliation [*14] on the grounds that Williams' claims is merely speculative and based on "contingent future events may not occur as anticipated, or indeed may not occur at all." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81, 105 S. Ct. 3325, 87 L. Ed. 2d 409 (1985). Defendants argue that because the claim is not ripe, this Court lacks subject matter jurisdiction to consider the claim.

When considering a motion to dismiss based on lack of subject jurisdiction, the Court must accept as true all material factual allegations in the complaint. *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) (citing *Scheuer*, 416 U.S. at 236). However, a "plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "[W]hen the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inference favorable to the party asserting it." *Drakos*, 140 F.3d at 131 (citing *Norton v. Larney*, 266 U.S. 511, 515, 45 S. Ct. 145, 69 L. Ed. 413 (1925)). In addition to materials contained in the pleadings, the Court may [*15] also "resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits." *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998) (citing *Antares Aircraft, L.P. v. Fed. Republic of Nigeria*, 948 F.2d 90, 96 (2d Cir. 1991), *vacated on other grounds*, 505 U.S. 1215, 112 S. Ct. 3020, 120 L. Ed. 2d 892 (1992)); *see also J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004), *cert. denied*, 544 U.S. 968, 125 S. Ct. 1727, 161 L. Ed. 2d 616 (2005). However, conclusory or hearsay statements contained in the affidavits may not be relied upon. *Attica Cent. Schs.*, 386 F.3d at 110.

Ripeness is a "constitutional prerequisite" to the exercise of jurisdiction by federal courts. *Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 225 (2d Cir. 1998). The ripeness doctrine prevents the courts from "premature adjudication" over "abstract disagreements," and protects the government from "judicial interference until a . . . decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 97 S. Ct. 980, 51 L. Ed. 2d 192 (1967). When "there are nebulous future events so contingent [*16] in nature that there is no certainty they will ever occur," the case is not ripe for adjudication. *In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138, 1146 (2d Cir. 1993).

"In order to determine whether an issue is ripe for adjudication, a court must make a fact-specific evaluation of 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *United States v. Fell*, 360 F.3d 135, 139 (2d Cir. 2004). The "fitness of the issues" prong of this inquiry "requires a weighing of the sensitivity of the issues presented and whether there exists a need for further factual development." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005) (citing *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581, 105 S. Ct. 3325, 87 L. Ed. 2d 409 (1985)). "Meanwhile, the 'hardship to the parties' prong clearly injects prudential consideration into the mix, requiring [the court] to gauge the risk and severity of injury to a party that will result if the exercise of jurisdiction is declined." *Id.* (citing *Abbott Labs.*, 387 U.S. at 149).

In *Williams v. Hernandez*, No. 05 Civ. 2420 (PKC), 2006 U.S. Dist. LEXIS 2087, 2006 WL 156411 (S.D.N.Y. Jan. 18, 2006), the Honorable P. Kevin Castel [*17] had occasion to consider the ripeness of similar claims brought by Plaintiff. There, Plaintiff alleged that the NYCHA had retaliated against her and subjected her to racial discrimination by initiating termination of tenancy proceedings in response to complaints of harassment from Plaintiff's neighbors. 2006 U.S. Dist. LEXIS 2087, [WL] at *2. At the time her complaint was filed, Williams had met with Robinson and

was informed that her tenant file was being forwarded to another NYCHA office for review. No other action was alleged by Williams. *Id.*

In considering Plaintiff's claim, Judge Castel first noted that the ripeness of Plaintiff's claim did not "turn on the precise moment when eviction proceedings should be deemed to have begun." *Williams*, 2006 U.S. Dist. LEXIS 2087, 2006 WL 156411, at *4. Instead, "the relevant inquiry . . . is whether the proceedings have progressed to a sufficiently late stage . . . . " *Id.* (citing *Murphy*, 402 F.3d at 347). Observing that "[n]ot every meeting or communication involving a state actor and an individual may give rise to a justiciable case or controversy," *Williams*, 2006 U.S. Dist. LEXIS 2087, 2006 WL 156411, at *4, Judge Castel cited the "extensive set of procedures" that NYCHA would have to follow before Plaintiff's eviction could [*18] occur. 2006 U.S. Dist. LEXIS 2087, [WL] at *5. Because "Plaintiff's claims in [the] case might not ever ripen into an actual controversy," no prejudice would result from the court's refusal to adjudicate her claims at that time. [3] *Williams*, 2006 U.S. Dist. LEXIS 2087, 2006 WL 156411, at *4-*5.

At the time the instant action was initiated, the eviction proceedings before the Hearing Officer had not yet been completed, and any ruling adverse to the Plaintiff remained subject to review by the NYCHA Board. Actual eviction would further require the NYCHA to obtain a warrant of eviction in Housing Court, during which time Plaintiff could obtain judicial review of the NYCHA's determination through an Article 78 proceeding in the New York courts. [4] While the eviction proceedings here have progressed further than the proceedings in *Williams*, they have yet to reach the point where Plaintiff faces an actual threat of eviction. Where, as here, a tenant has suffered no actual harm, courts have consistently found that there has been no adverse action sufficient to maintain a claim. [*19] *See Katz v. Klehammer*, 902 F.2d 204, 207 (2d Cir. 1990) (affirming Rule 12(b)(6) dismissal because mere threat of eviction, rather than actual eviction, was insufficient to support plaintiff's retaliation claim); *Adler v. Kent Vill. Hous. Co., Inc.*, 123 F. Supp. 2d 91, 93-94 (E.D.N.Y. 2000) (finding plaintiff's due process claims unripe in light of possibility of plaintiff's success in parallel administrative review process); *Congdon v. Strine*, 854 F. Supp. 355, 364 (E.D. Pa. 1994) (holding notices of eviction sent after plaintiff filed complaints with various government agencies did not by themselves constitute retaliation under FHA because "for such action to constitute a legal foul, there must be actual harm," and plaintiff was never evicted).

Plaintiff's third claim is dismissed as unripe.

## C. *The Tort Claim Is Dismissed*

Under New York [*20] Public Housing Law ("PHL") § 157, which incorporates General Municipal Law ("GML") § 50-e and § 50-h by reference, an individual must serve a Notice of Claim on NYCHA within one year and ninety days after the cause of action accrued before a personal injury action can be commenced. Compliance with this service requirement must also be alleged in the initial pleading. N.Y. Pub. Hous. Law § 157(2) (McKinney 2009); *see also Oshinsky v. New York City Hous. Auth.*, No. 98 Civ. 5467 (AGS), 2000 U.S. Dist. LEXIS 1879, 2000 WL 218395, at *14 n.5 (S.D.N.Y. Feb. 23, 2000). The purpose of PHL § 157 and GML § 50-e and § 50-h are to provide municipal entities with an opportunity to timely investigate the allegations, speak with witnesses while recollections are still fresh, and where warranted, resolve claims prior to the commencement of any litigation. Failure to meet these conditions precedent are fatal to any tort claim as a matter of law. *See id.* (finding failure to show notice of claim was filed permitted dismissal for failure to state a cause of action) (citing *Brown v. Metro. Transit Auth.*, 717 F. Supp. 257, 259 (S.D.N.Y. 1989)).

---

[3] Judge Castel further noted the potential hardship to the NYCHA if the court intervened prior to any meaningful action against the Plaintiff. *Williams*, 2006 U.S. Dist. LEXIS 2087, 2006 WL 156411, at *5.

[4] Plaintiff has filed a motion to strike Defendants' Reply and accompanying affidavits as improperly raising, for the first time, the argument that Plaitiff's third claim is now moot. *See infra* III.D. Because dismissal of Plaintiff's third claim is appropriate under the ripeness doctrine, consideration of the Defendants' mootness argument is unnecessary.

Williams' complaint fails to allege compliance with the Notice of Claim requirement as required [*21] by PHL § 157 and GML § 50-e in connection with her allegations that NYCHA negligently hired, supervised, and retained Robinson and Bush. Consequently, the tort claim alleged in the Complaint is dismissed as a matter of law for failure to meet a condition precedent. [5]

### D. Plaintiff's Motion to Strike Is Dismissed As *Moot*

In their Reply Brief, Defendants argue that Plaintiff's third claim is moot in light of the fact that the administrative proceedings against Williams have been discontinued during the briefing of the instant motion. In response, Plaintiff has filed a motion to strike Defendants' Reply Brief, including the accompanying affidavits, for improperly raising the mootness argument for the first time on reply. Because the dismissal of Plaintiff's third claim does not rely on consideration of the mootness argument presented in Defendants' Reply, Plaintiff's motion [*22] to strike is dismissed as moot.

### IV. CONCLUSION

On the facts and conclusions set forth above, the motion by the Defendants is granted and the Complaint is dismissed without prejudice.

It is so ordered.

**New York, NY**

July 22, 2009

/s/ Robert W. Swett

**ROBERT W. SWEET**

**U.S.D.J.**

---

---

[5] Plaintiff's tort claim must also be dismissed because she failed to allege that "at least thirty days have elapsed since the demand, claim or claims upon which such action . . . is founded were presented to the authority for adjustment" and that the NYCHA has not, in fact, adjusted the claim. N.Y. Pub. Hous. Law § 157(1).